ELLIS GEORGE CIPOLLONE O'BRIEN LLP
Eric M. George (State Bar No. 166403)
  egeorge@egcfirm.com
David J. Carroll (State Bar No. 291665)
  dcarroll@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

John V. Coghlan (DC Bar No. 1020405), *pro hac vice forthcoming*
  jcoghlan@egcfirm.com
Tara Helfman (DC Bar No. 90009379), *pro hac vice forthcoming*
  thelfman@egcfirm.com
1155 F Street, NW, Suite 750
Washington, DC 20004
Telephone: (202) 249-6900
Facsimile: (202) 249-6899

THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW, INC.
Kenneth L. Marcus (DC Bar No. 437391), *pro hac vice forthcoming*
  klmarcus@brandeiscenter.com
L. Rachel Lerman (State Bar No. 193080), *membership application pending*
1717 Pennsylvania Ave., NW, Suite 1025
Washington, DC 20006
Telephone: (202) 559-9296

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE LOUIS D. BRANDEIS CENTER, INC.; JEWISH AMERICANS FOR FAIRNESS IN EDUCATION (JAFE), | Case No. |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR:** |
| vs. | **1.  Violation of 42 U.S.C. § 1983 (the Equal Protection Clause)** |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA; UNIVERSITY OF CALIFORNIA AT BERKELEY; BERKELEY LAW SCHOOL; MICHAEL DRAKE, in his official capacity as President of the University of California; CAROL T. CHRIST, in her official capacity as Chancellor of the University of California, Berkeley; BEN HERMALIN, in his official capacity as Provost of the University of California, | **2. Violation of 42 U.S.C. § 1983 (Free Exercise Clause)** |
| | **3. Violation of 42 U.S.C. § 1981 (Interference with Right to Contract)** |
| | **4. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.** |
| | **DEMAND FOR JURY TRIAL** |
| Defendants. | Trial Date:  None Set |

2337311.2

COMPLAINT

**INTRODUCTION**

1.      This suit targets the longstanding, unchecked spread of anti-Semitism at the University of California Berkeley ("UC Berkeley"), which, following the October 7 Hamas attacks, has erupted in on-campus displays of hatred, harassment, and physical violence against Jews.  Court intervention is now needed to protect students and faculty and to end this anti-Semitic discrimination and harassment, which violates University policy, federal civil rights laws, and the U.S. Constitution.

2.      Anti-Semitism has been allowed to take root and grow at the UC Berkeley School of Law ("Berkeley Law"), which is located on the UC Berkeley campus.  For over a year, student organizations at Berkeley Law have been enacting and enforcing policies that confront Jews with an unthinkable and unlawful ultimatum: Disavow an integral component of your Jewish identity—Zionism—or be denied the same rights and opportunities enjoyed by other members of the campus community.  Although UC administrators have publicly acknowledged the fundamentally anti-Semitic nature of such policies, they have taken no action to address them.  Even now, in the wake of October 7, UC Berkeley and Berkeley Law have failed to confront, much less combat, the anti-Semitic environment their inaction has fostered.  Court intervention is therefore needed to put an end to this anti-Semitic discrimination and harassment, which violate University policy, federal civil rights laws, and the U.S. Constitution.

3.      Anti-Zionism is discrimination against those who recognize the Jews' ancestral heritage—in particular the Jews' historic connection to the land of Israel and the right of the Jewish people to self-determination in their ancestral homeland—as key components of their Jewish identity.  The United States, along with at least forty-two other nations, has recognized that demonizing, delegitimizing and applying a double standard to Israel—all forms of anti-Zionism that are distinct from criticism of the State of Israel or opposition to the policies of the Israeli government—are forms of anti-Semitism.  *What is antisemitism?*, INT'L HOLOCAUST REMEMBRANCE ALL., https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism (last visited Nov. 27, 2023).  By erasing or denying the Jewish people's ancestral connection to one another and to the land of Israel and by rejecting the

1  very right of the State of Israel to exist, anti-Zionism denies to the Jewish people alone a

2  fundamental human right to self-determination allowed to all other peoples of the world.  *See*, *e.g.*,

3  U.N. Charter  art. 1, ¶2.  To be clear, anti-Zionism is altogether different from criticism of the

4  State of Israel or opposition to the policies of the Israeli government—matters on which robust

5  debate is encouraged.

6        4.     In spite of the recognition of anti-Zionism as a form of anti-Semitism, no fewer

7  than 23 Berkeley Law student organizations have enacted policies to discriminate against and

8  exclude Jewish students, faculty, and scholars.  For example:

- To be a member of Women of Berkeley Law, the Queer Caucus at Berkeley, or the Asian Pacific American Law Students Association, Jewish students must accede to the groups' support of the Boycott Divestment and Sanctions movement, which seeks to dismantle the modern State of Israel;

- In order to volunteer to provide pro bono legal services through a number of Berkeley Law Legal Services organizations, Jewish students must undergo a "Palestine 101" training program that emphasizes the illegitimacy of the State of Israel;

- And to speak to any of these student organizations, invited speakers must first repudiate Zionism under a bylaw that prohibits speakers who hold Zionist views (the "Exclusionary Bylaw").  In fact, the *Berkeley Journal of Gender, Law, and Justice*, goes one step further, prohibiting Zionists not only from speaking to its members but from publishing in its pages.

22        5.     Under these policies, Jewish students, faculty, and guest speakers must deny a

23  central part of their cultural, ancestral heritage and a fundamental tenet of their faith in order to be

24  eligible for the same opportunities Berkeley accords to others.  The Exclusionary Bylaw's

25  wholesale ban on "Zionists" is unrelated to the viewpoint a speaker might express as the guest of a

26  student organization.  Rather, it is a ban on Jewish persons—and especially those whose support

27  for the Jewish State reflects an integral component of their Jewish ancestral, religious, ethnic,

28

national and/or racial identity.  Such discrimination is particularly acute for those Jews who must deny or disavow an integral part of their Jewish identity to be accepted by these Groups.

6.      The Dean of UC Berkeley, Erwin Chemerinsky, has acknowledged that anti-Zionism is anti-Semitic "because it denies the existence of the state of Israel, the historical home of the Jewish people."  Academic Engagement Network, *U.C. Berkeley School of Law Faculty Statement in Support of Jewish Law Students*, https://docs.google.com/document/d/1BiOeLJSG7lrbh9DSkvxsYRebE6Ck8a0rZaeBWNtjLPY/edit (last visited Nov. 27, 2023).  The Dean has also acknowledged the impact the Exclusionary Bylaw has on Jewish students at Berkeley.  In the wake of its adoption, he explained: "to say that anyone who supports the existence of Israel—that's what you define as Zionism—shouldn't speak would exclude about, I don't know, 90 percent or more of our Jewish students."  Gabe Stutman, *Several Berkeley Law student groups adopt 'no Zionist speakers' rule*, JEWISH NEWS OF N. CAL. (Aug. 29, 2022), https://jweekly.com/2022/08/26/several-berkeley-law-student-groups-adopt-no-zionist-speakers-rule/.

7.      UC Chancellor and Defendant Carol Christ "convey[ed] [her own] understanding as to why the adoption of the [Exclusionary Bylaw] was deeply upsetting to some Jewish members of our community for whom Zionism is an indivisible part of their Jewish identity, and who now say they no longer feel welcome at events held by some of the student organizations that have agreed to the [policies'] terms."  Exhibit A, Letter from Chancellor Carol T. Christ to the Berkeley Jewish Community.

8.      The lack of action against these student groups' anti-Semitic policies betrays not only Jewish students and faculty, but UC's own longstanding commitments to civil rights and equal treatment of all persons regardless of race, religion, ethnicity, national origin, gender, sexual preference, military status, physical disability, and/or heritage.

9.      Conditioning a Jew's ability to participate in a student group on his or her renunciation of a core component of Jewish identity is no less pernicious than demanding the renunciation of some other core element of a student's identity—whether based on race, ethnicity, gender, or sexual identity.  Imagine, in this day and age, asking members of the LGBTQ

community to remain 'in the closet' as a condition of membership in an authorized student group. No such imposition is required—or would be remotely tolerated—of other students, who remain free to participate fully in student organizations without disavowing or hiding any part of their identities.

10. The University's rules for registered student groups, including law school groups, codify UC's commitments to equality by requiring prospective and current groups alike to adopt an "all-comers" policy. Under this policy, registered student groups may not impose membership restrictions based on categories such as race, color, national origin, and religion, among others. Registered student groups must also pledge their commitment to "the dignity of all individuals," and "to uphold[ing] a just community in which discrimination and hate are not tolerated." *2023-2024 New Organization Application Questions* 6, LEAD CENTER, https://docs.google.com/document/d/1dx-7-2d47wuXD-_A7PLRdloQAbdOfJHBMOA-CLc27to/edit (last visited Nov. 27, 2023).

