**Pages 1 - 21**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

THE LOUIS D. BRANDEIS CENTER,  )
INC., et al.,                  )
                               )
          Plaintiffs,          )
                               )
  VS.                          )   **NO. C 23-06133-JD**
                               )
REGENTS OF THE UNIVERSITY OF   )
CALIFORNIA, et al.,            )
                               )
          Defendants.          )
                               )

San Francisco, California
Thursday, February 29, 2024

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiffs:
                    ELLIS GEORGE LLP
                    2121 Avenue of the Stars - 30th Floor
                    Los Angeles, California 90067
               BY:  **DAVID J. CARROLL, ATTORNEY AT LAW**

For Defendants:
                    MUNGER, TOLLES & OLSON LLP
                    560 Mission Street - 27th Floor
                    San Francisco, California  94105
               BY:  **BRYAN H. HECKENLIVELY, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES**:    (CONTINUED)

For Defendants:

> MUNGER, TOLLES & OLSON LLP
> 350 South Grand Avenue - 50th Floor
> Los Angeles, California 90071
> BY:  **HAILYN J. CHEN, ATTORNEY AT LAW**

Thursday - February 29, 2024                         10:46 a.m.

                        P R O C E E D I N G S

                              ---o0o---

THE CLERK:  Calling Civil 23-6133, The Louis D. Brandeis Center, Inc. vs. Regents of the University of California.

Counsel, you need to move out of the front and --

THE COURT:  Thank you.

                    (Pause in proceedings.)

THE CLERK:  Counsel.

MR. CARROLL:  Good morning, Your Honor.  David Carroll appearing on behalf of plaintiffs.

MR. HECKENLIVELY:  Good morning, Your Honor.  Bryan Heckenlively with Munger, Tolles & Olson for defendants. Hailyn Chen, my colleague, is here with me as well.

THE COURT:  Okay.  While you're here, Plaintiff, I'm just -- just tell me in a nutshell what your claim is.  Just in a nutshell.

MR. CARROLL:  Thank you, Your Honor.

So the complaint alleges that there are a number of student groups at Berkeley that have policies that the plaintiffs believe are antisemitic.  These are anti-Zionism policies insofar as these groups don't allow speakers or members of their groups who espouse -- who don't disavow Zionism.

Since Zionism is a core component of the Jewish identity --

THE COURT:  Let me just pause.

I'm going to throw some things at you.  You can tell me whether I'm understanding your complaint or not.  Okay?

This is just a discussion.  I'm not tying anybody's hands, but -- so I understand what you're saying.  So your concern is there are student groups, clubs, organizations on the U.C. Berkeley campus who are avowedly anti-Zionist.

Now, isn't it the case, though -- I mean, there are Jews, who I know personally, who are also strongly anti-Zionist.  They would still be allowed to participate in these groups because the test isn't Jewishness.  The test is:  Are you for or against Zionism?

Right?

MR. CARROLL:  Well, I think that might be a factual issue that we may get into in discovery.  I think -- you know, the complaint alleges that anti-Zionism is a core component of the Jewish identity, and it is effectively anti-Semitism --

THE COURT:  Not anti-Zionism.

MR. CARROLL:  -- and I think, Your Honor, the dean of the U.C. Berkeley Law School too, I think, has equated anti-Zionism with effectively anti-Semitism.

THE COURT:  It doesn't really matter what he thinks.  You're here now.  Okay?  He's not a judge or a jury.  It just

doesn't matter.

So I just don't see it.  I mean, I could see -- don't tell me it weights on the facts because I'm asking you about what you said in your complaint.

Your complaint does not say, to my eye, that a Jewish anti-Zionist would be banned by any of these groups.

**MR. CARROLL:**  I think that is correct, Your Honor; that if someone disavowed anti-Zionism, it appears that for at least some of the groups that they would be able to participate in the group but we, nonetheless, think that that is discrimination; and as alleged in the complaint, we do believe it violates the equal protection clause, First Amendment --

**THE COURT:**  One step at a time.

So the second step is -- I just -- I don't understand who has been harmed in this case.

How have the plaintiffs been harmed?

Let's say you're right and, you know, it's alleged in the complaint, so I accept it as true, but, you know, the -- I can't remember -- the Queer Caucus, is that one of ones you identified as being anti-Zionist?