11. The student groups' anti-Semitic policies also run afoul of the University's Policy on Nondiscrimination, which prohibits "legally impermissible, arbitrary, or unreasonable discriminatory practices." *Policies Applying to Campus Activities, Organizations and Students*, PACAOS-20, UNIV. OF CAL., https://policy.ucop.edu/doc/2710522/PACAOS-20 (last visited Nov. 27, 2023).

12. The failure of the University to enforce its all-comers and anti-discrimination policies in response to the Exclusionary Bylaw's ban on "Zionist" speakers and the exclusion of and hostility towards "Zionist" students across the entire Berkeley campus violates the Equal Protection and Free Exercise Clauses of the U.S. Constitution, as well as federal anti-discrimination laws.

13. By abdicating responsibility and failing to act as required by UC rules and U.S. law, the University has enabled the normalization of anti-Jewish hatred on campus. Jewish students feel compelled to hide their identities. Legal experts and professors are left to wonder whether they are barred from speaking to law student groups based on the fact that they are Jews.

14.     In the wake of October 7, 2023, the deadliest day for the Jewish people since the Holocaust, Jewish students at UC Berkeley have been the targets of harassment and physical violence.  A Jewish student draped in an Israeli flag was attacked by two protestors who struck him in the head with a metal water bottle.  Jews on campus have been receiving hate e-mails calling for their gassing and murder.  And Jewish students have reported being afraid to go to class, which would require them to pass through the pro-Hamas rallies taking place in Berkeley's main thoroughfares.

15.     Plaintiffs seek this Court's intervention to set things right by requiring Defendants to enforce UC policies in an evenhanded way, prohibit discrimination and bias as required by law, and treat Jewish students, faculty, and invited speakers in the same manner as their non-Jewish counterparts.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

16.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000d et. seq., and 42 U.S.C. § 1981.

17.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction of suits brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 because the causes of action arise under the Constitution and laws of the United States.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, Defendants reside in the Northern District of California and may be found and served in the Northern District of California, and because a substantial part of the events, acts, or omissions giving rise to these claims arose in this District.

19.     Pursuant to Local Rule 3-5, this action is properly assigned to either the San Francisco Division or the Oakland Division because a substantial part of the events or omissions giving rise to the claim occurred in the County of Alameda.

## PARTIES

20.     Plaintiff The Louis D. Brandeis Center, Inc. (the Brandeis Center) is a nonprofit, non-partisan corporation established to advance the civil and human rights of the Jewish people

and promote justice for all.  The Brandeis Center engages in research, education, and legal advocacy to combat anti-Semitism on college and university campuses and in K-12, in the workplace, and elsewhere.  It empowers students by training them to understand their legal rights and educates administrators and employers on best practices to combat racism and anti-Semitism. The Brandeis Center has expended considerable resources in responding to unlawful action by the defendants, including counseling aggrieved students and professors, raising public awareness of the defendants' conduct in an effort to seek compliance by the defendants, requesting public documents to understand Berkeley's violations, and incurring out-of-pocket expenses to hire outside counsel to assist with the filing of a Public Records Act lawsuit after Berkeley failed to provide the requested documents.  Brandeis Center attorneys and staff have been diverted from other work while dealing with these matters.

21.     Plaintiff Jewish Americans for Fairness in Education (JAFE) is a national membership organization that is housed within and operated by the Brandeis Center.  JAFE's mission, like that of the Brandeis Center, is to advance the civil and human rights of the Jewish people and promote justice for all; and, in particular, to eliminate anti-Semitism and discrimination in education and ensure fairness in education for Jewish, Israeli, and other Americans, through lawful means including litigation.  JAFE's members consist of Jewish American college students, graduate and professional students, parents, alumni, faculty, and other individuals who have personally been aggrieved by, or have by association been impacted by, anti-Semitism and discrimination in higher education and K-12.  JAFE has members throughout the country, including Jewish American students and professors affiliated with higher education and K-12 institutions across the United States.  JAFE's membership includes Berkeley undergraduate, graduate, and law students, as well as Berkeley and Berkeley Law faculty.[1]

22.     JAFE includes among its members legal scholars and Berkeley faculty who are qualified, willing, and able to speak to the Legal Programs, Journals, and Groups.  Some of these

---

[1] Because of its affiliation with the Brandeis Center, members of JAFE also become members of the Brandeis Center.

1   members have previously presented to student groups at Berkeley law and have expertise in areas

2   of the law that are germane to the student groups and legal services projects that have adopted the

3   Exclusionary Bylaw.  They are Jewish, however, and Zionism is integral to their Jewish identity.

4   Because of these members' Jewish identity, they are prevented from competing for the opportunity

5   to speak to the Legal Projects and Groups.  These Members are therefore denied the opportunity

6   both to receive compensation from such speaking engagements and to promote themselves and

7   their scholarship.

8        23.     JAFE Member # 1 is a UC Berkeley Law Professor.  He has expertise in legal

9   policy and criminal law, and has written recently on historic aspects of women in the criminal

10   justice system and the privatization of prisons.  Because he is a Jewish scholar who supports

11   Israel, he suffers dignitary harm by being treated as a second-class citizen at Berkeley's campus.

12   In addition, JAFE Member # 1 would welcome the opportunity to speak about his areas of

13   expertise to the law school's Community Defense Project, the Women of Berkeley, the Defenders

14   at Berkeley, and the Contra Costa Reentry Project, but he is denied the opportunity because these

15   groups have adopted the Exclusionary Bylaw.

16        24.     JAFE Member # 2 is a Berkeley Law Professor and one of the nation's foremost

17   authorities on corporate law and finance.  He is also the former head of the Chancellor's

18   Committee on Jewish Life and, among other things, formed the Women in Business Law Initiative

19   at the law school.  His expertise would be of value to any group whose members are interested in

20   corporations and finance, which play a role in virtually every organized human endeavor.

21   Because he is a Jewish scholar who supports Israel, he suffers dignitary harm by being treated as a

22   second-class citizen at Berkeley's campus.  In addition, JAFE Member # 2 would welcome the

23   opportunity to speak about his areas of expertise with any of the Law Student groups at his

24   University that have adopted the Exclusionary Bylaw.  But he is unable to do so because they have

25   adopted the Exclusionary Bylaw.

26        25.     JAFE Member # 3 holds a full professorship in law at a private West Coast

27   university.  This Member is a frequent lecturer at U.S. academic institutions, where he has spoken

28   on issues relating to the Middle East and Africa, international law, and Middle Eastern law.  He is

qualified, willing, and able to speak to Law School groups such as the Middle Eastern and North African Law Students Association, Law Students of African Descent, and the *Journal of Middle Eastern and Islamic Law*.  Because these groups have adopted the Exclusionary Bylaw, he is unable to do so.

26.     JAFE Member # 4 holds a full professorship in law at a private West Coast university.  This Member lectures to law student projects and student groups based on his professional expertise in constitutional law and constitutional rights (including issues relating to race and the law), law and religious freedom, separation of church and state, criminal law and criminal procedure, and law and public policy.  He would welcome the opportunity to speak to Legal Services Projects, Journals, or groups such as the Queer Caucus, Community Defense Project, Law Students of African Descent, Contra Costa Reentry Project, and the Defenders at Berkeley.  Because these groups have adopted the Exclusionary Bylaw, he is unable to do so.

27.     JAFE Member # 5 holds a full professorship in law emeritus at a public university in the Mid-Atlantic region.  His areas of expertise include constitutional law, civil liberties and international human rights.  He has written scholarly articles about issues pertaining to feminism and women's rights, gay rights, and Islam.  He has also been a frequent lecturer at various American institutions.  This Member would welcome the opportunity to speak about these topics with Berkeley Law's Legal Services Projects, Journals, or groups such as the Women of Berkeley Law, Queer Caucus at Berkeley Law, the *Berkeley Journal of Gender, Law, and Justice*, the Berkeley Law Muslim Students Association, and the Middle Eastern and North African Law Students Association, but he is unable to do so because these groups have adopted the Exclusionary Bylaw.

28.     JAFE Member # 6 holds a full professorship and an endowed chair in law at the flagship law school of a midwestern public university system.  He is an internationally recognized expert in the areas of international law and national security law, as well as an expert on the Middle East and the Arab-Israeli conflict.  This Member would welcome the opportunity to speak about these topics with Berkeley Law Legal Services Projects, Journals, or groups, such as the

Middle Eastern and North African Law Students Association and *Journal of Middle Eastern and Islamic Law*.  He is unable to do so because these groups have adopted the Exclusionary Bylaw.