**MR. CARROLL:**  I'm sorry, Your Honor?

**THE COURT:**  The Queer Caucus?

**MR. CARROLL:**  That's correct, and I --

**THE COURT:**  What's it called?  What's the formal name of that group?

MR. CARROLL:  The Women of Berkeley Law School, the Queer Caucus, Asian Pacific American Law Students Association --

THE COURT:  The Queer Caucus of Berkeley, yeah.  Okay. That's in paragraph 4 of your complaint.

Okay.  Let's say the Queer Caucus of Berkeley does what you say it does, which is will not allow a pro-Zionist speaker to say anything to the group and is, you know, avowedly anti-Zionist.

How have the plaintiffs been hurt by that?

MR. CARROLL:  Well, so the plaintiffs are -- so the plaintiffs claim standing, I think, on two bases.  They claim organizational standing and associational standing.

THE COURT:  Okay.  Let's just -- stop talking like a lawyer.  Just talk to me like we're two people going over a point of law.

How have they been hurt?  That's the question.  How were they hurt?

MR. CARROLL:  Your Honor, so they have been -- the members of the organizations have been excluded from speaking at these -- or would not be invited to speak at these organizations because they hold Zionist views and won't disavow those Zionist views.

THE COURT:  But what's wrong with that?  I mean, this happens all day, every day in the United States.

For example, I just published a Second Amendment decision. You know, firearms advocacy rights are not going to invite someone to speak to them who wants to abolish the Second Amendment, and there's nothing wrong with that.  And that person who wants to abolish the Second Amendment, I don't see how, under your theory, they've been harmed just because this group will not invite them.

How does not getting -- how does not getting an invitation constitute harm?

**MR. CARROLL:**  Well, I think to the extent that it violates the Constitution, that is a harm in and of itself to the extent --

**THE COURT:**  I'm asking you:  What is the harm?  Is it financial?  Is it constitutional?  Is it statutory?

I don't -- I can't figure out what the harm is.

**MR. CARROLL:**  I think in some cases it might be financial and some cases it --

**THE COURT:**  Don't speculate.  This is all based on your complaint.  I just -- what is the harm alleged in the complaint?  If it's constitutional, tell me what the constitutional tort is.

**MR. CARROLL:**  Well, the -- I think there is a substantial dignitary harm here, Your Honor, and that is our --

**THE COURT:**  What part of the Constitution that has dignitary harm in it?

**MR. CARROLL:** Well, I think -- and to say that the constitutional violation --

**THE COURT:** Just tell me the amendment or the article. Which one says dignitary harm?

**MR. CARROLL:** I'm sorry, Your Honor?

**THE COURT:** Which article or amendment says dignitary harm? It's not in the Constitution.

**MR. CARROLL:** No, it's not a --

**THE COURT:** So what is the constitutional tort, the harm?

**MR. CARROLL:** Well, I think the harm is different from the constitutional violation that underlies the claims in the complaint. We're complaining that there is an equal protection violation and various other violations that --

**THE COURT:** I may have -- I guess I misunderstood.

I thought you said there was a constitutional harm. But you're saying there isn't one?

**MR. CARROLL:** So the fact that their constitutional rights have been denied is a harm in and of itself.

**THE COURT:** What is it? What is being -- the Queer Caucus will -- there are 310 million Americans. The Queer Caucus is not going to invite to speak, probably, 309.999 million Americans.

Under your theory, you sort of have this idea that if you're not invited to speak, you've somehow been hurt in some

actionable way, and I'm just not getting it.

MR. CARROLL:  So the University of California has an all-comers policy and a nondiscrimination policy that we think is being unequally --

THE COURT:  I know that, but why is that a federal claim, that U.C. is not enforcing its student policy?

MR. CARROLL:  Because the law school is enforcing the nondiscrimination policy and the all-comers policy with respect to certain groups; but because of these -- it's not being enforced with respect to the groups that are identified in the complaint.  And I think it goes back to because we think anti-Zionism equals -- is equivalent to anti-Semitism, they are effectively prohibiting an overwhelming number of Jewish speakers from appearing in these particular groups, having membership in these particular groups.

And, Your Honor, and this might be a good time to raise one particular issue that has come up.  There has been an anti-Semitic incident on campus that the Court may be aware of this past week, and that is something that we did want to add to an amended complaint.