29.     JAFE Member # 7 holds a full professorship and an endowed chair in law at the private law school of a midwestern private university.  This Member is a native of Latin America, has considerable expertise in international law, and would welcome the opportunity to address Berkeley Law's Legal Services Projects, Journals or groups, but he is unable to do so because these groups have adopted the Exclusionary Bylaw.

30.     JAFE Member # 8 is the chairman of a private law firm, the president of a nonprofit organization, and an accomplished international lawyer and trial attorney.  This Member, who is of African descent, is one of the few Barrister-Attorneys with full active practicing certificates in England & Wales, New York, Florida, and Washington D.C.  He has written extensively on the First Amendment and the conflict between faith-based protections and the rights of the LGBTQ community.  This Member would welcome the opportunity to speak about these topics with the Law Students of African Descent and the Queer Caucus at Berkeley Law but would be unable to do so because these groups have adopted the Exclusionary Bylaw.

31.     JAFE Member # 9 holds a full professorship of law at a public university in the Southeast and heads an academic center for the study of the Middle East and international law.  He is also a frequent lecturer at various American law schools.  He has spoken at the invitation of student groups at Berkeley Law and other law schools.  This Member would welcome the opportunity to speak about these topics with the Middle Eastern and North African Law Students Association and the *Journal of Middle Eastern and Islamic Law*.  However, he is unable to do so because they have adopted the Exclusionary Bylaw.

32.     JAFE Member # 10 is a Clinical Professor of Law at an Ivy League Law School.  This Member's areas of expertise include securities law and the politicization of criminal law.  He has lectured at colleges and law schools on race relations, criminal trials, and the Black Lives Matter (BLM) movement and its history.  He would welcome the opportunity to speak about these topics to the Law School's Community Defense Project, the Defenders at Berkeley, Law Students

of African Descent, and the Abolitionist Collective.  But he is unable to do so because they have adopted the Exclusionary Bylaw.

33.     JAFE Member # 11 holds a university professorship chair in law at a public university in the Southeast.  He is also a frequent lecturer and prolific author with expertise in constitutional law, including gender issues and evidence, as well as issues related to the Middle East.  This Member would welcome the opportunity to speak about these topics to the Law School Legal Projects and groups, including with the Women of Berkeley Law, the *Berkeley Journal of Gender, Law, and Justice*, the Middle Eastern and North African Law Students Association, the Community Defense Project, the Defenders at Berkeley, and the *Journal of Middle Eastern and Islamic Law*.  However, he is unable to do so because these groups have adopted the Exclusionary Bylaw.

34.     JAFE Member # 12 holds a distinguished university professorship at a private Northeastern law school and is a celebrated novelist, law professor, and essayist.  He lectures widely and has been an invited speaker to a student group at Berkeley Law before the Exclusionary Bylaw was adopted.  His expertise includes criminal justice.  He would welcome the opportunity to speak to any of the Legal Projects, Journals, or Groups, such as the Community Defense Project, the Contra Costa Reentry Project, or the Defenders at Berkeley, but is unable to do so because these groups have adopted the Exclusionary Bylaw.

35.     JAFE Member # 13 is the legal advisor of an independent, nonpartisan research institute dedicated to promoting transparency and accountability of non-governmental organizations (NGOs) claiming human rights agendas.  Her areas of expertise include business and human rights, international human rights law, the laws of armed conflict, universal jurisdiction, international fact finding, NGOs, and the UN.  She has written on African law and policy.  She has accepted invitations to speak to law students at Harvard Law School, the University of Chicago, and Oxford University.  She would welcome the opportunity to speak about these topics with the Women of Berkeley Law, the *Berkeley Journal of Gender, Law, and Justice*, the Middle Eastern and North African Law Students Association, the *Berkeley Journal of African Law and Policy*,

and the *Journal of Middle Eastern and Islamic Law*, but she is unable to do so because the groups have adopted the Exclusionary Bylaw.

36.     JAFE Member # 14 is a lawyer, Berkeley resident, and co-shareholder in an Oakland, California-based law firm.  This member has employee rights expertise and criminal defense experience and has frequently spoken to law students at U.S. law schools.  He has also spoken before law students in the Berkeley area.  This member's cases include an important case on behalf of Asian Americans, and he would welcome the opportunity to speak with the South Asian Law Student Association as well as the Defenders at Berkeley, the Contra Costa Reentry Project, and the Community Defense Project but is unable to do so because these groups have adopted the Exclusionary Bylaw.

37.     JAFE Member # 15 is a prominent lawyer, syndicated columnist for a major newspaper, former Democratic political appointee, a United States delegate to an international human rights organization, and an instructor at an Ivy League university.  This member has represented parties in high-profile First Amendment, corporate takeover, employment, breach of fiduciary duty, and fraud-based cases.  His areas of expertise include litigation, employment litigation, First Amendment and media, and white-collar and government enforcement.  He would welcome the opportunity to speak about these topics to the Law School's Community Defense Project, the Defenders at Berkeley, and the Abolitionist Collective.  But he is unable to do so because they have adopted the Exclusionary Bylaw.

38.     JAFE also includes among its members UC Berkeley students who have been forced to choose between embracing an integral part of their Jewish identity or participating fully in student groups on campus.  Unfortunately, because of the nature of the discrimination at Berkeley, many of JAFE's members do not feel comfortable identifying themselves given the risk of further discrimination.

39.     Defendant UC Berkeley is a public law school founded by the California State Assembly and operated by the State of California.

40.     Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California.

41.     Defendant Berkeley Law School is an accredited professional school at UC Berkeley run by the Regents.

42.     Defendant Michael V. Drake is sued in his official capacity as President of the University of California.  As President, Defendant Drake oversees the University of California system, including UC Berkeley.

43.     Defendant Carol T. Christ is sued in her official capacity as the Chancellor of UC Berkeley.  As Chancellor, Defendant Christ is the Chief Executive Officer for the Berkeley campus.  Her duties include setting the policies, goals, and strategic direction for their campuses, consistent with those of the University.

44.     Defendant Benjamin E. Hermalin is sued in his official capacity as Executive Vice Chancellor and Provost of UC Berkeley.  Defendant Hermalin is responsible for Berkeley's day-to-day operations, as well as the planning, quality, and delivery of education provided to Berkeley's 27,000 undergraduate students and 10,000 graduate students.

## FACTUAL BACKGROUND

### A.     Zionism Is an Integral Component of Jewish Identity

45.     According to the Anti-Defamation League (ADL), "Zionism is the movement for the self-determination and statehood for the Jewish people in their ancestral homeland, the land of Israel." *Zionism*, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/glossary-term/zionism (last visited Nov. 27, 2023).  Inherent in Zionism is recognition of the Jews' ancestral connection to the land of Israel.  *See also Zionism*, OXFORD REFERENCE, https://www.oxfordreference.com/display/10.1093/oi/authority.20110803133512904;jsessionid=3977783EE002C3A6761612CD76AE0174 (last visited Nov. 27, 2023) (Zionism is "a movement for (originally) the re-establishment and (now) the development and protection of a Jewish nation in what is now Israel.").

46.     Zionism, which reflects the Jews' ancestral heritage and deep connection to Israel, is integral to the religious, national and/or ethnic identity of most Jews.  "The vast majority of Jews around the world feel a connection or kinship with Israel, whether or not they explicitly identify as Zionists, and regardless of their opinions on the policies of the Israeli government."  *Zionism,* ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/glossary-term/zionism (last visited Nov. 27, 2023).

47.     Dean Chemerinsky, himself, has stated, "For many Jews, Zionism is a core component of their identity and ethnic and ancestral heritage."  Academic Engagement Network, *U.C. Berkeley School of Law Faculty Statement in Support of Jewish Law Students*, https://docs.google.com/document/d/1BiOeLJSG7lrbh9DSkvxsYRebE6Ck8a0rZaeBWNtjLPY/edit (last visited Nov. 27, 2023).  Accordingly, he, like many other Jews, experienced the "No Zionist Speakers" policy "as antisemitism because it denies the existence of the state of Israel, the historical home of the Jewish people."  *Id.*

48.     The Jewish people share not only religious laws and traditions, but also a deep historical sense of Jewish peoplehood.  The Jewish people's history, theology, and culture are deeply intertwined with the land of Israel, the birthplace of Jewish religion and culture, and the place to which Jews have expressly yearned to return across centuries of forced diaspora.  Throughout millennia of exile and persecution, the Jewish people have continued to recognize Jerusalem (also known as "Zion") and the land of Israel as the Jews' ancestral homeland.  To this day, Jews pray facing toward Jerusalem.  The Jewish calendar, Jewish life cycle events, Jewish law, and Jewish prayer reflect the deep historic and ancestral connection of the Jewish people to the land of Israel.  For example, more than half of the 613 commandments included in the Pentateuch relate to, and can only be fulfilled in, the land of Israel.  YOTAV ELIACH, JUDAISM, ZIONISM AND THE LAND OF ISRAEL 5-6 (2018).