In this particular case, we are past the deadline to amend the claim.  It's been more than 21 days since the motion to dismiss was filed; but it seems like, for the sake of efficiency, it makes sense to kind of get this all out on the table before an opposition is filed, before a motion to dismiss

is decided so that it's all -- you know, to the greatest extent possible done in one go, obviously not foreclosing the chance that --

THE COURT:  If you'd like to amend, I will be candid with you and I'm saying I'm just not seeing it on the facts alleged now.  I don't see harm.  I think there is -- and as a result of that, there are some technical issues about standing, but I'm just more -- just plain and simple, I don't see how anybody's been hurt in an actionable way.

I understand there's a lot of public commentary about Zionism, there's a lot of public commentary about Judaism and practitioners of the faith.  That just doesn't have anything to do with a constitutional tort that I can see or any other constitutional violation in this case.

MR. CARROLL:  And so maybe, Your Honor, maybe it --

THE COURT:  If you want to take a crack at just kind of retrying the whole thing, I certainly would be open to that, and if you want to add -- look, you can add whatever you want. I'm sure there are going to be constant anti-Semitic incidents at Cal just because of the time that we're currently in.

I don't see how the University of California at Berkeley is liable for all that.  I mean, I just -- maybe they are; but, I mean, just saying, "Oh, and, by the way, there was another attack on a Jewish student," period -- I'm not being glib but, you know, just okay.  So?

University of California at Berkeley is not liable for that.  That's a bunch of third-party people doing bad things.

MR. CARROLL:  And this is something that has only recently arisen so we haven't sort of refined the exact theory that I think we would amend the complaint to state here.

THE COURT:  All right.  Well, are you amenable to kind of taking a major crack at redoing it?

MR. CARROLL:  Yes, Your Honor.  We would like an opportunity to amend the complaint, and I think it makes sense to do that before we continue forward with --

THE COURT:  I'll just tell you, I'll just pick out one of these JAFE members.  JAFE Member 15 is a lawyer, a columnist for a newspaper, a former democratic political appointee, an instructor at an Ivy League university.  I just cannot see how that person was harmed in any cognizable way by what happened at the Queer Caucus with respect to anti-Zionism.  I just don't see it.

I mean, how does the fact that the Queer Caucus says "No Zionists allowed" impact this Member 15?  He's been waiting breathlessly for an invitation that's never going to come?  That's what I hear you saying.  I just don't -- that cannot be a constitutional tort.

MR. CARROLL:  So I think he would be otherwise eligible for an invitation that he is now sort of foreclosed from receiving because of these Zionist views that he has.

But I think -- Your Honor, I think having an amended complaint to maybe address some of the concerns that the Court has and to add additional facts, to the extent that it makes sense --

THE COURT:  Can I also suggest -- and I want to hear from Mr. Heckenlively.  I haven't given him a chance to talk yet -- this seems like something you can work out.

MR. HECKENLIVELY:  On the nature of the amendment, Your Honor?

THE COURT:  No, no.  On just negotiations with the school about, "Okay, maybe we'll tweak the policy a little differently" or "We'll take a look at how we evaluate students."  I don't know.  Something.  This is not a -- this is not an end-of-the-world, unsolvable problem.

MR. HECKENLIVELY:  Yeah, Your Honor, I agree with the comments you've made about the merits of the case.  I also agree with --

THE COURT:  I'm just -- now, remember I'm just -- I'm just responding to the complaint.  I'm not making any holdings. You may very well establish all this, but I have to say, I had some serious concerns, and that's all that I'm articulating but don't bank on that.

But, go ahead, yeah.

MR. HECKENLIVELY:  Fair enough, Your Honor.

What I would say is that this is something that the

University and the Law School have been very focused on for obvious reasons; right?  It's been in the news.  There have been a lot of situations on campus.  They're very focused on this problem, welcome to dialogue and constructive input from anyone who has solutions to move us here.

THE COURT:  Let me ask you this:  What do you want the school -- what do you understand the University to do, Mr. Carroll?

MR. CARROLL:  So the relief that we are seeking for -- seeking in our complaint is to have the all-comers policy and the nondiscrimination policy evenly enforced across these groups; and if they don't comply with that policy, then to revoke -- originally revoke academic credit, but that's something the school has already done so.  But I think even further, if they're not complying with the University policy, then they should --

THE COURT:  Let me ask you this:  Let's just say Zionism is purely a political point of view.  Purely political.  Okay?