49.     For most Jews, Zionism is as integral to Judaism as observing the Jewish Sabbath or maintaining a kosher diet.  Of course, not all Jews observe the Sabbath or keep kosher, but those who do clearly are expressing critical components of their Jewish identity.  Similarly, not all

Jews are Zionists, but for those who are, the connection to the Jewish State is integral to their Jewish identity.

50.     It has become commonplace among persons seeking to disguise their anti-Semitism to use the word "Zionists" to mean Jews, while at the same time arguing (incongruously) that Zionism is merely a political viewpoint.  For example, Zahra Billoo, an activist with the Council on American-Islamic Relations (CAIR), who was invited to talk to LSJP members, told students that the ADL and American Jewish Congress are "Zionist" organizations, because she equates Jews with Zionists.  American Muslims for Palestine (AMP) 14th Annual Convention for Palestine, YOUTUBE (Nov. 27, 2021), https://www.youtube.com/watch?v=0q6oroJXkMs&t=1849s.  At the same time, she told the students that "Zionism" is merely a political position, and that "Zionists" are not a protected class. *Id*.  Arguing about Israeli policy is one thing; no one claims this is anti-Semitic.  But as the ADL has observed, "criticism or condemnation of Israel is transparently a cover for anti-Semitism … when it uses traditional anti-Semitic imagery or stereotypes, blames all Jews for the actions of Israel, or denies or questions Israel's right to exist."  *What Is… Anti-Israel, Anti-Semitic, Anti-Zionist?*, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/tools-and-strategies/what-anti-israel-anti-semitic-anti-zionist (last visited Nov. 27, 2023).  Marginalizing, demonizing, and excluding Jews on the basis of the Zionist component of their Jewish identity is discrimination against Jews, pure and simple.

51.     Nor does being a Zionist remotely equate to being anti-Palestinian.  Many Zionists are pro-Palestinian, sympathetic to Palestinian causes and issues, and desirous of engaging with groups that support Palestinians.

**B.     Lawmakers In The United States And Around The Globe Recognize That Anti-Zionism Is Anti-Semitism.**

52.     The International Holocaust Remembrance Alliance ("IHRA")—whose member states include the United States—recognizes that Zionism (connection to the Jewish State of Israel) cannot be separated from the identity of most Jews.  On May 26, 2016, the IHRA adopted a working definition of anti-Semitism (the Definition) that covers acts "[d]enying the Jewish people

1 their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist

2 endeavor."  *What is antisemitism?*, INT'L HOLOCAUST REMEMBRANCE ALL.,

3 https://www.holocaustremembrance.com/resources/working-definitions-charters/working-

4 definition-antisemitism (last visited Nov. 27, 2023).

5      53.    The IHRA Definition has been adopted or endorsed by 43 United Nations (UN)

6 member states, including the United States.  See *Information on endorsement and adoption of the*

7 *IHRA working definition of antisemitism, International Holocaust Remembrance Alliance*, INT'L

8 HOLOCAUST REMEMBRANCE ALL., https://www.holocaustremembrance.com/resources/working-

9 definitions-charters/working-definition-antisemitism/adoption-endorsement (last visited Nov. 27,

10 2023).  Over a thousand governmental and non-governmental organizations have likewise adopted

11 the definition.  Zvika Klein, *More than 1,000 global entities adopted IHRA definition of*

12 *Antisemitism*, JERUSALEM POST (Jan. 17, 2023),

13 https://www.jpost.com/diaspora/antisemitism/article-728773.

14      54.    On November 4, 2022, the U.S. Department of State (under President Biden's

15 leadership) reaffirmed its commitment to the IHRA Definition.  It explained:

> The United States unequivocally condemns antisemitism and views the International Holocaust Remembrance Alliance (IHRA) Working Definition of Antisemitism as integral to the fight to eliminate this scourge. It is widely accepted and used throughout the world by governments, international organizations, religious and sports entities, and other civil society organizations, which sends a powerful message of solidarity against antisemitism.  Bipartisan U.S. administrations have embraced and used the IHRA Working Definition of Antisemitism, inclusive of its examples, as a policy tool.

21 U.S. Dep't of State, Press Statement: The International Holocaust Remembrance Alliance

22 Working Definition of Antisemitism (Nov. 4, 2022), https://www.state.gov/the-international-

23 holocaust-remembrance-alliance-working-definition-of-antisemitism/.

24      55.    In May 2023, the Biden White House issued a National Strategy to Counter

25 Antisemitism (the "National Strategy"), particularly in the educational arena.  According to the

26 White House, the dramatic increase in the number of reported anti-Semitic incidents, many of

27 which are occurring on campuses and in schoolyards, is simply "unacceptable."  The U.S.

28 National Strategy to Counter Antisemitism 9 (May 2023), https://www.whitehouse.gov/wp-

content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf (last visited Nov. 27, 2023).  Jewish students report that classmates and teachers "make unfair judgments about them because they are Jewish," and ostracize them "if they support the existence of Israel as a Jewish state."  *Id.* at 40.  The National Strategy noted that "[w]hen Jews are targeted because of their beliefs or their identity, when Israel is singled out because of anti-Jewish hatred, that is antisemitism."  *Id.* at 9.  As the White House has repeatedly explained and confirms in its National Strategy, protection of Jews as a religious, national, and ethnic group includes protection from anti-Israel bias and discrimination.

56.     The Biden administration has likewise publicly embraced the IHRA Definition in the domestic context through its repeated reliance on Executive Order 13899, which was issued by President Trump on December 16, 2019.  That Executive Order directs federal agencies charged with enforcing Title VI to consider the IHRA Definition of Anti-Semitism, including the examples of anti-Semitism identified by IHRA.  Exec. Order No. 13899, 84 Fed. Reg. 68799 (Dec. 11, 2019).

57.     Assistant Secretary of Education Catherine Lhamon wrote in January 2023 that the administration "affirms OCR's [Office for Civil Rights] commitment to complying with Executive Order 13899 on Combating Anti-Semitism," and referenced OCR guidance on the Executive Order which remains available in OCR's online compendium of active policy documents.  U.S. Dep't of Educ., Press Release: OCR Releases New Fact Sheet on Title VI Protection from Discrimination Based on Shared Ancestry or Ethnic Characteristics (Jan. 4, 2023), https://content.govdelivery.com/accounts/USED/bulletins/340e623.  In other words, this administration affirms the order as an active component of President Biden's civil rights policy— and emphasizes OCR's "commitment to complying" with it.  The IHRA Definition thus remains the federal regulatory standard for evaluating whether harassing conduct is motivated by anti-Semitic intent.

58.     In May 2023, in a Dear Colleague Letter addressing discrimination against Jewish students, Assistant Secretary Lhamon lists as a resource "Questions and Answers on Executive Order 13899 (Combating Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights

Act of 1964."  U.S. Dep't of Educ., Dear Colleague Letter Addressing Discrimination Against

Jewish Students 3 (May 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-

dcl.pdf.  That FAQ in turn explains that Executive Order 13899 "requires federal agencies to

consider the International Holocaust Remembrance Alliance's (IHRA) working definition of anti-

Semitism and the IHRA's contemporary examples of anti-Semitism in enforcing Title VI."  U.S.

Dep't of Educ., Questions and Answers on Executive Order 13899 (Combating Anti-Semitism and

OCR's Enforcement of Title VI of the Civil Rights Act of 1964) 1, OCR-000127 (Jan. 19, 2021),

https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf; *see also*

*id*. at 5 (attaching as appendix the IHRA's Working Definition of Anti-Semitism and

Contemporary Examples of Anti-Semitism).

59.     The IHRA definition is consistent with the definition of anti-Semitism adopted by

the U.S. Department of State on June 8, 2010, during President Obama's administration.  This

definition explains that anti-Semitism includes efforts to "Delegitimize Israel" by "Denying the

Jewish people their right to self-determination and denying Israel the right to exist."  Dep't of

State*, Fact Sheet: Defining Anti-Semitism (June 8, 2010),  https://2009-

2017.state.gov/j/drl/rls/fs/2010/122352.htm.

60.     On September 26, 2018, UN Secretary General Antonio Guterres applauded the

IHRA's work in drafting a common definition of anti-Semitism and noted that the IHRA

Definition "can serve as a basis for law enforcement, as well as preventative policies."  Press

Release, Anti-Semitism Rising Even in Countries with No Jews at All, Secretary-General Tells

Event on Power of Education to Counter Racism, Discrimination, U.N. Press Release

SG/SM/19252-RD/1022 (Sept. 26, 2018), https://press.un.org/en/2018/sgsm19252.doc.htm.