There are some Jews who are Zionists.  There are some Jews who are anti-Zionists.  There are some Christians who are Zionists -- which is true -- and there are some Christians who are not Zionists.  In other words, it's just a purely non-religion-based, non-ethnicity-based political view.

The school can't do anything about that.  They can't snuff

out a point of view no matter how offensive they find it; right, Mr. Heckenlively?

**MR. HECKENLIVELY:**  That's right, Your Honor.  That's the fundamental problem with the --

**THE COURT:**  So your whole case is going to hinge on what you are representing to be an inextricable intertwinedness -- intertwininity -- I'm inventing words as I'm trying to struggle with this -- an ex- -- the fact that Judaism and Zionism are so tied together at the hip they can't be separated I don't think is true at all.

But, you know, if it's just a political point of view, you know you can't get that relief; right?

**MR. CARROLL:**  Well, I -- so I think a lot of it might turn on whether anti-Zionism is effectively anti-Semitism, and certainly, you know, our clients feel strongly that that is the case.  And I think there is --

**THE COURT:**  I just don't -- how are you going to prove that?

I mean, I literally drove by a synagogue in Oakland on the way to the dentist a couple of weeks ago which had a banner that said, "We are an anti-Zionist congregation."  It literally said that.  I wish I could remember the name of synagogue.

Okay.  So what are you going to do about the fact that there's no Jewish faith?  Like a Catholic church, there's no unified Jewish faith, and there are a lot of people who are

ethnically and culturally Jewish who don't practice any religious beliefs and the community is riven between Zionists and anti-Zionists:  I love Netanyahu.  I hate Netanyahu.  I think Israel should exist.  I think Israel should be abolished.

This is all -- how are you going to prove any of this?  How are you going to prove that all -- that Zionism and Judaism are equivalents?

MR. CARROLL:  And so I do want to distinguish between what we think are political viewpoints, for example, you know, policies of the Israeli government, things of that nature, as opposed to Zionism, which I don't think is necessarily coextensive.

THE COURT:  I understand, and I may be wrong, this goes back to my days when I was a graduate student doing Modern European History.  My understanding is that Zionism was born in Vienna in the early part of the Twentieth Century as a political movement.  That was the first avowedly or self-consciously Zionist movement, Theodor Herzl.  I may be wrong.  Maybe I'm wrong, but that's my recollection.  So this isn't something that goes back to the Old Testament is my point.

So how are you going to prove any of this?

MR. CARROLL:  Well, so I think, Your Honor, I'm not prepared right now to go too deep into the history of anti-Zionism, I mean, besides to say that I think there is an

extremely strong and, like Your Honor said, inextricable connection between Zionism and the Jewish -- both the Jewish faith and the Jewish identity.  And that's a large part of the complaint.

But as I think I indicated, Your Honor, I think, to the extent an amended complaint can help solve some of these concerns that the Court has, I think that's something I would like to do.

**THE COURT:**  Well, I'd like you to do that.  I'll throw out one other recollection.

You know, the temperance movement in the United States, a result of briefly an unconstitutional amendment that banned the consumption of alcohol, or sale of alcohol, I should say.  It happened at a time when there was a surge of immigrants, Catholic, impoverished, semiliterate, poor people from Southern Europe -- Italy, Greece, Mediterranean islands -- and a number of scholars at one point concluded that the temperance movement was an effort because these are wine-drinking people who practiced Catholicism typically, which is a faith that involves wine as a sacrament.  A number of scholars concluded at one point that an important part of the temperance movement was a bias and prejudice against this influx of what were considered to be dirty, undesirable Southern Europeans, my people.  Okay?  That's -- my people came over at that time.

I would never dream and I don't think any lawyer would

dream to say that the constitutional amendment discriminated against Italians because of that because there are a bunch of a Italians who didn't drink wine, who didn't practice a religious sacrament that involved wine.

In other words, it's just -- it may be said the Venn diagrams may overlap a little bit, but they're not completely coterminous.  So think of it -- think this through.

And, also, there must be something you can work on, some -- I mean, I know you see Berkeley from other contexts. The school has always been reasonable.  I don't -- I think their heart is in the right place.  I mean, they're not -- they're not looking to sponsor anti-Semitic conduct; they're just not.