61.     On December 6, 2018, the European Council urged European Union member states

that had not done so already to endorse the IHRA's definition of anti-Semitism.  Eur. Council,

Outcome of Proceedings (EC) No. 15213/18 (Dec. 6, 2018),

https://data.consilium.europa.eu/doc/document/ST-15213-2018-INIT/en/pdf.

62.     On June 4, 2019, Organization of American States (OAS) Secretary General Luis

Almagro asked every member state to adopt the IHRA definition of anti-Semitism and adopted the

IHRA definition as the official OAS definition to be employed in OAS work.  General Luis

Almagro (@Almagro_OEA2015), TWITTER (June 4, 2019, 1:47 PM),

https://twitter.com/Almagro_OEA2015/status/1135966386302459906?s=20.

      **C.**      **Registered Student Groups At UC Berkeley, Including The Law School, Are Required Annually To Pledge Their Commitment To "A Just Community In Which Discrimination and Hate Are Not Tolerated."  Once Registered, Groups Obtain Significant Advantages, Including Funding.**

      63.      Both UC Berkeley and the Law School have long and famously heralded their commitment to civil rights and equal treatment of all persons regardless of race, ethnicity, national origin, gender, sexual preference, faith, military status, physical disability, and/or heritage.

      64.      UC Berkeley's rules for registered student groups, including law school groups, require prospective and current groups alike to include the following "all-comers" clause verbatim in their respective constitutions:

> We will not restrict membership based upon race, color, national origin, religion, sex, gender identity, pregnancy (including pregnancy, childbirth, and medical conditions related to pregnancy or childbirth), physical or mental disability, medical condition (cancer related or genetic characteristics), ancestry, marital status, age, sexual orientation, citizenship, or service in the uniformed services (including membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services).

*Required RSO Constitution Clauses*, LEAD CENTER, https://docs.google.com/document/d/13UcGDtafC2aqQtWaSN9RhL9XivBCndA201sQHmZ8YQ0/edit (last visited Nov. 27, 2023).

      65.      Registered student groups must also pledge their commitment to "the dignity of all individuals," to free expression, and to upholding "a just community in which discrimination and hate are not tolerated."  *2023-2024 New Organization Application Questions* 6, LEAD CENTER, https://docs.google.com/document/d/1dx-7-2d47wuXD-_A7PLRdloQAbdOfJHBMOA-CLc27to/edit (last visited Nov. 27, 2023).

66.     In exchange for making and upholding this pledge and other commitments, groups are afforded significant privileges, including funding for events, meeting spaces on campus, and use of the words "UC Berkeley" as part of the groups' names.  Funding is derived from mandatory student activities fees paid by each student or, in the case of the Law School, from the UC Berkeley Graduate Assembly, which is funded by Graduate Student Fees.

67.     Among the groups that make these commitments are "student-initiated legal services projects," which are part of Berkeley Law's experiential education programs.  The Law School provides these programs so that students can participate in "hands-on learning opportunities" as early as their first semester at the law school.  The Law School describes these programs as being at the "cutting-edge of legal education" and maintains that they "make Berkeley Law graduates particularly ready for practice in whatever area they pursue."  *See Experiential education is a central component of the Berkeley Law experience*, BERKELEY LAW SCH., https://www.law.berkeley.edu/experiential/ (last visited Nov. 27, 2023).  These programs allow students to gain client experience; develop lawyering and leadership skills; meet minimum hours requirements for summer fellowships; serve the community; receive training, supervision, and mentoring; and earn pro bono hours for state bar requirements, summer public interest stipends, and recognition at Berkeley Law's Public Interest and Pro Bono graduation.  *Id.*

68.     These commitments are also made by Berkeley Law's student-edited law journals (the Journals).  Berkeley Law maintains that participation in its Journals "enhances the learning experience for Berkeley Law students by providing opportunities to develop and improve legal writing and research skills, with in-depth exposure to a rapidly expanding body of law that augments general course work."  *Student Journals*, BERKELEY LAW SCH., https://www.law.berkeley.edu/students/student-journals/ (last visited Nov. 27, 2023).  The Law School maintains that Journal membership, with the exception of the *California Law Review*, is "open to all students" in "keeping with Berkeley Law's spirit of cooperative education."  *Id.*

69.     Unfortunately, as discussed below, a number of student organizations at Berkeley Law (including student-initiated legal service projects and law journals) and at the undergraduate

1  campus have made and renewed their pledges to respect the dignity of all individuals while

2  simultaneously expressing their hostility towards Jews.

> **D.    Legal Services Projects And Registered Student Groups At Berkeley Law Adopt An Anti-Semitic Bylaw That Excludes "Zionist" Speakers And Silences Jewish Students, Faculty, And Other Members Of The Berkeley Community Who Support The Jewish State Of Israel.**

7    70.    Law Students for Justice in Palestine (LSJP) is a recognized student group

8  operating at Berkeley Law.  Its constitution includes an "all-comers" clause which precludes

9  membership restrictions based on categories such as race, color, national origin, and religion,

10  among others.  Like other registered student groups, LSJP pledges its commitment to "the dignity

11  of all individuals," to free expression, and to upholding "a just community in which discrimination

12  and hate are not tolerated."

13    71.    In August 2022, LSJP amended its constitution to include a bylaw that

14  discriminates against the Jewish community by providing that the student group "will not invite

15  speakers that have expressed and continue to hold views or host/sponsor/promote events in

16  support of Zionism[.]"  See LSJP Const., UNIV. OF CAL. BERKELEY,

17  https://callink.berkeley.edu/organization/lsjp (last visited Nov. 27, 2023).  The LSJP Constitution

18  reads, in pertinent part:

> In the rejection of colonialism, imperialism, and other types of oppression, LSJP is dedicated to wholly boycotting, sanctioning, and divesting funds from institutions, organizations, companies, and any entity that participated in or is directly/indirectly complicit in the occupation of the Palestinian territories and/or supports the actions of the apartheid state of Israel. Furthermore, in the interest of protecting the safety and welfare of Palestinian students on campus, LSJP will not invite speakers that have expressed and continued to hold views or host/sponsor/promote events in support of Zionism, the apartheid state of Israel, and the occupation of Palestine. To ensure that solidarity is practiced both in theory and in practice, LSJP members agree to participate in a "Palestine 101" training held by the Law Students Justice for Palestine executive board to learn ways to create a safe and inclusive space for Palestinian students and students that are in the support of the liberation of Palestine, as well as engaging in the BDS movement in the principled manner Palestinians are asking for.

72.     A Berkeley law student and self-proclaimed author of the LSJP amendment (*e.g.,* the Exclusionary Bylaw) explained in a public webinar that the ban on Zionist speakers is to be read as a declaration that, "We stand against white supremacy and colonialism," and that only speakers who agree that Israel is a "racist" and "colonial" endeavor may be invited to speak to Law School Group members.  Because Dean Chemerinsky is himself a Zionist, she stated that UC Berkeley cannot be "a neutral space where free and open dialogue is taking place."  Finally, she revealed that her "goal" is to persuade all student groups, including undergraduate groups, at UC Berkeley and elsewhere, to adopt her Exclusionary Bylaw or a similar statement demonizing Israel as a "white supremacist," "colonial" state.  *See* Foundation of Middle East Peace, The Berkeley LSJP Bylaw and Its Aftermath, YOUTUBE (March 6, 2023), https://www.youtube.com/watch?v=7oHIyCpgCJ8.

73.     Dylan Saba, an attorney holding himself out as counsel for LSJP, has admitted that the marginalization and exclusion of Jewish students is both an intended and acceptable consequence of the Exclusionary Bylaw.  His clients, he explained, are "are trying to build a mass movement" against Israel and are not interested in alleviating "the discomfort of Zionist students." To the contrary, he stated, "it is good for people like that to be uncomfortable."  *See* Peter Beinart with Dylan Saba & Ethan Katz on the Controversy About Zionist Speakers at Berkeley Law, YOUTUBE (January 6, 2023), https://www.youtube.com/watch?v=RuDmyoO7-Zk.

74.     Following its own adoption of the Exclusionary Bylaw, LSJP circulated it to other student groups and Legal Services Projects at Berkeley Law, urging them to amend their own constitutions to include the Exclusionary Bylaw.  Berkeley LSJP (@berkeleylawforpalestine), INSTAGRAM (Aug. 21, 2022), https://www.instagram.com/p/Chh_43tpLnm/?igshid=YmMyMTA2M2Y=.

75.     Following this request, at least 23 organizations at Berkeley Law have adopted the Exclusionary Bylaw or a substantially similar version of it to date.

76.     For example, the Community Defense Project, one of Berkeley's practical clinics, similarly amended its Constitution to read, in pertinent part:

> In the rejection of colonialism, imperialism, and other types of oppression, CDP is dedicated to wholly boycotting, sanctioning, and divesting funds from organizations, companies, and any entity that participated in or is directly/indirectly complicit in the occupation of Palestinian territories and/or supports the actions of the apartheid state of Israel. Furthermore, in the interest of protecting the safety of Palestinian students on campus, CPD will not invite speakers that have expressed and continued to hold views or host/sponsor/promote events in support of Zionism, the apartheid state of Israel, and the occupation of Palestine.