So is there some way you can have some dialogue?

MR. HECKENLIVELY:  We're open to dialogue.

THE COURT:  Maybe some of the Brandeis people and a couple of U.C. people --

MR. HECKENLIVELY:  We're open to having that discussion, Your Honor.

I think the fundamental problem is we can't agree to discipline student groups for engaging in protected speech; but I think, short of that, there probably is room to have a discussion.

THE COURT:  Well, let's get -- let's -- how about this:  I would like both of you to really think about some kind

of a meeting -- okay? -- which may be just the principals.  You can say it's off the record so nobody is going to take -- I won't see it in a declaration.  There won't be any admissions.  You just have a little mothball conversation that's totally safe from litigation.  All right?  I won't -- it's me, so I will control it.  I will not allow anyone to do that.

And you just have a candid discussion saying:  Okay, Brandeis people, what is it you want us to do?

And if they say:  Well, we want you to revoke the charters of these people.

And then the school will say:  Well, you know, we can't do that because of this.

And then you just get a conversation going.

Can we do that?

**MR. HECKENLIVELY:**  That's fine with us, Your Honor.

**THE COURT:**  Who would be the right person at U.C. for that?  Is there a student organization person or a dean, a vice dean, a vice chancellor?

**MR. HECKENLIVELY:**  Right.  So it's -- it kind of depends on what the amended complaint is going to say.  Right now, it's --

**THE COURT:**  Well, you know what it's going to say.

**MR. HECKENLIVELY:**  Well, no --

**THE COURT:**  It's going to be roughly what it says now.

**MR. HECKENLIVELY:**  If that's the case, then I think

it's a law-school-focused problem, and it's probably the dean or the dean of students at the law school.

THE COURT:  The law school.  Okay.

MR. HECKENLIVELY:  But if the complaint -- this latest incident that Mr. Carroll mentioned was a main campus incident so I don't know if that changes my answer.

THE COURT:  It's still going to be the law school mainly; right?

MR. CARROLL:  I'm sorry, Your Honor?

THE COURT:  It's still going to be the law school mainly?

MR. CARROLL:  So it does apply more broadly to U.C. Berkeley, but the law school has so far been, I think, the core focus here.

THE COURT:  Okay.  That's a good idea.  So why don't you start thinking about that person at the law school.

And who would you want?  Who's your one -- is there one person at the Brandeis Center or something that you like?

MR. CARROLL:  I think I would need to find out who the appropriate person is at the Brandeis Center.  I can check that.

THE COURT:  Make it a, you know, high-level person who can have a good conversation.  Okay?

And you plan -- I'm going to make this an order.  You get them into a room in the next three weeks.  All right?

And this will be an off-the-record discussion, not to be used; nobody can take anything out of that and put it in a declaration or a pleading or summary judgment, or anything else.  All right?  This is just a frank -- what the State Department would call "frank and candid conversations."  Okay?

MR. HECKENLIVELY:  For the sake of clarity, Your Honor, can we just treat that as covered by the California mediation statute?

THE COURT:  You work out the details.  I'm the judge.  This is my rule.  I'm not going to look at it.  I'm not going to let you use it.  You want to dress it up, so that's fine, you do that.

Okay.  But just let it happen.  You two are not in the room.  I just want these two principals alone.  That's it.  Okay?

MR. CARROLL:  Thank you, Your Honor.  I understand.

THE COURT:  All right.  Let's get that done.

MR. CARROLL:  Just one housekeeping item.  With respect to the amended complaint, does it make sense to --

THE COURT:  Yeah.  How much time -- how much time would you like?

MR. CARROLL:  Would three weeks be -- would that be all right?

THE COURT:  I'll give you 30 days.  If you want to beat it, you can.  Okay?

PROCEEDINGS

And then I'm just going -- we're just going to terminate any pending motions and see where we are after that. All right?

MR. HECKENLIVELY:  All right.  Thank you, Your Honor.

THE COURT:  I think you can work this out.  I actually think you can work this out.

MR. CARROLL:  We will certainly try to do so, Your Honor.

THE COURT:  And "we" being maybe not you two but your principals.

Okay.  All right.  Thanks a lot.

(Proceedings adjourned at 11:07 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, March 8, 2024

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court