Cmty. Defense Project Constn. art. V, UNIV. OF CAL. BERKELEY, (amended Aug. 18, 2023), https://callink.berkeley.edu/organization/communitydefenseproject (last visited Nov. 27, 2023).

77.     The Constitution of the *Berkeley Journal of Gender, Law & Justice* has been amended to read, in pertinent part:

> In the rejection of colonialism, imperialism, and other types of oppression, BGLJ is dedicated to wholly boycotting, sanctioning, and divesting funds from institutions, organizations, companies, and any entity that participated in or is directly/indirectly complicit in the occupation of the Palestinian territories and/or supports the actions of the apartheid state of Israel. . . Furthermore, in the interest of protecting the safety and welfare of Palestinian students on campus, BGLJ will not invite speakers or publish pieces by authors that have expressed and continued to hold views or host/sponsor/promote events in support of Zionism, the apartheid state of Israel, and the occupation of Palestine.

Bylaws (current through July 10, 2023), Art. 4.4(a)-(b),  UNIV. OF CAL. BERKELEY, https://callink.berkeley.edu/organization/gaberkeleyjournalofgenderlawandjustice (last visited Nov. 27, 2023).

78.     Student leaders in any Legal Services Project or Group wishing to join this "movement" are required to "participate in a 'Palestine 101' training held by the Law Students Justice for Palestine[.]"  *See, e.g., id* at Art. 4.4(c).  They are also required to participate actively in BDS, a movement that seeks the elimination of the Jewish State.  *Id.*

79.     Other than LSJP, none of the Legal Services Projects or Groups has a mission or purpose that is related to Zionism, Israel, or the Israeli-Palestinian conflict.

80.     According to students who participated in the Palestine 101 training held by LSJP, "[t]he presenters equated Zionism with imperialism, ethnic erasure, and colonialism."  Charlotte Aaron, Noah Cohen, Billy Malmed, Adam Pukier, *We're Jewish Berkeley Law Students, Excluded*

*in Many Areas on Campus*, DAILY BEAST (Oct. 17, 2022),  https://www.thedailybeast.com/were-jewish-berkeley-law-students-excluded-in-many-areas-on-campus.  The "main takeaway" from the presentation was that "Israel is an illegitimate state that does not have a right to exist" and the "only option to protect Palestinian students is to exclude Zionists and denounce Zionism." *Id.*

81.     The result of the amended constitutions and the Palestine 101 training was predictable.  Jewish first-year law students chose not to join student groups that adopted the Exclusionary Bylaw and whose leaders attended the Palestine 101 training.  As several law school students explained,  "No organization has said 'Jews are not welcome,' but in practice, these by-laws and the training say exactly that. Student leaders now accept the exclusion of Jews because of an aspect of their identity.  There is tolerance to marginalize us because of our faith." *Id.*

82.     By amending their constitutions to add the Exclusionary Bylaw, these entities have marginalized Jewish students for whom Zionism is integral to their identity and excluded Jewish members of the Berkeley community from participating in group activities in violation of the all-comers policy.  While the Legal Services Projects and Groups may protest that anyone can join, the fact is that Jewish and Israeli students can do so only by renouncing or hiding their own identities or by remaining silent.  Neither option can lawfully be demanded of any individual under UC policy or U.S. law.

83.     As a result, the Exclusionary Bylaw prevents students from obtaining the same opportunities for participation at the law school and deprives them of opportunities for career advancement.  The ban on Zionist speakers serves to exclude Jewish law students, as Zionism is integral to Jewish identity, from serving in leadership roles or from fully participating in law student groups that have adopted the Exclusionary Bylaw.  These Jewish students are compelled to hide or disavow their pride in their ancestral Jewish heritage in order to fully benefit from club membership.

84.     Preventing Jewish law students from participating in a journal like *The Berkeley Journal of Gender, Law, and Justice* denies them a beneficial educational opportunity that is afforded to other students.  It limits their avenues for developing and improving legal research,

writing, and editing skills, while also limiting their choices for obtaining academic credits towards graduation.

85.     Excluding law students from Legal Services Projects prevents them from receiving a quintessential law school experience.  Experiential legal work enables students to acquire hands-on legal experience while at the same time earning other valuable benefits.  These projects allow law students to earn pro-bono hours for state bar requirements, and receive training, supervision, and mentorship.  Depriving Jewish students of the opportunity to be part of the Community Defense Project, for example, disserves not only the students but the members of the community that come to the project for assistance.

86.     Being excluded from groups like Women of Berkeley Law, the Queer Caucus at Berkeley, and the Law Students of African Descent means not only the loss of camaraderie and educational opportunities; it means lost networking opportunities with other students destined for the California bar and bench, and with practicing lawyers who are interested in mentoring and promoting young lawyers who belong or belonged to the groups they belonged to in law school.

87.     The harm is not limited to Jewish students.  Registered student groups at UC Berkeley and at the Law School routinely contract with outside speakers to present to their members, paying their fees with funds the University provides to registered student groups.  By placing a discriminatory ban on "Zionist" speakers, they have also stigmatized and violated the rights of scholars who would otherwise have an opportunity to speak to these groups.  And they have prevented those scholars from having even the opportunity to be considered for speaking engagements, which deprives them of monetary compensation and the advancement of their own careers.

88.     As discussed below, the adoption of the Exclusionary Bylaw and the exclusion of Jews by these Legal Services Projects and Groups violates the U.S. Constitution and federal law.  It also violates UC and UC Berkeley policy, namely the UC Policy on non-discrimination and UC Berkeley's "all-comers" policy.

1           **E.**       **Berkeley Leaders Acknowledge That The Ban Is Discriminatory And**

2                   **Anti-Semitic Yet Fail To Take Meaningful Action.**

3       89.     Although Defendants acknowledged the adoption of the discriminatory violates

4  school policy, they have failed to take appropriate action in response.

5       90.     Section 20.00 of the UC Policies Applying to Campus Activities, Organizations

6  and Students (PACAOS) entitled "Policy on Nondiscrimination," provides:

7          The University is committed to a policy against legally impermissible, arbitrary, or

8          unreasonable discriminatory practices. All groups operating under the authority of
        The Regents, including administration, faculty, student governments, University-

9          owned residence halls, and programs sponsored by the University or any campus, are
        governed by this policy of nondiscrimination. The intent of the University's policy

10         on nondiscrimination is to reflect fully the spirit of the law. In carrying out this
        Policy, the University also shall be sensitive to the existence of past and continuing

11         societal discrimination.

12 PACAOS-20, https://policy.ucop.edu/doc/2710522/PACAOS-20 (last visited Nov. 27, 2023).

13      91.     As noted above, under the University's "all-comers" policy, registered student

14 groups may not impose membership restrictions based on categories such as race, color, national

15 origin, and religion, among others.  Registered student groups must also pledge their commitment

16 to "the dignity of all individuals," to free expression, and to upholding "a just community in which

17 discrimination and hate are not tolerated." *2023-2024 New Organization Application Questions* 6,

18 Lead Center,  https://docs.google.com/document/d/1dx-7-2d47wuXD-

19 _A7PLRdloQAbdOfJHBMOA-CLc27to/edit (last visited Nov. 27, 2023).

20      92.     Excluding Jewish students and speakers from participating in these groups violates

21 both the Policy on Nondiscrimination and the "all-comers" policy.  Dean Chemerinsky has

22 explained that student organizations "have the right to choose speakers for their events based on

23 viewpoint."  Pat Joseph, *Discriminatory Bylaws and Free Speech; A Q&A with Berkeley Law*

24 *Dean Erwin Chemerinsky*, Cal. Mag. (Dec. 1, 2022), https://alumni.berkeley.edu/california-

25 magazine/2022-winter/discriminatory-bylaws-and-free-speech/.  But he added that "[i]t would be

26 punishable if they discriminated based on religion (or race or sex or sexual orientation) in inviting

27 speakers." *Id*.

28

93.     Dean Chemerinsky further explained that actually "exclud[ing] a speaker on account of being Jewish or holding particular views about Israel" is "conduct, of course, [that] would be subject to sanctions."  Erwin Chemerinsky, *There Are No 'Jewish-Free' Zones on the UC-Berkeley Campus*, DAILY BEAST (Oct. 1, 2022) (updated Oct. 2, 2022), https://www.thedailybeast.com/there-are-no-jewish-free-zones-on-the-uc-berkeley-campus.  *See also* Erwin Chemerinsky, *On "Jewish Free Zones" at Berkeley, the Debate Between Chemerinsky and Marcus Continues*, JEWISH J. (Oct. 12, 2022), https://jewishjournal.com/commentary/opinion/352237/on-jewish-free-zones-at-berkeley-the-debate-between-chemerinsky-and-marcus-continues/ (explaining that "den[ying] the right or the ability [of students] to express themselves, to exercise their freedom of speech … would represent a cross-over from expression to conduct and that would be subject to serious discipline.").

94.     Berkeley seeks to avoid liability by suggesting the Exclusionary Bylaw discriminates on the basis of viewpoint but not race, ethnicity, or religion.  However, at the same time, Defendants admit that the Bylaw is anti-Semitic.  Dean Chemerinsky, along with 23 other Berkeley law professors, issued a statement acknowledging that "[m]any Jews (including some of us signing below who are Jewish) also experience this [bylaw] as antisemitism because it denies the existence of the state of Israel, the historical home of the Jewish people.  For many Jews, Zionism is a core component of their identity and ethnic and ancestral heritage."  Academic Engagement Network, *U.C. Berkeley School of Law Faculty Statement in Support of Jewish Law Students*, https://docs.google.com/document/d/1BiOeLJSG7lrbh9DSkvxsYRebE6Ck8a0rZaeBWNtjLPY/edit?pli=1 (last visited Nov. 27, 2023).  In the same statement, Dean Chemerinsky and his colleagues acknowledged, "These bylaws would also impermissibly exclude a large majority of our faculty from participating in the work of these organizations, including … Dean [Chemerinsky]."  *Id.*  More recently, Dean Chemerinsky recognized that it was "problematic" for the Law School to award academic credit to students who participated in law journals who adopt the bylaw.  *See* Exhibit B, E-Mail from Erwin Chemerinsky to Student Journal Leaders.

95.     Defendant Christ has also acknowledged that the bylaw improperly discriminates. She has explained that "[e]xcluding anyone from any campus activity based on their race, religion, nationality, ethnicity, gender, or sexuality would represent impermissible discrimination."  Exhibit A.

96.     In the same statement, Defendant Christ "convey[ed] [her] understanding as to why the adoption of the Bylaw was deeply upsetting to some Jewish members of our community for whom Zionism is an indivisible part of their Jewish identity, and who now say they no longer feel welcome at events held by some of the student organizations that have agreed to the Bylaw's terms."  *Id.*

97.     Yet, despite being fully aware of the anti-Semitic nature of the Exclusionary Bylaw and the discriminatory effect it is having on campus, Defendants have not enforced their policies. They continue to allow groups adopting the Exclusionary Bylaw to receive all the benefits of a recognized student organization, including space to meet on campus, funding, and use of the Berkeley logo.

### F.     The University's Failure To Address Anti-Semitism Boils Over After The October 7, 2023 Attacks.

98.     In the days following October 7, 2023—the date that, in President Biden's words, "[t]he terrorist group Hamas … slaughtered … over 1,300 people" and "committed evils … and atrocities that make ISIS look somewhat more rational"—the anti-Semitic atmosphere on Berkeley's campus ignited.  *Remarks by President Biden and Prime Minister Netanyahu of Israel Before Bilateral Meeting*, THE WHITE HOUSE (Oct. 18, 2023), https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/10/18/remarks-by-president-biden-and-prime-minister-netanyahu-of-israel-before-bilateral-meeting-tel-aviv-israel/.

99.     While the civilized world responded with horror and grief, students at UC Berkeley celebrated this twenty-first century pogrom with resulting violence against Jewish students.  For example, a Jewish undergraduate draped in an Israeli flag was set upon by two protesters, who struck him in the head with his own metal water bottle after he dropped it trying to evade them. The incident was caught on video and publicly reported.  Emily Raguso, *Robbery attempt of*

*Israeli flag at UC Berkeley rally for Palestine*, BERKELEY SCANNER (Oct. 25, 2023), https://www.berkeleyscanner.com/2023/10/25/uc-berkeley-crime/uc-berkeley-robbery-rally/.

100.    Two students described pro-Palestinian protesters disrupting a gathering by Jewish students to pray and deal with the shock of the Hamas attack. The students also described pro-Palestinian rallies blocking the main entrance to campus and a lecturer who told students that class was over early before proceeding to embark on an anti-Israel rant for 18 minutes, with roughly 1,000 freshman as his captive audience.  Both students stated that the school does so little to protect Jewish students, it feels as if the school were condoning anti-Semitism. They added that officials at the university display a "general disregard" for Jewish students.

101.    Indeed, many Jewish students have reported feeling afraid to go to class during these rallies, which take place in Berkeley's main throughfares—and for good reason.  They have little confidence that UC will protect them from anti-Semitic mobs.  On information and belief, following the October 7 attacks, Chancellor Christ told some members of the Berkeley community that her public statement addressing the attacks was not as strong as she would have liked due to her concerns about violence on the campus.  And, as Defendant Michael V. Drake recently acknowledged, "Some [students] feel unsafe leaving their dorm rooms."  UC President Michael V. Drake, M.D., Opening Remarks at November 15 Regents Meeting (Nov. 15, 2023), https://www.universityofcalifornia.edu/press-room/uc-president-michael-v-drake-md-opening-remarks-november-15-regents-meeting.

102.    Dean Chemerinsky, himself, has written that he "was stunned when students across the country, including mine, immediately celebrated the Hamas terrorist attack in Israel on Oct. 7." Erwin Chemerinsky, *Nothing has prepared me for the antisemitism I see on college campuses now,* L.A. TIMES (Oct. 29, 2023), https://www.latimes.com/opinion/story/2023-10-29/antisemitism-college-campus-israel-hamas-palestine; *see also id.* (stating that he has "been called 'part of a Zionist conspiracy,' which echoes of antisemitic tropes that have been expressed for centuries" and stating that "calling for the total elimination of Israel"—as the anti-Zionists on campus have been doing—"is antisemitic.").

103.    On information and belief, a number of persons on campus (including Jewish faculty and staff) have also been receiving hate e-mails calling for their gassing and murder. Although these e-mails were reported to the University, it has failed to respond appropriately or in a timely matter.

104.    To quote Dean Chemerinsky, "There has been enough silence and enough tolerance of antisemitism on college campuses." *Id.*  Plaintiffs seek relief from this Court to ensure that Berkeley complies with the law and its own policies to ensure that anti-Semitic discrimination— like all discrimination—is punished.  At the very least, the University must stop providing recognition and resources to those student organizations that are openly excluding Jews and fueling further anti-Semitism.

<u>**COUNT I**</u>

**Violation of 42 U.S.C. § 1983 (the Equal Protection Clause)**

**(on Behalf of All Plaintiffs)**

105.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

106.    Under the Fourteenth Amendment to the United States Constitution, a State shall not "deny to any person within its jurisdiction the equal protection of the laws."

107.    Defendants have, in their individual and official capacities, deprived Plaintiffs of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiffs differently than similarly situated individuals because Plaintiffs are Jewish.  Specifically, Defendants have selectively chosen not to enforce Berkeley's all-comers policy and Policy on Nondiscrimination against student organizations in the Law School and the undergraduate campus that have discriminated against or excluded Jewish members of the school community from participating in organizations, programs, and activities.  For similar reasons, Defendants' decision not to enforce the Policy on Nondiscrimination against these groups where they refuse to accept Jewish speakers is unlawful.

108.    Defendants intentionally chose not to enforce the school's policies in an evenhanded way, stating that they would enforce school policies in similar circumstances but

1  would not do so against anti-Zionist behavior by Law School student organizations, despite

2  acknowledging that the behavior by these organizations is anti-Semitic.

3      109.    As a result of Defendants' decision not to enforce its policies, Plaintiffs have

4  suffered significant injuries.

5      110.    Legal scholars who are members of Plaintiff JAFE have been deprived of the right

6  to compete for the opportunity to present to organizations at Berkeley that have adopted the

7  Exclusionary Bylaw.  They are denied this right not because of anything they would say, but

8  because of their Jewish identity.  Many of these scholars have expertise in areas that would be

9  directly relevant to the groups that have adopted the Exclusionary Bylaw and would benefit—

10  financially and otherwise—by being able to present before these groups.

11      111.    Student members of Plaintiff JAFE are deprived of the right to participate fully in

12  student organizations at a time when "extracurricular programs are … essential parts of the

13  educational process."  *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of L. v.*

14  *Martinez*, 561 U.S. 661, 686 (2010).  This denial is most acute for those members of JAFE who

15  are Berkeley law students who are now unable to participate fully in groups that have adopted the

16  Exclusionary Bylaw.  This denial precludes them from participating in groups that have nothing to

17  do with their Jewish beliefs or identity.  For example, the Law School members of JAFE are

18  denied the ability to participate in Community Defense Project, an organization whose mission is

19  to provide pro bono legal services to the community.  The harm extends to undergraduates, as

20  well, who have been forced to choose between embracing their Jewish identity or being rejected

21  from student organizations.   These undergraduates report that the campus environment is not

22  welcoming to Jewish students, many of whom feel silenced and alienated. Some avoid wearing

23  anything that identifies them as Jewish.  Some avoid campus activities altogether, while others

24  stick to Jewish groups and activities.

25      112.    Defendants have no overriding or legitimate state interest, let alone a compelling

26  one, to justify their decision to selectively enforce UC Berkeley policy to the detriment of

27  Plaintiffs.  Even if such an interest existed, Defendants have failed to narrowly tailor their actions

28  to serve such an interest.

### COUNT II

**Violation of 28 U.S.C. § 1983 (Free Exercise Clause) (on behalf of all Plaintiffs)**

113.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

114.    Free exercise of religion "means first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dept. of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990).

115.    In addition to being an integral component of Jewish ancestral, ethnic and national identity, Zionism is a core tenet of the religious identity of many Jews, including Jews at Berkeley Law, and Jews in the legal profession whose ideas, experience, and practice might resonate with members of the Groups that would ban them.

116.    Legal scholars who are members of Plaintiff JAFE and are practicing Jews for whom Zionism is a core tenet of their religious identity have been deprived of the right to compete for the opportunity to present to organizations at Berkeley that have adopted the Exclusionary Bylaw.

117.    Similarly, student members of Plaintiff JAFE who are practicing Jews for whom Zionism is a core tenet of their religious identity are deprived of the right to fully participate in student organizations.

118.    The Legal Scholars and speakers who are practicing Jews may not profess, but must disavow or conceal, a core element of their Jewish religious identity to present to or participate in these Groups, and are thus being asked to forego the free exercise of their religion as a condition of speaking to or with Group members.  Similarly, the Jewish students who are practicing Jews may not profess, but must disavow or conceal, a core element of their Jewish religious identity to fully benefit from the student group opportunities.

119.    UC leaders recognize this state of affairs but, by permitting the Groups to remain UC registered student groups with all of the material support and resources that entails, are abdicating their duty to protect the Free Exercise rights of these individuals in contravention of the

1  U.S. Constitution, federal civil rights laws, and UC rules prohibiting discrimination on the basis of

2  religious identity.

3  **COUNT III**

4  **Violation of 42 U.S.C. § 1981 (Interference with Right to Contract**

5  **Based on Race) (on Behalf of JAFE Members Who Are Scholars)**

6  120.    Plaintiffs incorporate by reference the allegations set forth in the preceding

7  paragraphs.

8  121.    42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the

9  United States shall have the same right in every State and Territory to make and enforce

10  contracts…as is enjoyed by white citizens."  "The term 'make and enforce contracts' includes the

11  making…of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

12  contractual relationship." *Id*. § 1981(b).

13  122.    To be actionable under § 1981, a contractual relationship need not already exist,

14  "because § 1981 protects the would-be contractor along with those who already have made

15  contracts."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

16  123.    The U.S. Supreme Court has recognized that Jews may state a claim of racial

17  discrimination under the civil rights statutes, including § 1981 and its sister statute,

18  42 U.S.C. § 1982.  *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 618 (1987) ("Jews are not

19  foreclosed from stating a cause of action against other members of what today is considered to be

20  part of the Caucasian race."); *see also id*. (citing the analysis of *Saint Francis Coll. v. Al-Khazraji*,

21  481 U.S. 604, 613 (1987), which examined Section 1981).

22  124.    JAFE Members include Legal Scholars who, but for the existence of the

23  Exclusionary Bylaw, could and would have the ability to enter into a contract to present to student

24  organizations at Berkeley.  Because of their Jewish ancestral heritage and related support for

25  Israel, and because of the Exclusionary Bylaw, they cannot do so.

26  125.    By permitting the Groups to remain registered student groups with all the benefits

27  accruing to such groups, including space to meet on campus, funding, and use of the Berkeley

28

2337311.2

-33-

COMPLAINT

logo, Defendants are allowing funds and assets derived from taxpayer money to be disbursed in a discriminatory manner.

## COUNT IV

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (on behalf of JAFE Members Who Are Berkeley Undergraduates and Law Students)**

126.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

127.    Defendant UC Berkeley receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

128.    Discrimination against Jews is prohibited under Title VI of the Civil Rights Act of 1964, as reflected in the written policies of the Department of Education's Office for Civil Rights. *See e.g.*, U.S. Dep't of Educ., OCR Dear Colleague Letter: Addressing Discrimination Against Jewish Students (May 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-dcl.pdf; U.S. Dep't of Educ., OCR-000127, Questions and Answers on Executive Order 13,899 (Jan. 19, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf; U.S. Dep't of Educ., OCR-00107, Dear Colleague Letter: Combatting Discrimination Against Jewish Students (2017), https://www2.ed.gov/about/offices/list/ocr/docs/jewish-factsheet-201701.pdf; Letter from Thomas Perez, Asst. Att. Gen., Civ. Rts. Div., U.S. Dep't of Justice to Russlyn Ali, Asst. Sec'y for Civ. Rts., OCR, U.S. Dep't of Educ. Re: Title VI and Coverage of Religiously Identifiable Groups (Sept. 8, 2010), https://www.justice.gov/sites/default/files/crt/legacy/2011/05/04/090810_AAG_Perez_Letter_to_Ed_OCR_Title%20VI_and_Religiously_Identifiable_Groups.pdf; U.S. Dep't of Educ., OCR Dear Colleague Letter: Religious Discrimination (Sept. 23, 2004), https://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html.

129.    On November 7, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they have a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious

group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language. . . Harassing conduct can be verbal or physical and need not be directed at a particular individual.  U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

130.    OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.*  And it repeats its longstanding admonition that "[s]chools must take immediate and effective action to respond to harassment that creates a hostile environment." *Id.*

131.    By the admission of Berkeley, itself, its willful failure to enforce its Policy on Nondiscrimination—including by revoking privileges of registration to the student groups who are violating this policy—discriminates against Jews.

132.    Defendants' failure to enforce UC policies has created an environment that is hostile towards Jews.  The hostility towards Jewish members of the UC Berkeley community is severe enough that it interferes with their ability to participate in the programs and activities of the school, including clinical opportunities, which provide students the opportunity to engage in supervised practice of law and to earn course credits toward their law degrees.

133.    JAFE Members include students at Berkeley.  As described in the allegations above, these members have effectively been excluded from participation in, and have been denied the benefits of, educational, networking, and other programs at Berkeley.  Specifically, while Jewish individuals can in theory join student groups that ban speech by Zionists, they can do so

only by renouncing or pretending to renounce an immutable aspect of their identity or by remaining silent, since their speech is prohibited by the bylaws.  Neither "solution" is tenable, nor can either lawfully be required of any individual.

134.    While on notice of the discrimination against and hostile environment for Jewish members of the community (as shown by their public statements), Defendants have failed to take corrective action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court order the following relief:

1.    An injunction preliminarily and permanently enjoining Defendants from (i) permitting registered student organizations to exclude Jews; (ii) funding any student organization that excludes Jews; and (iii) granting official recognition to any student organization that excludes Jews.

2.    An injunction preliminarily and permanently requiring Defendants to enforce their Policy on Nondiscrimination and their all-comers policy on an evenhanded basis, ensuring that Jewish members of the Berkeley community are protected, with respect to their physical safety and otherwise, from discrimination on the basis of their Jewish identity, including those for whom Zionism is an integral part of that identity.

3.    An injunction preliminarily and permanently mandating that Defendants take action to end the hostile environment on campus by (i) communicating to the entire Berkeley community via broadcast e-mail or a similar medium that Berkeley will condemn, investigate, and punish any conduct that harasses members of the Jewish community, or others, on the basis of their ethnic or ancestral background; (ii) providing education about anti-Semitism, including by conducting mandatory training for administrators and professors; (iii) instituting strict review and approval policies to ensure that the administration does not conduct, or finance, programs that deny equal protection to Jewish members of the Berkeley community including those for whom Zionism is an integral part of their identity.

4.      A declaratory judgment that the failure by Defendants to enforce its policies to protect Jewish members of the Berkeley community has violated Plaintiffs' rights under (i) the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, (ii) the Free Exercise Clause of the U.S. Constitution, (iii) Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq., and (iv) Plaintiffs' right to contract as ensured by 42 U.S.C. § 1981.

5.      Plaintiffs' reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

6.      Any other relief which this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

DATED:  November 28, 2023        ELLIS GEORGE CIPOLLONE O'BRIEN LLP
                                        Eric M. George

By:  _____
        Eric M. George
        David J. Carroll
    Attorneys for Plaintiffs