TORRIDON LAW PLLC
John V. Coghlan (admitted *Pro Hac Vice*)
    jcoghlan@torridonlaw.com
Tara Helfman (admitted *Pro Hac Vice*)
    thelfman@torridonlaw.com
1155 F Street NW
Washington, DC 20004
Telephone: (202) 249-6900
Facsimile: (202) 249-6899

THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW
Kenneth L. Marcus (admitted *Pro Hac Vice*)
    klmarcus@brandeiscenter.com
L. Rachel Lerman (State Bar No. 193080)
    rlerman@brandeiscenter.com
1717 Pennsylvania Ave., NW, Suite 1025
Washington, DC 20006
Telephone: (202) 559-9296

ELLIS GEORGE LLP
Eric M. George (State Bar No. 166403)
    egeorge@ellisgeorge.com
David J. Carroll (State Bar No. 291665)
    dcarroll@ellisgeorge.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE LOUIS D. BRANDEIS CENTER, INC.; JEWISH AMERICANS FOR FAIRNESS IN EDUCATION (JAFE),<br><br>        Plaintiffs,<br><br>        vs.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA; UNIVERSITY OF CALIFORNIA AT BERKELEY; BERKELEY LAW SCHOOL; MICHAEL DRAKE, in his official capacity as President of the University of California; CAROL T. CHRIST, in her official capacity as Chancellor of the University of California, Berkeley; BEN HERMALIN, in his official capacity as Provost of the University of California,<br><br>        Defendants. | Case No. 3:23-cv-06133-JD<br><br>The Hon. James Donato<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR:**<br><br>**1.  Violation of 42 U.S.C. § 1983 (Equal Protection Clause)**<br><br>**2. Violation of 42 U.S.C. § 1983 (Free Exercise Clause)**<br><br>**3. Violation of 42 U.S.C. § 1981 (Interference with Right to Contract)**<br><br>**4. Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.**<br><br>Trial Date:  August 11, 2025 |

2415336.1

**INTRODUCTION**

1.      This suit concerns the grossly inadequate response of Defendants to longstanding and widely-reported anti-Semitic harassment of Jewish students at the University of California Berkeley ("UC Berkeley" or the "University").  In the wake of the Hamas attacks of October 7, 2023, this longstanding anti-Semitism erupted in a series of violent attacks and public incidents that were, by the University's own repeated admissions, anti-Semitic.  Yet the University has failed to respond to the ongoing targeting and harassment in the manner required by law.  Court intervention is now needed to protect students and faculty and to end this anti-Semitic discrimination, which violates University policy, federal civil rights laws, and the U.S. Constitution.

2.      Since October 7, 2023, the deadliest day for the Jewish people since the Holocaust, Jewish students at UC Berkeley have been the targets of unrelenting harassment and physical violence, all of which has been widely publicized and is well-known to University officials. Shortly after the attacks, a Jewish student draped in an Israeli flag was attacked by two protestors who struck him in the head with a metal water bottle.  A Jewish professor on campus received an e-mail calling for his gassing and murder.  Another Jewish professor was the victim of vandalism, with graffiti messages calling him a terrorist and saying he "gets horny to genocide."  Many Jewish students are afraid to go to class.  A Jewish graduate student was the victim of a home break-in with a note left saying: "Fuck the Jews, Free Palestine from the River to the Sea."  A study surveying Jewish students at 51 campuses in the wake of the October 7, 2023, terrorist attack ranked UC Berkeley in its worst category, "Highest antisemitic hostility."  Graham Wright et al., *In the Shadow of War: Hotspots of Antisemitism on U.S. College Campuses*, MAURICE AND MARILYN COHEN CENTER FOR MODERN JEWISH STUDIES 8 (2023), https://scholarworks.brandeis.edu/esploro/outputs/report/9924312184701921.

3.      On February 26, 2024, a violent student mob succeeded in executing its plan to forcibly shut down a speaking engagement organized by Jewish students at Berkeley.  Jewish students who had assembled to hear the speaker, and the speaker himself, were evacuated by police, who were unable to prevent the mob from smashing through glass windows, forcing their

way into the event, terrorizing Jewish students, and physically assaulting them.  Students screamed for help to the police.  The police yelled to each other for help.  Both the students and the police were overwhelmed.  The mob's anti-Semitic motives were on full display, as when a rioter spat on a Jewish student and called him a "dirty Jew."

4.     The organizers of the mob—Bears for Palestine, an officially recognized student organization—made no secret of their plans or intent.  They openly advertised their plan to shut down the event.  UC Berkeley was aware of their plans.  Yet, not only did UC Berkeley fail to stop the mob from terrorizing and assaulting Jews, it has failed to take any meaningful action against Bears for Palestine since the riot.  To this day, Bears for Palestine and other groups on campus continue to target and intimidate Jewish students, forcing them to conceal their Jewish identity, seclude themselves in their dorm rooms, or take circuitous routes around campus to avoid harassment.

5.     Starting in early February, Sather Gate, a landmark that leads to the center of the UC Berkeley campus, has been the site of a blockade organized by a registered student organization.  The blockade has closed down the middle of the gate completely to foot traffic, leaving only two smaller side paths available to the University at large.  Although this blockade impedes all persons equally, Jewish students who have tried to pass have been singled out for harassment.  They have been spat at, called ethnic slurs (including "dirty Zionist"), filmed as they pass, and even followed by the organizers of the blockade.  Students have been singled out for such abuse if the protestors knew them to be Jewish or if they were wearing outward signs of their Jewish identity, such as Stars of David or yarmulkes.  As a result of this intimidation, Jewish students have often stayed home or have been forced to take alternate routes to avoid Sather Gate.  The blockade's effects have also been keenly felt by the disabled community.  One Jewish graduate student who is blind repeatedly collided with protestors and nearly fell on multiple occasions while trying to make his way through the blockade.  The University was repeatedly apprised that Jewish students are being harassed as a result of the blockade and that the disabled community's right to equal access was being denied.  While the University committed to ending the harassment and ensure freedom of access through the gate, these issues continue.

6.      Unfortunately, the harassment and obstruction that began at Sather Gate has spread. As of the filing of this Amended Complaint, student groups have occupied the area outside of Sproul Hall, an administration building on campus that houses the Registrar, Financial Aid, and other offices to which students require access.  Because of the occupation, Jewish students report being unable to access the building and being harassed when they try to do so.  One Jewish student was physically assaulted when he was observing the occupation.  Another Jewish student who was wearing a Star of David was surrounded by masked protestors, who restricted his movement while telling him that "Zionists can go back to Europe."  Despite being informed of the harassment, the University has once again failed to act.  Indeed, the occupation has grown from 50 tents as of the week of April 21 to up to at least 175 at the time of this filing. Leslie Brinkley, *UC Berkeley pro-Palestinian encampment growing larger by the day*, ABC 7 NEWS, April 30, 2024, https://abc7news.com/uc-berkeley-pro-palestine-encampment-growing-larger-by-the-day/14747741/.

7.      The post-October 7 eruption of anti-Semitic harassment was not a new development that caught the University off guard.  To the contrary, anti-Semitism has been allowed to fester and grow on campus *because* UC Berkeley has chosen for years to ignore it.  In 2016, a Brandeis University research study on anti-Semitism on college campuses found that over a third of students surveyed at UC Berkeley and three other University of California (UC) campuses perceived a hostile environment toward Jews on their campuses.  Leonard Saxe et al., *Hotspots of Antisemitism and Anti-Israel Sentiment on U.S. Campuses*, STEINHARDT SOC. RESEARCH INSTITUTE 16 (2016), https://hdl.handle.net/10192/33070.  And in 2017, Berkeley ranked fifth in a Jewish publication's list of the 40 worst colleges for Jewish students in the United States and Canada.  *The 40 Worst Colleges for Jewish Students, 2017*, THE ALGEMEINER, https://www.algemeiner.com/list/the-40-worst-colleges-for-jewish-students-2017/.  That study noted that "Berkeley has long been accused of fostering an environment that can be unfriendly to Jews and Zionists."  *Id.*

8.      That anti-Semitism has manifested in concrete ways, only some of which are outlined above.  To take another example, at least twenty-two student organizations at Berkeley

Law have for over a year been enacting and enforcing a constitutional provision or bylaw (the Exclusionary Bylaw) that confronts Jews with an unthinkable and unlawful ultimatum: disavow an integral component of your Jewish identity—Zionism—or be denied the same rights and opportunities enjoyed by other members of the campus community.  "Zionism" is a proxy term for Jews.  In the context of these bylaws (and the current environment towards Jews at UC Berkeley generally), the exclusion of Zionists is tantamount to an exclusion of Jews. The Exclusionary Bylaw requires organizations to exclude any speakers not because of what they might say or do but simply because they are Zionists—persons who support the right of Israel to exist—an integral part of Jewish identity for the majority of Jews.   Zionism is a central tenet of the Jewish faith and a recognition that the Jews are a people with an ancestral heritage rooted in the land of Israel.

9.      These bylaws—or any other mechanism—that treat Zionists in an inferior manner to non-Zionists are a guise for anti-Semitism.  This reality is evident from the post-October 7 harassment of Jews at UC Berkely, where the harassers no longer hide their anti-Jewish animus behind the "it's just anti-Zionism" pretext.  Jewish students who want to participate in the organizations that adopted the Exclusionary Bylaw have been constructively expelled or barred from joining.  And legal scholars who are ready, able, and willing to speak to these organizations are prohibited from even competing for the opportunity to do so.

10.      Although the Exclusionary Bylaw purports to target "Zionists," the message, as accurately perceived by Jewish students, is clear: Jews are not welcome.  Charlotte Aaron, Noah Cohen, Billy Malmed, Adam Pukier, *We're Jewish Berkeley Law Students, Excluded in Many Areas on Campus*, THE DAILY BEAST, Oct. 17, 2022, *available at* https://www.thedailybeast.com/were-jewish-berkeley-law-students-excluded-in-many-areas-on-campus.  Moreover, while UC Berkeley administrators have publicly acknowledged the fundamentally anti-Semitic nature of the Exclusionary Bylaw, they have continually failed to take action to address it.  To this day, student organizations on campus openly exclude Jews under the guise of excluding "Zionists."

11.      The same anti-Semitic sentiment that animates the Exclusionary Bylaw recently spread beyond the walls of the University and invaded the home of the Dean of Berkeley Law,

1  Erwin Chemerinsky.  Less than a month ago, students from Law Students for Justice in
2  Palestine—the same group responsible for drafting the Exclusionary Bylaw—disrupted a dinner
3  Dean Chemerinsky was hosting to recognize and celebrate graduating students.  The protestors
4  refused to leave when asked to do so, violating not only University policy but numerous state
5  trespass laws in the process.

6        12.     Law Students for Justice in Palestine had planned their protest in advance, making
7  no effort to disguise the anti-Semitic motives when they announced their protest on Instagram.
8  There, they posted the e-mail invitation that Dean Chemerinsky had sent to students together with
9  the dates the dinners would occur and a sign-up link to attend.  Law Students for Justice in
10 Palestine (@berkeleylawforpalestine), INSTAGRAM (Apr. 1, 2024),
11 https://www.instagram.com/p/C5OkbBTJdnC/?img_index=1.  The same post featured a gruesome
12 caricature of Dean Chemerinsky holding a blood-soaked knife and fork with the caption, "No
13 Dinner With Zionist Chem While Gaza Starves."    Jessica Costescu, *Berkeley Student Group*
14 *Shares Blood Libel Cartoon Targeting Law School Dean,* The Washington Free Beacon, April 2,
15 2024, https://freebeacon.com/campus/berkeley-student-group-shares-blood-libel-cartoon-
16 targeting-law-school-dean/.  The image invoked the ancient anti-Semitic "blood libel" that Jews
17 use the blood of non-Jewish children for ritual purposes.  *See Blood Libel,* HOLOCAUST
18 ENCYCLOPEDIA, https://encyclopedia.ushmm.org/content/en/article/blood-libel (last visited May 2,
19 2024).  As Dean Chemerinsky acknowledged in response to the image, "I never thought I would
20 see such blatant antisemitism, with an image that invokes the horrible antisemitic trope of blood
21 libel and that attacks me for no apparent reason other than I am Jewish." *Statement from Dean*
22 *Erwin Chemerinsky,* BERKELEY LAW, April 13, 2024,
23 https://www.law.berkeley.edu/article/statement-from-dean-erwin-chemerinsky/.[1]  As a result of
24 this disruption, Jewish students did not attend additional dinners that Dean Chemerinsky hosted.

25        13.     The unmistakable anti-Semitism animating this "anti-Zionist" protest was

26

27 ───────────────
   [1] Law Students for Justice in Palestine ultimately took down the blood-stained caricature,
   replacing it with an identical image of Dean Chemerinsky, this time holding clean utensils.
28

recognized by the University as well.  Defendant Drake, issuing an official statement, recognized that "[t]he individuals that targeted [Dean Chemerinsky's dinner] did so simply because it was hosted by a dean who is Jewish," and explained that the protestors' actions "were antisemitic, threatening, and do not reflect the values of this university."  Josh Kraushaar (@JoshKraushaar), X (Apr.11, 2024), https://x.com/JoshKraushaar/status/1778396582385258740.  Rich Leib, Chair of the University of California Board of Regents echoed the same statement and called the students' actions "deplorable."  Jaweed Kaleem, *'Please leave!' A Jewish UC Berkeley dean confronts pro-Palestinian activist at his home*, LOS ANGELES TIMES (Apr. 10, 2024), https://www.latimes.com/california/story/2024-04-10/uc-berkeley-law-school-dean-clashes-with-pro-palestinian-activists  ("The individuals that targeted this event did so simply because it was hosted by a dean who is Jewish. These actions were antisemitic, threatening, and do not reflect the values of this university.").

14.     As this incident and others make clear, the student groups on campus responsible for this harassment equate Zionists with Jews or, at the very least, do not differentiate between the two.  They single out Jewish students and faculty for harassment (even though non-Jews who associate with Jews may also be Zionists), and they target events organized by Jews or Jewish organizations.  As the gruesome caricature of "Zionist Chem" made clear, they targeted him not because of his views on the policies of Israel—he is a frequent critic of the current Israeli government and avowed supporter of Palestinian rights.  Rather, they targeted him because he is a Jew.  Indeed, Law Students for Justice in Palestine—an organizing force behind the protests on campus—offers a "Tool Kit" to its supporters that equates Zionists with Jews, defining Zionism as "[t]he claim that **all people worldwide who identify themselves as Jewish** belong to a 'Jewish nation . . . and that this 'nation' has an inherent right to a 'Jewish state' in Palestine."  *Sather Gate Divestment Toolkit,* Law Students for Justice in Palestine, https://docs.google.com/document/u/0/d/1YbGqSFYsHLNrp7fIX3WSXveF_4V6Ona_bcHqM9u

UEws/  (emphasis added). [2]

15.     The University has acknowledged that what is occurring on campus violates school policy.  It has acknowledged that the incursion onto a Jewish faculty member's property violated the student code of conduct.  *See* Ronald K.L. Collins, *Falsely claiming a First Amendment right at a dinner party at private home – FAN 419.1,* THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, April 12, 2024, https://www.thefire.org/news/blogs/ronald-kl-collins-first-amendment-news/falsely-claiming-first-amendment-right-dinner (statement by Dean Chemerinsky indicating that future disruptions "will be reported to student conduct and a violation of the student conduct code is reported to the Bar").  It has admitted that the blockade of Sather Gate violated the school's time, place, and manner restrictions on campus free speech.  It has acknowledged that the February 26 rioters targeted Jews, despite the fact that the University's original statement in response to the riot omitted any reference to anti-Semitism.  Dean Chemerinsky has even implicitly acknowledged that the Exclusionary Bylaw is anti-Semitic, given his recognition that Zionism is an integral part of Jewish identity for more than 90% of the Jewish students on campus.

16.     Dean Chemerinsky said it best shortly after October 7, when he remarked that "Nothing has prepared me for the antisemitism I see on college campuses now."  Erwin Chemerinsky, *Nothing has prepared me for the antisemitism I see on college campuses now,* L.A. TIMES (Oct. 29, 2023), https://www.latimes.com/opinion/story/2023-10-29/antisemitism-college-campus-israel-hamas-palestine.  Unfortunately, as evidenced by the February 26 riot, the blockade of Sather Gate, the occupation at Sproul Hall, the hijacked dinner at Dean Chemerinsky's house, and numerous other examples of anti-Semitism discussed below, things have gone from bad to worse at Berkeley.  The University's failure to address anti-Semitism has prompted the U.S. Department of Education and the House Committee on Education and the Workforce to launch

---

[2] The full LSJP definition reads as follows: "Zionism: The claim that all people worldwide who identify themselves as Jewish belong to a 'Jewish nation', although these people are citizens of many countries, and that this 'nation' has an inherent right to a 'Jewish state' in Palestine, despite the presence of the indigenous Palestinian population."  *Id.* This "definition" erases the centuries of Jewish history in the land of Israel, thereby denying an integral component of Jewish ancestral identity.

investigations into the violation of Jewish students' civil rights.  *See* Katherine Knott, *U.S. Opens Civil Rights Investigation Into UC Berkeley, 4 Others*, INSIDE HIGHER ED (Mar. 7, 2024), https://www.insidehighered.com/news/quick-takes/2024/03/07/us-opens-civil-rights-probes-uc-berkeley-four-others; Letter from Chairwoman Virginia Foxx to Carol Christ, Michael Drake, and Richard Leib (Mar. 19, 2024), https://edworkforce.house.gov/uploadedfiles/3.19.24_foxx_letter_to_uc_berkeley.pdf.

17.     The conduct of the responsible students and student organizations is not protected speech.  As Dean Chemerinsky has made clear, while "criticism of the Israeli government is not antisemitism … if you listen to what is being said on college campuses now, some of the loudest voices are not advocating for a change in Israeli policies, but are calling for an end to Israel."  Erwin Chemerinsky, *Nothing has prepared me for the antisemitism I see on college campuses now,* L.A. TIMES (Oct. 29, 2023), https://www.latimes.com/opinion/story/2023-10-29/antisemitism-college-campus-israel-hamas-palestine.  He added, "[C]alling for the total elimination of Israel is antisemitic."  *Id.*  Indeed, the students do not differentiate between Jews and Israelis.  They target both—making the environment on campus hostile for both Jews and Israelis alike.

18.     Specific instances demonstrate that Israelis are also victims of the current hate on campus.  A group of Israelis who came to observe the Sproul Hall occupation were harassed and physically assaulted.  The protestors at the occupation told the Israelis that they should "Go back to Europe!," that "Zionists [should stay] out of Berkeley!" and "We will find the Zionists and kick them out of our classes!"  Making clear that they equate Israelis with Jews (as well as Zionists), the protestors also called the Israeli students "Talmudic devils."  One of the protestors approached one of the Israeli observers who was holding an Israeli flag, grabbed the flag, and then punched the observer three times in the head.  The observer received medical care for his injuries.

19.     A visiting Israeli professor had her invitation to return and teach at the school revoked given "everything that's happening on campus."  The professor indicated that she had heard there was "enormous pressure from the faculty, especially from the furious master's degree students, not to bring anybody from Israel and not to hold courses dealing with Israel."  Yael

Nativ, *Opinion | UC Berkeley Gave in to Fear and Division When It Canceled My Invitation After October 7*, HAARETZ (Dec. 31, 2023), https://www.haaretz.com/opinion/2023-12-31/ty-article-opinion/.premium/uc-berkeley-gave-in-to-fear-and-division-when-it-canceled-my-invitation-after-october-7/0000018c-bc16-d45c-a98e-bf5e849a0000.

20.　　In short, as the Dean stated, "[t]here has been enough silence and enough tolerance of antisemitism on college campuses."  Chemerinsky, *supra.*  Plaintiffs seek relief from this Court to ensure that UC Berkeley complies with the law and its own policies to ensure that anti-Semitic discrimination—like all discrimination—is not tolerated on campus.  At the very least, the University must stop providing recognition and resources to student organizations that are openly harassing and excluding Jews and fueling further anti-Semitism.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

21.　　Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000d et. seq., 42 U.S.C. § 1981, and 42 U.S.C. § 12131 et seq.

22.　　Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction of suits brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 because the causes of action arise under the Constitution and laws of the United States.

23.　　Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, Defendants reside in the Northern District of California and may be found and served in the Northern District of California, and because a substantial part of the events, acts, or omissions giving rise to these claims arose in this District.

24.　　Pursuant to Local Rule 3-5, this action is properly assigned to either the San Francisco Division or the Oakland Division because a substantial part of the events or omissions giving rise to the claim occurred in the County of Alameda.

## PARTIES

25.　　Plaintiff The Louis D. Brandeis Center, Inc. (the Brandeis Center) is a nonprofit, non-partisan corporation established to advance the civil and human rights of the Jewish people and promote justice for all.  The Brandeis Center engages in research, education, and legal

advocacy to combat anti-Semitism on college and university campuses and in K-12, in the workplace, and elsewhere.  It empowers students by training them to understand their legal rights and educates administrators and employers on best practices to combat racism and anti-Semitism.  The Brandeis Center has expended considerable resources in responding to unlawful action by the Defendants.  It has had to redirect its limited resources and limited staff hours to counseling and advising UC Berkeley students, their parents, and professors who have experienced harassment on the basis of their Jewish identity.  Those counseling and advising efforts have included the following: assisting in the preparation of reports to campus police regarding harassment; drafting or assisting in the drafting of letters to University administration seeking help in addressing anti-Semitic activities on campus; counseling students on obtaining extensions or other accommodations necessitated by the hostile campus environment; counseling disabled students seeking accommodations due to impediments created by campus protestors; and advising students how to navigate the process of hosting speakers after a speaker invited by Jewish student groups was prevented from speaking by a heckler's veto.  The Brandeis Center has also, on occasion, expended resources to obtain the services of outside counsel in connection with the forgoing efforts.  In addition, it has had to devote substantial time and resources to requesting public documents to understand UC Berkeley's violations.  The Brandeis Center has also incurred out-of-pocket expenses to hire outside counsel to assist with the filing of a Public Records Act lawsuit after UC Berkeley failed to provide the requested documents.  Brandeis Center attorneys and staff have been diverted from other work while dealing with these matters.

26.     The Brandeis Center is also a membership organization.  Membership is open to everyone who shares the Center's mission to advance the civil and human rights of the Jewish people and to promote justice for all.  Brandeis's members include Jewish American college students, graduate and professional students, parents, alumni, faculty, and other Israeli and American individuals who have personally been aggrieved by, or have by association been impacted by, anti-Semitism.  Its members include Berkeley undergraduate, graduate, and law students, as well as Berkeley and Berkeley Law faculty.

27.     Plaintiff Jewish Americans for Fairness in Education (JAFE) is a national

membership organization that is housed within and operated by the Brandeis Center.  JAFE's mission, like that of the Brandeis Center, is to advance the civil and human rights of the Jewish people and promote justice for all; and, in particular, to eliminate anti-Semitism and discrimination in education and ensure fairness in education for Jewish, Israeli, and other Americans, through lawful means including litigation.  JAFE's members consist of Jewish American college students, graduate and professional students, parents, alumni, faculty, and other individuals who have personally been aggrieved by, or have by association been impacted by, anti-Semitism and discrimination in higher education and K-12.  JAFE has members throughout the country, including Jewish American students and professors affiliated with higher education and K-12 institutions across the United States.  JAFE's membership includes Berkeley undergraduate, graduate, and law students, as well as Berkeley and Berkeley Law faculty.[3]

28.      Brandeis and JAFE include among their members UC Berkeley students who have been harassed—both physically and verbally—by students and student organizations on campus. Members of Brandeis and JAFE were at the February 26 riot, where they were the victims of physical assault and verbal harassment.  Members of Brandeis and JAFE have been harassed at Sather Gate and Sproul Hall, forcing many to avoid these areas as they traverse campus.  A disabled member of Brandeis and JAFE has had his right to equal public access denied, as he has been unable to traverse campus safely without the risk of injury.  Members of Brandeis and JAFE include two UC Berkeley law students who were active participants in one of the student organizations that passed the Exclusionary Bylaw.  These students attended events and functions hosted by this student organization, until they were constructively expelled by the groups making clear that Jews were no longer welcome.

29.      JAFE Member #1[4] is a Jewish Ph.D. candidate in History at UC Berkeley. He is legally blind and has been harassed and obstructed by student protestors as he tries to cross

---

[3] Because of its affiliation with the Brandeis Center, members of JAFE also become members of the Brandeis Center.

[4] While all members of JAFE are also members of the Brandeis Center, for simplicity they are referred to here simply as JAFE members.

campus.  JAFE Member #1 was an attendee at the February 26 event that was violently shut down by protestors, where he needed to call on friends to help him leave after police ordered an evacuation.  He has been unable to pass through Sather Gate at times due to the ongoing blockade by student protestors without risking injury to himself.  He was recently harassed and told to go back to Europe by protestors at the Encampment currently blocking access to Sproul Hall when he walked by while wearing a Star of David.

30.     JAFE Member # 2 is an undergraduate freshman at UC Berkeley who was assaulted during the February 26 riot.  Protestors grabbed her by the neck in an attempt to break into the building where the event was to be held.  Following the event, she had nightmares and suffered trauma while crossing campus for fear of repeated harassment.

31.     Unfortunately, because of the nature of the discrimination at Berkeley, many of Brandeis and JAFE's other student members do not feel comfortable identifying themselves given the risk of retaliation.

32.     Brandeis and JAFE also include among their members legal scholars and Berkeley faculty.  JAFE members of the Berkeley faculty are subject to the same hostile environment as the students.  One member has received hate mail from students and has resigned from University positions due to the University's tolerance of anti-Semitism.

33.     The Berkeley faculty and other JAFE legal scholars who reside off campus are also denied the opportunity to speak to Legal Programs, Journals, and Groups on UC Berkeley's campus, despite being qualified, willing, and ready to do so.  Some of these members have previously given talks to student groups at Berkeley Law and have expertise in areas of the law that are germane to the student groups and to the legal services projects that have adopted the Exclusionary Bylaw.  Because Zionism is integral to these members' Jewish identity, they are prevented from competing for the opportunity to speak to the Legal Projects and Groups.  These Members are therefore denied the opportunity both to receive compensation from such speaking engagements and to promote themselves and their scholarship.  They have not made futile efforts to seek speaking invitations to groups whose Bylaws expressly preclude them from speaking.

34.     JAFE Member # 3 is a Berkeley Law Professor and one of the nation's foremost

authorities on corporate law and finance.  He is also the former head of the Chancellor's Committee on Jewish Life and, among other things, formed the Women in Business Law Initiative at the law school.  Recently, JAFE Member # 3 received hate e-mail calling for his gassing and murder.  He chose to resign from his previously held positions because of the University's failure to adequately address anti-Semitism on campus.  In addition, JAFE Member #3 would welcome the opportunity to speak about his areas of expertise with any of the Law Student groups at his University that have adopted the Exclusionary Bylaw.  But he is unable to do so because they have adopted the Exclusionary Bylaw.

35.     JAFE Member # 4 is a UC Berkeley Law Professor.  He has expertise in legal policy and criminal law, and has written recently on historic aspects of women in the criminal justice system and the privatization of prisons.  Because he is a Jewish scholar who supports Israel, he suffers dignitary harm as a result of being treated as a second-class citizen at Berkeley's campus.  JAFE Member # 4 would welcome the opportunity to speak about his areas of expertise to the law school's Community Defense Project, the Women of Berkeley, the Defenders at Berkeley, and the Contra Costa Reentry Project, but he is denied the opportunity because these groups have adopted the Exclusionary Bylaw.

36.     JAFE Member # 5 holds a full professorship in law at a private West Coast university.  This Member is a frequent lecturer at U.S. academic institutions, where he has spoken on issues relating to the Middle East and Africa, international law, and Middle Eastern law.  He is qualified, willing, and able to speak to Law School groups such as the Middle Eastern and North African Law Students Association, Law Students of African Descent, and the *Journal of Middle Eastern and Islamic Law*.  Because these groups have adopted the Exclusionary Bylaw, he is unable to do so.

37.     JAFE Member # 6 holds a full professorship in law emeritus at a public university in the Mid-Atlantic region.  His areas of expertise include constitutional law, civil liberties and international human rights.  He has written scholarly articles about issues pertaining to feminism and women's rights, gay rights, and Islam.  He has also been a frequent lecturer at various American institutions.  This Member would welcome the opportunity to speak about these topics

with Berkeley Law's Legal Services Projects, Journals, or groups such as the Women of Berkeley Law, Queer Caucus at Berkeley Law, the *Berkeley Journal of Gender, Law, and Justice*, the Berkeley Law Muslim Students Association, and the Middle Eastern and North African Law Students Association, but he is unable to do so because these groups have adopted the Exclusionary Bylaw.

38.     JAFE Member # 7 holds a full professorship and an endowed chair in law at the flagship law school of a midwestern public university system.  He is an internationally recognized expert in the areas of international law and national security law, as well as an expert on the Middle East and the Arab-Israeli conflict.  This Member would welcome the opportunity to speak about these topics with Berkeley Law Legal Services Projects, Journals, or groups, such as the Middle Eastern and North African Law Students Association and *Journal of Middle Eastern and Islamic Law*.  He is unable to do so because these groups have adopted the Exclusionary Bylaw.

39.     JAFE Member # 8 holds a full professorship and an endowed chair in law at the private law school of a midwestern private university.  This Member is a native of Latin America, has considerable expertise in international law, and would welcome the opportunity to address Berkeley Law's Legal Services Projects, Journals or groups, but he is unable to do so because these groups have adopted the Exclusionary Bylaw.

40.     JAFE Member # 9 is the chairman of a private law firm, the president of a nonprofit organization, and an accomplished international lawyer and trial attorney.  This Member, who is of African descent, is one of the few Barrister-Attorneys with full active practicing certificates in England & Wales, New York, Florida, and Washington D.C.  He has written extensively on the First Amendment and the conflict between faith-based protections and the rights of the LGBTQ community.  This Member would welcome the opportunity to speak about these topics with the Law Students of African Descent and the Queer Caucus at Berkeley Law but would be unable to do so because these groups have adopted the Exclusionary Bylaw.

41.     JAFE Member # 10 holds a full professorship of law at a public university in the Southeast and heads an academic center for the study of the Middle East and international law.  He is also a frequent lecturer at various American law schools.  He has spoken at the invitation of

student groups at Berkeley Law and other law schools.  This Member would welcome the opportunity to speak about these topics with the Middle Eastern and North African Law Students Association and the *Journal of Middle Eastern and Islamic Law*.  However, he is unable to do so because they have adopted the Exclusionary Bylaw.

42.     JAFE Member # 11 is a Clinical Professor of Law at an Ivy League Law School.  This Member's areas of expertise include securities law and the politicization of criminal law.  He has lectured at colleges and law schools on race relations, criminal trials, and the Black Lives Matter (BLM) movement and its history.  He would welcome the opportunity to speak about these topics to the Law School's Community Defense Project, the Defenders at Berkeley, Law Students of African Descent, and the Abolitionist Collective.  But he is unable to do so because they have adopted the Exclusionary Bylaw.

43.     JAFE Member # 12 holds a university professorship chair in law at a public university in the Southeast.  He is also a frequent lecturer and prolific author with expertise in constitutional law, including gender issues and evidence, as well as issues related to the Middle East.  This Member would welcome the opportunity to speak about these topics to the Law School Legal Projects and groups, including with the Women of Berkeley Law, the *Berkeley Journal of Gender, Law, and Justice*, the Middle Eastern and North African Law Students Association, the Community Defense Project, the Defenders at Berkeley, and the *Journal of Middle Eastern and Islamic Law*.  However, he is unable to do so because these groups have adopted the Exclusionary Bylaw.

44.     JAFE Member # 13 holds a distinguished university professorship at a private Northeastern law school and is a celebrated novelist, law professor, and essayist.  He lectures widely and has been an invited speaker to a student group at Berkeley Law before the Exclusionary Bylaw was adopted.  His expertise includes criminal justice.  He would welcome the opportunity to speak to any of the Legal Projects, Journals, or Groups, such as the Community Defense Project, the Contra Costa Reentry Project, or the Defenders at Berkeley, but is unable to do so because these groups have adopted the Exclusionary Bylaw.

45.     JAFE Member # 14 is the legal advisor of an independent, nonpartisan research

institute dedicated to promoting transparency and accountability of non-governmental organizations (NGOs) claiming human rights agendas.  Her areas of expertise include business and human rights, international human rights law, the laws of armed conflict, universal jurisdiction, international fact finding, NGOs, and the UN.  She has written on African law and policy.  She has accepted invitations to speak to law students at Harvard Law School, the University of Chicago, and Oxford University.  She would welcome the opportunity to speak about these topics with the Women of Berkeley Law, the *Berkeley Journal of Gender, Law, and Justice*, the Middle Eastern and North African Law Students Association, the *Berkeley Journal of African Law and Policy*, and the *Journal of Middle Eastern and Islamic Law*, but she is unable to do so because the groups have adopted the Exclusionary Bylaw.

46.     JAFE Member # 15 is a lawyer, Berkeley resident, and co-shareholder in an Oakland, California-based law firm.  This member has employee rights expertise and criminal defense experience and has frequently spoken to law students at U.S. law schools.  He has also spoken before law students in the Berkeley area.  This member's cases include an important case on behalf of Asian Americans, and he would welcome the opportunity to speak with the South Asian Law Student Association as well as the Defenders at Berkeley, the Contra Costa Reentry Project, and the Community Defense Project but is unable to do so because these groups have adopted the Exclusionary Bylaw.

47.     JAFE Member # 16 is a prominent lawyer, syndicated columnist for a major newspaper, former Democratic political appointee, a United States delegate to an international human rights organization, and an instructor at an Ivy League university.  This member has represented parties in high-profile First Amendment, corporate takeover, employment, breach of fiduciary duty, and fraud-based cases.  His areas of expertise include litigation, employment litigation, First Amendment and media, and white-collar and government enforcement.  He would welcome the opportunity to speak about these topics to the Law School's Community Defense Project, the Defenders at Berkeley, and the Abolitionist Collective.  But he is unable to do so because they have adopted the Exclusionary Bylaw.

48.     JAFE Member #17 is a Professor of Law at a private midwestern University.  Her

areas of expertise include corporate law and governance, and her work has been cited by Congress, the Securities and Exchange Commission, and the U.S. Court of Appeals for the Ninth Circuit.  She writes a column for a major business media company and provides commentary about business law on a range of media outlets.  JAFE Member # 17 would welcome the opportunity to speak about his areas of expertise with any of the Law Student groups at the UC Berkeley that have adopted the Exclusionary Bylaw.  But she is unable to do so because they have adopted the Exclusionary Bylaw.

49.     JAFE Member #18 is a legal scholar, historian, and practicing attorney who focuses on international adoption law.  She has advised families who seek to adopt from non-U.S. countries.  Her practice has included extensive work with the State Department and the Bureau of Citizenship and Immigration Services.  She also serves as the Executive Director of a non-profit organization devoted to providing research, analysis, advice and education to practitioners and the public about current legislation and practices governing domestic and intercountry adoption. JAFE Member # 16 would welcome the opportunity to speak about her areas of expertise with any of the Law Student groups at the University that have adopted the Exclusionary Bylaw.  But she is unable to do so because they have adopted the Exclusionary Bylaw.

50.     Defendant UC Berkeley is a public law school founded by the California State Assembly and operated by the State of California.

51.     Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California.

52.     Defendant Berkeley Law School is an accredited professional school at UC Berkeley run by the Regents.

53.     Defendant Michael V. Drake is sued in his official capacity as President of the University of California.  As President, Defendant Drake oversees the University of California system, including UC Berkeley.

54.     Defendant Carol T. Christ is sued in her official capacity as the Chancellor of UC Berkeley.  As Chancellor, Defendant Christ is the Chief Executive Officer for the Berkeley

1   campus.  Her duties include setting the policies, goals, and strategic direction for their campuses,

2   consistent with those of the University.

3       55.     Defendant Benjamin E. Hermalin is sued in his official capacity as Executive Vice

4   Chancellor and Provost of UC Berkeley.  Defendant Hermalin is responsible for Berkeley's day-

5   to-day operations, as well as the planning, quality, and delivery of education provided to

6   Berkeley's 27,000 undergraduate students and 10,000 graduate students.

7                           **FACTUAL BACKGROUND**

8           **A.      Defendants' Policies Prohibit Discrimination, Harassment, And Ensure**

9                   **Students Can Enter and Cross Campus Without Impediment.**

10      56.     The University of California has long and famously heralded its commitment to

11  civil rights and equal treatment of all persons regardless of race, ethnicity, national origin, gender,

12  sexual preference, faith, military status, physical disability, and/or heritage.

13      57.     The University purports to show this commitment through policies and procedures

14  that purport to punish those who would discriminate.  To that end, Section 20.00 of the UC

15  Policies Applying to Campus Activities, Organizations and Students (PACAOS) entitled "Policy

16  on Nondiscrimination," provides:

17          The University is committed to a policy against legally impermissible, arbitrary, or
            unreasonable discriminatory practices. All groups operating under the authority of The
18          Regents, including administration, faculty, student governments, University-owned
            residence halls, and programs sponsored by the University or any campus, are governed by
19          this policy of nondiscrimination. The intent of the University's policy on
            nondiscrimination is to reflect fully the spirit of the law. In carrying out this Policy, the
20          University also shall be sensitive to the existence of past and continuing societal
            discrimination.
21

22  PACAOS-20, https://policy.ucop.edu/doc/2710522/PACAOS-20 (last visited May 3, 2023).  The

23  current version of this policy was put in place on August 15, 1994.  *Id.*

24      58.     In February 2024, the University adopted a comprehensive Anti-Discrimination

25  Policy, https://policy.ucop.edu/doc/1001004/Anti-Discrimination (last visited May 3, 2024).  This

26  policy prohibits "Unfavorable Action taken because of an individual's actual or perceived

27  Protected Category."  *Id.*  Unfavorable Action is defined broadly to include:

28

Adverse or unequal treatment under University authority that unreasonably denies, unreasonably limits, or materially interferes with an individual's ability to participate in programs, activities, or employment of the University, and/or receive services, benefits, or aid of the University, unless required or authorized by law.

*Id.*

59.     Protected Category is also defined broadly.  It includes:

An identity protected by federal or state law, including the following: race, religion, color, citizenship, national or ethnic origin, ancestry, sex (including pregnancy, childbirth, lactation or related medical conditions), gender, gender identity, gender expression, gender transition, sexual orientation, physical or mental disability (including having a history of a disability or being regarded as being disabled), medical condition (cancer-related or genetic characteristics), predisposing genetic information (including family medical history), marital status, age (at least 40 years of age), or veteran or military status.

*Id.*

60.     Thus, under the Anti-Discrimination Policy, any adverse or unequal treatment of an individual based on his or her perceived race, religion, ethnicity, or national origin is prohibited.

61.     Although the policy was only adopted in February 2024, it acknowledges that "the University has addressed discrimination, harassment, and retaliation in sections of other University policies. This Policy consolidates these sections into a comprehensive Policy, regardless of an individual's affiliation with the University."  *Id.*

62.     Discrimination is also addressed by UC Berkeley's Code of Conduct.  *See* Berkeley Campus Code of Student Conduct, https://conduct.berkeley.edu/wp-content/uploads/2023/07/Code_of_Conduct-July_2023.pdf (last visited May 2, 2024).  This policy prohibits harassment that "so substantially impairs a person's access to University programs or activities that the person is effectively denied equal access to the University's resources and opportunities."  *Id.* at 21.  Like the policies above, by its terms it is to apply to protect a broad range of protected classes.  It addresses:

[C]onduct that is motivated on the basis of the person's race, color, national or ethnic origin, citizenship, sex, religion, age, sexual orientation, gender identity, pregnancy, marital status, ancestry, service in the uniformed services, physical or mental disability, medical condition, or perceived membership in any of these classifications.

*Id.*

63.     A student or organization that violates the Code of Conduct is subject to sanctions. For students, such sanctions can include (among other things) a warning, suspension, probation, dismissal, or expulsion.  *Id.* at 23-26.  Students may also be excluded from specific areas of the campus or university functions.  *Id.*  Student organizations may also be sanctioned.  They may receive warnings, be excluded from areas of the campus or university functions, or have their status as an officially recognized organization revoked.  *Id.*  Officers in those groups may also have their status revoked, and an organization may be punished where members of the organization violate the Code with the knowledge and consent of the organization's officers or acted in concert with other members of the organization.  *Id.*  These "sanctions may be enhanced for conduct motivated on the basis of [protected] classifications."  *Id.* at 21.

64.     The University also has an "all-comers" policy.  Under this policy, registered student groups may not impose membership restrictions based on categories such as race, color, national origin, and religion, among others.  Registered student groups must also pledge their commitment to "the dignity of all individuals," to free expression, and to upholding "a just community in which discrimination and hate are not tolerated." *2023-2024 New Organization Application Questions* 6, LEAD CENTER, https://docs.google.com/document/d/1dx-7-2d47wuXD-_A7PLRdloQAbdOfJHBMOA-CLc27to/edit (last visited May 3, 2024).

65.     Like many public entities, Berkeley has enacted a set of purportedly neutral time, place, and manner regulations that seek to balance the right of individuals to express themselves with the right of all to have equal access to University facilities.  As the University explains, "[t]hese regulations purport to assure the right of free expression and advocacy on the Berkeley campus, to minimize conflict between the form of exercise of that right and the rights of others in the effective use of University facilities."  Berkeley Campus Regulations § 311, https://studentaffairs.berkeley.edu/student-affairs-policies/berkeley-campus-regulations-implementing-university-policies/. ("Time, Place and Manner Policy").

66.     First among Berkeley's time, place, and manner regulations is a requirement that "[n]o person on University property or at official University functions may . . . block entrances to or otherwise interfere with the free flow of traffic into and out of campus buildings."  Berkeley

Time, Place, and Manner Policy § 321(a).

67.     This restriction is emphasized on the Berkeley Student Affairs website, which instructs students on "How to Protest Safely."  As the website explains, students are to "[a]void activity that infringes on the rights of others, such as blocking and preventing the movement of others."  *How to Protest Safely,* BERKELEY DIVISION OF STUDENT AFFAIRS, https://studentaffairs.berkeley.edu/student-affairs-policies/how-to-protest-safely/ (last accessed May 2, 2024).

68.     Unfortunately, the University has failed to enforce these policies in response to a host of anti-Semitic incidents on campus. The University's anti-discrimination policies were adopted to protect members of the University community from discrimination and harassment on the basis of actual or perceived protected categories.  But, as described in this Complaint, where the protected category is Jewish identity, the anti-discrimination policies have not been enforced.

**B.      On February 26, 2024, A UC Berkeley Student Organization Violently Shuts Down A Speaking Engagement Organized By Jewish Groups.**

69.     On February 26, 2024, Jewish students at UC Berkeley were forced to evacuate a campus theater after a riot led by Bears for Palestine, an officially-recognized undergraduate student organization, forcibly shut it down.  Emma Goss et al., *'I'm screaming for help': Jewish students face violence at UC Berkeley Israel Talk*, J. THE JEWISH NEWS OF NORTHERN CALIFORNIA (Feb. 27, 2024), https://jweekly.com/2024/02/27/im-screaming-for-help-jewish-students-face-violence-at-uc-berkeley-israel-talk/.  This riot—estimated to include at least 200 protestors—was organized by Bears for Palestine in response to Jewish student organizations on campus hosting a reserve combat officer in the Israel Defense Forces (IDF) who was deployed in Gaza.  *Id.*

70.     The speaker planned to address the current Israel/Palestine conflict.  *Id.*  His address was initially conceived as a small lecture in a classroom on campus.  *Id.*  Bears for Palestine, upon learning of the event, publicly called the speaker a "genocidal murderer" who was "invited to speak on … campus to spread settler colonial Zionist propaganda about the very genocide he has participated in."  Bears for Palestine (@bearsforpalestine), INSTAGRAM (Feb. 25, 2024), https://www.instagram.com/p/C3ytamHJyIg.  Bears for Palestine said that the speaker "has

committed crimes against humanity, is a genocide denier, and we will not allow for this event to go on." *Id.*

71.     In response to these explicit threats to shut down the event, Berkeley directed the Jewish student leaders who organized the event to move it to another location "for safety reasons." Emma Goss et al., *'I'm screaming for help': Jewish students face violence at UC Berkeley Israel Talk*, J. THE JEWISH NEWS OF NORTHERN CALIFORNIA (Feb. 27, 2024), https://jweekly.com/2024/02/27/im-screaming-for-help-jewish-students-face-violence-at-uc-berkeley-israel-talk/. Just as the University predicted, a mob arrived at the original location for the event but, upon learning quickly on social media that it had been moved, they went to the new location, smashed through two windows and a door, assaulted Jewish students, and succeeded in violently shutting the event down.

72.     Campus police at the event were quickly overwhelmed. *Id.*  Audio of the campus police scanner "revealed a chaotic situation." *Id.*  One officer remarked of the crowd, "I don't see how we're going to clear this." *Id.*  As a door was opened and protestors forced their way inside, another said "I need more people at the gate … we're going to lose this." *Id.*  Another officer yelled "We need cover!" *Id.*  Eventually, the chief of campus police got onto a public announcement system from the stage and said that the police were "asking all persons to leave." *Id.*  Those who had attended the event to hear the speaker were evacuated, while the protestors eventually "reached the stage and lobby." *Id.*  Officers reported "vandalism and windows broken." *Id.*

73.     The chaos reported by the officers matches accounts from university officials and students at the event.  Although the event was supposed to be private, Defendant Christ acknowledged that students from Bears for Palestine had "gained unauthorized entry into the building." *Id.*

74.     One female Jewish student said that the protestors initially arrived and demanded to be let into the event.  In her words, "[t]hey were surrounding the table that I was standing at, yelling and screaming.  There was spit flying left and right." *Id.*  A university administrator advised her to shut her laptop, given that the protestors were "looking at the names" on the actual

RSVP list and out of concern that they would take a photo of the students who were actually invited by the Jewish organizations to attend the event.

75.    Eventually, it became unsafe for the female student to remain outside.  She entered the event forum to try to check on the safety of her younger sister, as she heard protestors "banging on the windows and the doors" and eventually breaking the glass.  *Id.*; s*ee also* Aden Kasoi (@AdenKasoi), X (Feb. 26, 2024), https://twitter.com/adenkosoi/status/1762328205153665345/video/2.  The student then saw a door being opened by protestors who were trying to gain access.  Emma Goss et al., *'I'm screaming for help': Jewish students face violence at UC Berkeley Israel Talk*, J. THE JEWISH NEWS OF NORTHERN CALIFORNIA (Feb. 27, 2024), https://jweekly.com/2024/02/27/im-screaming-for-help-jewish-students-face-violence-at-uc-berkeley-israel-talk/.  As she tried to pull the door shut, she said that she was "screaming for help from the police" and "screaming for someone to come help me."  *Id.*  Because campus police were barricading another door, the protestors were able to "rip [her] out of the door" and she fell into the crowd, injuring her hand.  *Id.*

76.    Describing the event after the fact, the student said that, because the demonstrators had their faces covered, "it seemed like they could do whatever they wanted."  *Id.*  As she explained:

A. When I was standing out there, when they were surrounding me, and they were yelling in my face to let them in, I realized that there were no repercussions for what they were doing.  Because there's no way to identify these people . . . Something clicked in my brain.  I was like, wow, they really could do anything to anyone here—and get away with it.

*Id.*

77.    Another female Jewish student and member of JAFE was physically assaulted at the event.  The student explained that, as she was trying to shut a door to prevent protestors from coming in, she "was shoved out of the way through the strangulation of my neck."  Statement by JAFE Member #2.[5]  A police officer eventually came to help push the crowd outside, at which time she was able to "escape from the mob to be able to breathe again."  *Id.*  The student said that,

---

[5] This statement is on file with the Brandeis Center and JAFE.

afterwards, she "was hyperventilating for hours, as [she] ha[d] never been touched like that in [her] life." *Id.*  That night, the student said she "had nightmares of being stuck in the crowd with no escape" and, the following day, had to "[hold] back tears walking through Sather Gate, still uncontrollably shaking."  She added:

> My neck is sore, and I'm traumatized, not knowing when I am safe on campus, or if I'm going to be personally targeted when walking on my own, knowing that already the members of the Bears for Palestine know my face.

*Id.*

78.     A picture was posted on X showing several red marks around the student's neck. Aden Kosoi (@adenkosoi), X (Feb. 26, 2024), https://twitter.com/adenkosoi/status/1762328205153665345.

79.     Another student and member of JAFE who is legally blind was left stranded in an area unfamiliar to him after police told students to evacuate; he had to call for his friends to come help him leave safely.

80.     Jewish students at the event reported that the mob was not targeting the event because of Israeli policy, but because Bears for Palestine was either (i) blaming all Jews for the situation in Gaza or (ii) simply engaging in pure anti-Semitic hate.  One male Jewish student at the event made clear that the mob was not there to simply protest Israeli policy, but equated Jews with what was occurring.  He said that he was "personally…verbally attacked" was "called a Jew and dirty Jew," was called "A Nazi" and was "spit at…[a]ll in my face."  Goss, *supra.*   University spokesman Dan Mogulof said that "[s]everal attendees have reported to campus police that they were physically assaulted and called antisemitic slurs by the protestors."  Johanna Alonso, *Israeli Speaker Cancelled, Event Evacuated at UC Berkeley*, INSIDE HIGHER ED (Feb. 29, 2024), https://www.insidehighered.com/news/students/free-speech/2024/02/29/uc-berkeley-evacuates-event-amid-pro-palestinian-protest.

81.     Defendant Christ and Defendant Hermalin have acknowledged that students at the event were faced with "overtly antisemitic expression."  Alex Baker, *Hate crime investigation launched in connection to protest over Israeli speaker at UC Berkeley*, KRON4 (Mar. 4, 2024).

1   The UC Berkeley Police Department is investigating the incidents as hate crimes.  *Id.*

2         82.    The Chairman of the Chancellor's Advisory Committee on Jewish Student Life and

3   Campus Climate, Ethan Katz, conceded it was "unequivocally" clear that "Jews were targeted at

4   this event and antisemitic actions occurred, including reported physical assaults and ethnic slurs."

5   *See* Exhibit A, Letter from Ethan Katz to Chancellor Carol Christ (March 3, 2024).  In a letter to

6   Defendant Christ, Professor Katz asked that the University issue a public statement "as soon as

7   possible" acknowledging that the event was anti-Semitic and suspending Bears for Palestine.  *Id.*

8   Professor Katz also asked that the speaker whose event was shut down be invited back to campus

9   "with a guarantee of robust security, and a prominent venue in which to speak."  *Id.*  As Professor

10  Katz explained, "[i]nviting the speaker back and giving him a major platform and ample security

11  is something for which there is precedent at Berkeley."  *Id.*

12        83.    The University failed to provide adequate safety protections to the Jewish

13  organizers and participants despite being fully on notice of the Bears for Palestine's intentions to

14  shut down the event.  Nor has it taken effective action after the event.  As of the filing of this

15  Amended Complaint, Bears for Palestine has not been suspended or disciplined.

16        **C.**    **A UC Berkeley Student Organization Targets And Disrupt A Dinner**

17                  **Hosted By A Jewish Faculty Member.**

18        84.    On March 27, 2024, Dean Chemerinsky sent an e-mail to the class of third-year law

19  students at Berkeley Law, inviting them to come to one of three scheduled dinners at his home to

20  celebrate their accomplishments.  Dean Chemerinsky's e-mail made no mention of the situation in

21  Gaza or the Israeli-Palestinian conflict.

22        85.    Upon learning of the dinners, members of Law Students for Justice in Palestine

23  ("LSJP"), a registered student organization at Berkeley Law, targeted Dean Chemerinsky on

24  Instagram, posting a caricature of the Dean with a fork and knife in his hands with the caption "No

25  Dinner With Zionist Chem While Gaza Starves."  *See* Law Students for Justice in Palestine

26  (@berkeleylawforpalestine), Instagram (Apr. 1, 2024),

27  https://www.instagram.com/p/C5OkbBTJdnC/?img_index=1.

28        86.    The caricature originally had blood covering the fork and knife held in

Chemerinsky's hands.  Jessica Costescu, *Berkeley Student Group Shares Blood Libel Cartoon Targeting Law School Dean,* The Washington Free Beacon (Apr. 2, 2024), https://freebeacon.com/campus/berkeley-student-group-shares-blood-libel-cartoon-targeting-law-school-dean/.  This image invokes the anti-Semitic trope of the "blood libel," the false allegation that Jews use the blood of non-Jewish children for ritual purposes.  *See Blood Libel,* HOLOCAUST ENCYCLOPEDIA, https://encyclopedia.ushmm.org/content/en/article/blood-libel (last accessed May 2, 2024).  The caricature was later removed and replaced with one that did not have blood on the fork and knife.

87.     As Dean Chemerinsky said in response to the image, "I never thought I would see such blatant antisemitism, with an image that invokes the horrible antisemitic trope of blood libel and that attacks me for no apparent reason other than I am Jewish."  *Statement from Dean Erwin Chemerinsky,* BERKELEY LAW (Apr. 13, 2024), https://www.law.berkeley.edu/article/statement-from-dean-erwin-chemerinsky/.

88.     Although their public Instagram post encouraged individuals to boycott Dean Chemerinsky's dinners, a group of LSJP students decided to attend and disrupt the first of these dinners instead.  While the Dean and his wife were entertaining their guests, a group of about ten or eleven students came for the purpose of staging a protest.  *Id.*  One student obtained a microphone and began making a speech to her captive audience.  Steve McGuire (@sfmcguire), X (Apr. 11, 2024), https://twitter.com/sfmcguire79/status/1778390157277774052.

89.     Dean Chemerinsky and his wife immediately approached the student and asked her to stop and leave their private property.  *Id.*  The student refused to do so but continued speaking.  *Id.*  An attempt was made to take away the student's microphone, but the student and her colleagues still refused to leave.  *Id.*  After repeated requests, the students finally left.  *Id.*

90.     In order to avoid repeat occurrences at the following two scheduled dinners, Dean Chemerinsky and his wife were forced to obtain security.  *See* David Lat, *A Tale of Two Protests,* Original Jurisdiction (Apr. 11, 2024), https://davidlat.substack.com/p/protest-berkeley-law-dean-erwin-chemerinsky-home (earlier statement of Dean Chemerinsky noting that security would be present at future dinners).

91.     Defendant Drake, issuing an official statement, recognized that "[t]he individuals that targeted this event did so simply because it was hosted by a dean who is Jewish," and explained that their actions "were antisemitic, threatening, and do not reflect the values of this university."  Josh Kraushaar (@JoshKraushaar), X (Apr.11, 2024), https://x.com/JoshKraushaar/status/1778396582385258740.  Rich Leib, chair of the University of California Board of Regents echoed the same statement and called the students' actions "deplorable."   Jaweed Kaleem, *'Please leave!' A Jewish UC Berkeley dean confronts pro-Palestinian activist at his home*, LOS ANGELES TIMES (Apr. 10, 2024), https://www.latimes.com/california/story/2024-04-10/uc-berkeley-law-school-dean-clashes-with-pro-palestinian-activists ("The individuals that targeted this event did so simply because it was hosted by a dean who is Jewish. These actions were antisemitic, threatening, and do not reflect the values of this university.").

92.     Dean Chemerinsky has stated publicly that he "strongly oppose[s] the policies of the Netanyahu government, favor[s] full rights for Palestinians, and believe[s] that there must be a two-state solution."  Erwin Chemerinsky, *Nothing has prepared me for the antisemitism I see on college campuses now,* L.A. TIMES (Oct. 29, 2023), https://www.latimes.com/opinion/story/2023-10-29/antisemitism-college-campus-israel-hamas-palestine.  But his support for Palestinian students did not prevent him from being a target of harassment.  Instead, the students targeted "Zionist Chem" because he was Jewish.  Yet, as of this time, no action has been taken against LSJP in response to the event.

**D.     Sather Gate Is Blockaded By Anti-Semitic Protestors.**

93.     Beginning in early February, students from a registered student organization on campus began blocking access to Sather Gate, a famous landmark on Berkeley's campus.  Alex N. Gecan, *Jewish students at UC Berkeley demand greater protections from university*, BERKELEYSIDE, Mar. 11, 2024.  The large, middle portion of the gate has been entirely blocked off with either yellow police tape or a large banner, completely preventing any foot traffic from passing through.  Only the sides of the gate, which are significantly smaller than the middle, remain partially open.  Access through the sides of the gate has been largely restricted due to the

high volume of traffic.  On February 26, 2024, the protestors hung a banner saying "Flood Sather Gate," ostensibly referencing the Hamas codename for the October 7 attacks, Operation Al-Aqsa Flood.  Daniel J. Solomon, *Opinion*, *Mob Violence at Berkeley Shows Free Speech Doesn't Exist for Zionists,* THE JEWISH NEWS OF NORTHERN CALIFORNIA (Feb. 27, 2024), https://jweekly.com/2024/02/27/mob-violence-at-uc-berkeley-shows-free-speech-doesnt-exist-for-zionists/.

94.     Although all members of the Berkeley community have had their travel through Sather Gate impeded, the situation has been worse for Jewish students.  As they attempt to pass by the gate, Jewish students have been frequently harassed on the basis of their Jewish identity by the organizers of the protest who stand by the sides of the gates.  Those organizers have called Jewish students walking by ethnic slurs, including "dirty Zionist."  The organizers often yell at Jewish students that they "have blood on their hands."  The organizers have also taken out their phones and filmed Jewish students as they cross through, sometimes stating that the filming is part of their process of "identifying Zionists."  Some Jewish students have even been followed and filmed after they have crossed through the gates.  Non-Jewish students have not been subjected to the same treatment.

95.     The demonstrators at Sather Gate do not inquire whether passersby are Zionists before hurling calls of "dirty Zionist" at them.  Rather, students singled out for such abuse have been those whom the protestors know to be Jewish and those wearing outward signs of their Jewish identity, such as Stars of David or yarmulkes.  Non-Jewish students are spared this abuse, demonstrating that "Zionist" is merely a proxy for "Jew" in the minds of the harassers.

96.     One Jewish student and member of JAFE is legally blind and has had to find alternate paths to class, given the degree to which the blockade restricted his movement.  His disability has led him to collide with others as he tries to make his way through the sides of the gate.  That student informed the University of the challenges he was facing as a result of the blockade and that the University was failing to comply with disability laws.  In response, the student was told that he could take an alternative path that led uphill and requires him to ascend a flight of stairs.  Of course, as the U.S. Court of Appeals for the Ninth Circuit has observed,

"[o]bstructed sidewalks exclude disabled persons from ordinary communal life and force them to risk serious injury to undertake daily activities." *Cohen v. City of Culver City*, 754 F.3d 690, 700 (9th Cir. 2014).

97.     In addition, the organizers of the blockade have at times continuously played a ten-minute amplified audio recording on repeat.  Lea Loeb, *In wake of chaos, UC Berkeley Jewish students feeling demoralized, angry*, THE JEWISH NEWS OF NORTHERN CALIFORNIA (Mar. 6, 2024), https://jweekly.com/2024/03/06/in-wake-of-chaos-uc-berkeley-jewish-students-feeling-demoralized-angry/.  That audio "features a continuous drone sound, the voices of several people purporting to be besieged Gazans and a mock Israeli announcing that bombs will be dropped, followed by the sound of an explosion and screaming." *Id.*

98.     On March 11, 2024, Jewish students held a peaceful protest to the blockade and the University's failure to take action to respond to it.  Gloria Rodriguez and Leslie Brinkley, *UC Berkeley Jewish students successfully march without confrontation*, ABC NEWS 7 (Mar. 11, 2024), https://abc7news.com/uc-berkeley-jewish-students-march-sather-gate/14514475.  In their protest, "the Jewish students marched onto Sproul Plaza and instead of passing through Sather Gate and past the banner, they avoided a confrontation by literally fording the creek to get to the other side on a foot path." *Id.*  In response to the peaceful march, the protest organizers began handing out flyers, noting that the Jewish students who organized the rally were actually "an outside Zionist organization known for its Islamophobic and anti-Palestinian rhetoric." *See* Exhibit B, Sather Gate Flyer.  To clear up any doubt that they equated "Zionists" with "Jews," the flyer also explained that the purpose of their harassment was to cause "the discomfort of Zionists." *Id.*

99.     The University admitted that this blockade violates its Time, Place, and Manner policy.  Specifically, in a release, the University explained that it has "been making efforts to end those aspects of the nonviolent protest at Sather Gate *that violate those [time, place, and manner] restrictions*."  Dave Pehling, *Jewish UC Berkeley students hold campus demonstration over violent pro-Palestinian counter protest*, CBS NEWS BAY AREA (Mar. 11, 2024), https://www.cbsnews.com/sanfrancisco/news/jewish-uc-berkeley-students-hold-on-campus-demonstration-over-violent-february-counter-protest/ (emphasis added). Indeed, University

spokesperson Dan Mogulof stated that "The banner is up and it too represents a violation of time, place and manner rules."  He explained, however, that the University chose not to enforce its own rules because "we assessed that using law-enforcement to clear it would create turmoil." Gloria Rodriguez and Leslie Brinkley, *UC Berkeley Jewish students successfully march without confrontation,* ABC 7 NEWS (Mar. 11, 2024), https://abc7news.com/uc-berkeley-jewish-students-march-sather-gate/14514475/.

100.    The University recently committed to posting monitors at the gate to ensure that the harassment is halted and reporting any violations to the police.  However, the University has not indicated that it will take any action against the students who violate University policy to harass Jews or revoke the recognized status of the groups responsible for the blockade.  And students who have passed through Sather Gate since the University's promise to add monitors have reported that those monitors never appeared.

### E.      Sproul Hall Is Blocked By Anti-Semitic Protestors.

101.    Unfortunately, the harassment and obstruction that began at Sather Gate has spread. On or about April 22, 2024, student groups began occupying the area outside of Sproul Hall, an administration building on campus that houses the Registrar, Financial Aid, and other offices to which students require access.  Maya Mirsky, *UC Berkeley's pro-Palestinian tent camp joins others across nation,* THE JEWISH NEWS OF NORTHERN CALIFORNIA, April 25, 2024; https://jweekly.com/2024/04/25/uc-berkeleys-pro-palestinian-tent-camp-joins-others-across-nation/.  Within a matter of days, what began as a handful of tents had mushroomed to an occupation of about 70 tents.  *Id.*  A week later, that number had grown to 175 tents.  Leslie Brinkley, *UC Berkeley pro-Palestinian encampment growing larger by the day*, ABC 7 NEWS, April 30, 2024, https://abc7news.com/uc-berkeley-pro-palestine-encampment-growing-larger-by-the-day/14747741/.

102.    Because of the occupation, Jewish students report being unable to access Sproul Hall and being harassed when they try to do so.  For example, one JAFE member who is a graduate student at Berkeley attempted to walk through the occupation to gain access to Sproul Hall while visibly wearing a Star of David.  He was quickly surrounded by masked demonstrators

and followed as he attempted to walk among the tents.  During a tense verbal confrontation, a masked, hooded demonstrator told the JAFE member, "Go back to Europe.  Zionists can go back to Europe . . . Go back to freaking Germany," all while obstructing the JAFE member's path with a Palestinian flag.  An unmasked demonstrator intervened and told the JAFE member, "We don't want you in here," and repeatedly ordered him to leave—again, all the while obstructing his path so he could *not* leave the encampment.

103.    In another instance, a masked demonstrator confronted a different Jewish student and JAFE member who was observing the occupation by following him, pushing him, and then punching him in the face.

104.    The harassment at Sproul Hall has targeted Israelis as well as Jews.  On May 1, a group of Israelis went to observe the protest, displaying the Israeli flag and singing the Israeli national anthem as they approached from a safe distance.  The protestors at the occupation yelled at the Israeli students that they should "Go back to Europe!," that "Zionists [should stay] out of Berkeley!" and "We will find the Zionists and kick them out of our classes!"  Making clear that they equate Israelis and Zionists with Jews, the protestors also called the Israeli students "Talmudic devils."

105.    One of the protestors approached one of the Israeli observers, who is a member of JAFE and was holding an Israeli flag. The protestor grabbed the JAFE Member's flag and then punched him three times in the head.  The JAFE Member received medical care for his injuries.

106.    The students organizing the occupation at Sproul Hall are the same ones who targeted Dean Chemerinsky as a Zionist and disrupted his celebratory dinner.  Indeed, the student who grabbed a microphone and gave a speech at Dean Chemerinsky's dinner is also the student who is communicating to the public the demands the group is making of the University.  *See* Jose Martinez, *Pro-Palestinian demonstrators at UC Berkeley demand action from university*, CBS News Bay Area, April 26, 2024, https://www.cbsnews.com/sanfrancisco/news/pro-palestinian-demonstrators-uc-berkeley-demand-action-university/.

107.    Despite the University's assurance that "they are observing the demonstration," *id.*, and have received reports of harassment from students, those students who have been harassed

1  report that there are no police officers or university observers at the occupation.  No disciplinary

2  action has been taken against the groups who have organized the event and are harassing Jews.

### F.    Jewish Students Are Attacked And Threatened Following The October 7, 2023 Hamas Attacks.

5  108.    In the days following October 7, 2023—the date that, in President Biden's words,

6  "[t]he terrorist group Hamas … slaughtered … over 1,300 people" and "committed evils … and

7  atrocities that make ISIS look somewhat more rational"—the anti-Semitic atmosphere on

8  Berkeley's campus ignited.  *Remarks by President Biden and Prime Minister Netanyahu of Israel*

9  *Before Bilateral Meeting*, THE WHITE HOUSE (Oct. 18, 2023),

10  https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/10/18/remarks-by-president-

11  biden-and-prime-minister-netanyahu-of-israel-before-bilateral-meeting-tel-aviv-israel/.

12  109.    While the civilized world responded with horror and grief, many students at UC

13  Berkeley celebrated this twenty-first century pogrom with harassment targeting Jewish students,

14  harassment that often turned violent.  On October 16, 2023, a Jewish student was attacked during

15  an anti-Israel rally after protestors attempted to steal an Israeli flag he was holding.

16  StopAntisemitism (@stopantisemites), X (Oct. 19, 2023, 9:06 PM),

17  https://twitter.com/StopAntisemites/status/1715172700631507345.  According to Jewish students

18  on campus, the University has failed to investigate the incident as a hate crime.  March 19, 2023

19  Letter from Chairwoman Virginia Foxx to Carol Christ, Michael Drake, and Richard Leib at 3-4,

20  https://edworkforce.house.gov/uploadedfiles/3.19.24_foxx_letter_to_uc_berkeley.pdf.

21  110.    Two students described pro-Palestinian protesters disrupting a gathering by Jewish

22  students to pray and deal with the shock of the Hamas attack.  Both students stated that the school

23  does so little to protect Jewish students, it feels as if the school were condoning anti-Semitism.

24  They added that officials at the university display a "general disregard" for Jewish students.

25  111.    On October 19, 2023, a Jewish professor and member of JAFE received an

26  antisemitic e-mail at his university account with the subject line "You are a dirty Jew."  Foxx

27  Letter at 4.  The e-mail stated, "[i]f the Holocaust were happening right now, you'd be the first one

28  to be gassed."  *Id.*

112. On October 25, 2023, a Jewish undergraduate draped in an Israeli flag was set upon by two protesters, who struck him in the head with his own metal water bottle after he dropped it trying to evade them. The incident was caught on video and publicly reported. Emily Raguso, *Robbery attempt of Israeli flag at UC Berkeley rally for Palestine*, BERKELEY SCANNER (Oct. 25, 2023), https://www.berkeleyscanner.com/2023/10/25/uc-berkeley-crime/uc-berkeley-robbery-rally/.

113. On November 17, 2023, a Berkeley instructor used the majority of his computer science class to embark on an anti-Israel rant, with up to 1,100 students held as his captive audience. Hannah B. Schlacter, *Statement of Hannah B. Schlacter: Antisemitism at Post Secondary Institutions: Bipartisan Roundtable Before the H. Comm. on Ed.& the Workforce*, 118th Cong. 6 (Feb. 29, 2024), https://edworkforce.house.gov/uploadedfiles/022924_schlacter_testimony-updated.pdf ("Schlacter Statement").

114. On December 1, 2023, Jewish professor Ron Hassner was targeted with vandalism, with graffiti on campus stating "Ron Hassner gets horny to genocide," and "Prof Hassner lowkey a terrorist." March 19, 2023 Letter from Chairwoman Virginia Foxx to Carol Christ, Michael Drake, and Richard Leib at 4, https://edworkforce.house.gov/uploadedfiles/3.19.24_foxx_letter_to_uc_berkeley.pdf. The graffiti listed Professor Hassner's e-mail address. *Id.*

115. On December 7, 2023, a Jewish graduate student's home was broken into and the student was robbed, while a note was left that read "Fuck Jews. Free Palestine from the river to the sea." Alex N. Gecan, *Jewish students at UC Berkeley demand greater protections from university*, BERKELEYSIDE, Mar. 11, 2024; Schlacter Statement at 7. While an e-mail sent the following day identified the event as a potential hate crime, it did not describe it as anti-Semitic in nature. *Id.* By contrast, similar communications sent by the university about hate crimes towards other protected groups provided the nature of the alleged hate crimes. *Id.*

116. The hostile environment on campus has also affected Israelis. A visiting Israeli professor and Member of Brandeis had her invitation to return and teach at the school revoked

given "everything that's happening on campus."  The professor indicated that she had heard there was "enormous pressure from the faculty, especially from the furious master's degree students, not to bring anybody from Israel and not to hold courses dealing with Israel."  Yael Nativ, *Opinion / UC Berkeley Gave in to Fear and Division When It Canceled My Invitation After October 7*, HAARETZ (Dec. 31, 2023), https://www.haaretz.com/opinion/2023-12-31/ty-article-opinion/.premium/uc-berkeley-gave-in-to-fear-and-division-when-it-canceled-my-invitation-after-october-7/0000018c-bc16-d45c-a98e-bf5e849a0000.

117.     As Defendant Michael V. Drake acknowledged shortly after the October 7 attacks, "[s]ome [students] feel unsafe leaving their dorm rooms."  UC President Michael V. Drake, M.D., Opening Remarks at November 15 Regents Meeting (Nov. 15, 2023), https://www.universityofcalifornia.edu/press-room/uc-president-michael-v-drake-md-opening-remarks-november-15-regents-meeting. These students had good reason.  The University's response to October 7, as well as its response to prior incidents of anti-Semitism, gave them little confidence that Defendants would protect them from the anti-Semitic rallies and mob violence, which took place in Berkeley's main throughfares.

> **G.     Legal Services Projects And Registered Student Groups At Berkeley Law Adopt An Anti-Semitic Bylaw That Excludes "Zionist" Speakers And Silences Jewish Students, Faculty, And Other Members Of The Berkeley Community Who Support The Jewish State Of Israel.**

118.     LSJP's disruption of Dean Chemerinsky's dinner is only the latest in a pattern of anti-Semitic actions.  In August 2022, LSJP amended its constitution to include a bylaw that discriminates against the Jewish community by providing that the student group "will not invite speakers that have expressed and continue to hold views or host/sponsor/promote events in support of Zionism[.]"  *See* LSJP Const., UNIV. OF CAL. BERKELEY, https://callink.berkeley.edu/organization/lsjp (last visited Nov. 27, 2023).  The LSJP Constitution reads, in pertinent part:

> In the rejection of colonialism, imperialism, and other types of oppression, LSJP is dedicated to wholly boycotting, sanctioning, and divesting funds from institutions,

organizations, companies, and any entity that participated in or is directly/indirectly complicit in the occupation of the Palestinian territories and/or supports the actions of the apartheid state of Israel. Furthermore, in the interest of protecting the safety and welfare of Palestinian students on campus, LSJP will not invite speakers that have expressed and continued to hold views or host/sponsor/promote events in support of Zionism, the apartheid state of Israel, and the occupation of Palestine. To ensure that solidarity is practiced both in theory and in practice, LSJP members agree to participate in a "Palestine 101" training held by the Law Students Justice for Palestine executive board to learn ways to create a safe and inclusive space for Palestinian students and students that are in the support of the liberation of Palestine, as well as engaging in the BDS movement in the principled manner Palestinians are asking for.

119.    A Berkeley law student and self-proclaimed author of the LSJP amendment (*e.g.,* the Exclusionary Bylaw) explained in a public webinar that the ban on Zionist speakers is to be read as a declaration that, "We stand against white supremacy and colonialism," and that only speakers who agree that Israel is a "racist" and "colonial" endeavor may be invited to speak to Law School Group members.  *See* Foundation of Middle East Peace, The Berkeley LSJP Bylaw and Its Aftermath, YOUTUBE (March 6, 2023), https://www.youtube.com/watch?v=7oHIyCpgCJ8.

120.    Dylan Saba, an attorney holding himself out as counsel for LSJP, has admitted that the marginalization and exclusion of Jewish students is both an intended and acceptable consequence of the Exclusionary Bylaw.  His clients, he explained, are "are trying to build a mass movement" against Israel and are not interested in alleviating "the discomfort of Zionist students." To the contrary, he stated, "it is good for people like that to be uncomfortable."  *See* Peter Beinart with Dylan Saba & Ethan Katz on the Controversy About Zionist Speakers at Berkeley Law, YOUTUBE (January 6, 2023), https://www.youtube.com/watch?v=RuDmyoO7-Zk.

121.    Following its own adoption of the Exclusionary Bylaw, LSJP circulated it to other student groups and Legal Services Projects at Berkeley Law, urging them to amend their own constitutions to include the Exclusionary Bylaw.  Berkeley LSJP (@berkeleylawforpalestine), INSTAGRAM (Aug. 21, 2022), https://www.instagram.com/p/Chh_43tpLnm/?igshid=YmMyMTA2M2Y=.  Following this request, at least 23 organizations at Berkeley Law have adopted the Exclusionary Bylaw or a substantially similar version of it to date.

122.     The Constitution of the *Berkeley Journal of Gender, Law & Justice* went even further, preventing Zionists from publishing on its pages.  It was amended to read, in pertinent part:

> In the rejection of colonialism, imperialism, and other types of oppression, BGLJ is dedicated to wholly boycotting, sanctioning, and divesting funds from institutions, organizations, companies, and any entity that participated in or is directly/indirectly complicit in the occupation of the Palestinian territories and/or supports the actions of the apartheid state of Israel. . . Furthermore, in the interest of protecting the safety and welfare of Palestinian students on campus, ***BGLJ will not invite speakers or publish pieces by authors that have expressed and continued to hold views or host/sponsor/promote events in support of Zionism, the apartheid state of Israel, and the occupation of Palestine.***

Bylaws (current through July 10, 2023), Art. 4.4(a)-(b), UNIV. OF CAL. BERKELEY, https://callink.berkeley.edu/organization/gaberkeleyjournalofgenderlawandjustice (last visited Nov. 27, 2023) (emphasis added).

123.     Student leaders in any Legal Services Project or Group wishing to join this "movement" are required to "participate in a 'Palestine 101' training held by the Law Students Justice for Palestine[.]"  *See, e.g., id* at Art. 4.4(c).  They are also required to participate actively in BDS, a movement that seeks the elimination of the Jewish State.  *Id.*

124.     Other than LSJP, none of the Legal Services Projects or Groups has a mission or purpose that is related to Zionism, Israel, or the Israeli-Palestinian conflict.

125.     According to students who participated in the Palestine 101 training held by LSJP, "[t]he presenters equated Zionism with imperialism, ethnic erasure, and colonialism."  Charlotte Aaron, Noah Cohen, Billy Malmed, Adam Pukier, *We're Jewish Berkeley Law Students, Excluded in Many Areas on Campus*, DAILY BEAST (Oct. 17, 2022), https://www.thedailybeast.com/were-jewish-berkeley-law-students-excluded-in-many-areas-on-campus.  The "main takeaway" from the presentation was that "Israel is an illegitimate state that does not have a right to exist" and the "only option to protect Palestinian students is to exclude Zionists and denounce Zionism."  *Id.*

126.     As noted above, LSJP equates Zionists with Jews, or, at the very least, does not differentiate between the two.  In a "Tool Kit" the group offers for its supporters, it defines Zionism as "[t]he claim that ***all people worldwide who identify themselves as Jewish*** belong to a

1  'Jewish nation.'[6]

2  https://docs.google.com/document/u/0/d/1YbGqSFYsHLNrp7fIX3WSXveF_4V6Ona_bcHqM9u

3  UEws/mobilebasic?pli=1 (emphasis added).  The repeated targeting of Jews by this group—

4  including most recently Dean Chemerinsky, a vocal supporter of Palestinian rights—demonstrates

5  that LSJP's harassment of Zionists is meant to target Jews.

6       127.    But even if the students were not simply using "Zionist" as a proxy for "Jew," their

7  actions would still be anti-Semitic.  For most Jews, Zionism is not a viewpoint. It is not an

8  opinion.  As the Anti-Defamation League (ADL) explains, "Zionism is the movement for the self-

9  determination and statehood for the Jewish people in their ancestral homeland, the land of Israel."

10  *Zionism*, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/glossary-term/zionism (last

11  visited Nov. 27, 2023).  Inherent in Zionism is recognition of the Jews' ancestral connection to the

12  land of Israel.  *See also Zionism*, OXFORD REFERENCE,

13  https://www.oxfordreference.com/display/10.1093/oi/authority.20110803133512904 (last visited

14  Nov. 27, 2023) (Zionism is "a movement for (originally) the re-establishment and (now) the

15  development and protection of a Jewish nation in what is now Israel.").

16       128.    Dean Chemerinsky himself has stated, "For many Jews, Zionism is a core

17  component of their identity and ethnic and ancestral heritage."  Academic Engagement Network,

18  *U.C. Berkeley School of Law Faculty Statement in Support of Jewish Law Students*,

19  https://docs.google.com/document/d/1BiOeLJSG7lrbh9DSkvxsYRebE6Ck8a0rZaeBWNtjLPY/ed

20  it (last visited Nov. 27, 2023).  Accordingly, he, like many other Jews, experienced the "No

21  Zionist Speakers" policy "as antisemitism because it denies the existence of the state of Israel, the

22  historical home of the Jewish people."  *Id.*  In the wake of the bylaw's adoption, Dean

23  Chemerinsky explained that, "to say that anyone who supports the existence of Israel—that's what

24  you define as Zionism—shouldn't speak would exclude about, I don't know, 90 percent or more

25  of our Jewish students."  Gabe Stutman, *Several Berkeley Law student groups adopt 'no Zionist*

26  *speakers' rule*, JEWISH NEWS OF NORTHERN CALIFORNIA (Aug. 29, 2022),

27

28

---

[6] For the full LSJP definition, see footnote 2, *supra*.

https://jweekly.com/2022/08/26/several-berkeley-law-student-groups-adopt-no-zionist-speakers-rule/.

129.   The International Holocaust Remembrance Alliance ("IHRA")—whose member states include the United States—recognizes that Zionism (recognition of the ancestral connection of the Jewish people to Israel) cannot be separated from the identity of most Jews.  On May 26, 2016, the IHRA adopted a working definition of anti-Semitism (the Definition) that covers acts "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor."  *What is antisemitism?*, INT'L HOLOCAUST REMEMBRANCE ALL., https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism (last visited Nov. 27, 2023).

130.   The IHRA Definition has been adopted or endorsed by 43 United Nations (UN) member states, including the United States.  *Who has adopted the working definition of antisemitism?*, INT'L HOLOCAUST REMEMBRANCE ALL., https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism/adoption-endorsement (last visited May 3, 2024).  Over a thousand governmental and non-governmental organizations have likewise adopted the definition.  Zvika Klein, *More than 1,000 global entities adopted IHRA definition of Antisemitism*, JERUSALEM POST (Jan. 17, 2023), https://www.jpost.com/diaspora/antisemitism/article-728773.

131.   The result of the amended constitutions and the Palestine 101 training was predictable.  Jewish law students chose not to join student groups that adopted the Exclusionary Bylaw and whose leaders attended the Palestine 101 training.  As several law school students explained, "No organization has said 'Jews are not welcome,' but in practice, these by-laws and the training say exactly that.  Student leaders now accept the exclusion of Jews because of an aspect of their identity.  There is tolerance to marginalize us because of our faith."  Charlotte Aaron, Noah Cohen, Billy Malmed, Adam Pukier, *We're Jewish Berkeley Law Students, Excluded in Many Areas on Campus*, THE DAILY BEAST, Oct. 17, 2022, https://www.thedailybeast.com/were-jewish-berkeley-law-students-excluded-in-many-areas-on-campus.

132.    Law School groups who amended their constitutions to add the Exclusionary Bylaw have marginalized Jewish students for whom Zionism is integral to their identity and effectively excluded Jewish members of the Berkeley community from participating in group activities in violation of the all-comers policy.  As a result, the Exclusionary Bylaw deprives them of opportunities for career advancement, from serving in leadership roles or from fully participating in law student groups that have adopted the Exclusionary Bylaw.  While the Legal Services Projects and Groups may protest that anyone can join and participate, the fact is that Jewish and Israeli students can do so only by renouncing or hiding critical aspects of their own identities or by remaining silent.  Neither option can lawfully be demanded of any individual under UC policy or U.S. law.

133.    Preventing Jewish law students from participating in a journal like *The Berkeley Journal of Gender, Law, and Justice* denies them a beneficial educational opportunity that is afforded to other students.  It limits their avenues for developing and improving legal research, writing, and editing skills, while also limiting their choices for obtaining academic credits towards graduation.

134.    Excluding law students from Legal Services Projects prevents them from receiving a quintessential law school experience.  Experiential legal work enables students to acquire hands-on legal experience while at the same time earning other valuable benefits.  These projects allow law students to earn pro-bono hours for state bar requirements, and receive training, supervision, and mentorship.  Depriving Jewish students of the opportunity to be part of the Community Defense Project, for example, disserves not only the students but the members of the community that come to the project for assistance.

135.    Being excluded from groups like Women of Berkeley Law, the Queer Caucus at Berkeley, and the Law Students of African Descent means not only the loss of camaraderie and educational opportunities; it means lost networking opportunities with other students destined for the California bar and bench, and with practicing lawyers who are interested in mentoring and promoting young lawyers who belong or belonged to the groups they belonged to in law school.

136.    The harm is not limited to Jewish students.  Registered student groups at UC

Berkeley and at the Law School routinely contract with outside speakers to present to their members, paying their fees with funds the University provides to registered student groups.  By placing a discriminatory ban on "Zionist" speakers, they have also stigmatized and violated the rights of scholars who would otherwise have an opportunity to speak to these groups.  And they have prevented those scholars from having even the opportunity to be considered for speaking engagements, which deprives them of monetary compensation and the advancement of their own careers.

137.    The adoption of the Exclusionary Bylaw and the exclusion of Jews by these Legal Services Projects and Groups violates UC and UC Berkeley policy, namely the UC Policy on non-discrimination and UC Berkeley's "all-comers" policy.

**H.      Berkeley Fails To Take Meaningful Action Despite Full Knowledge Of Anti-Semitic Harassment At The University.**

138.    Defendants are and have been fully aware of the unprecedented scope of anti-Semitism occurring on campus that was described above.  Nearly all of the events described above have been widely publicized in national publications.  On multiple occasions, students have filed formal complaints about anti-Semitic harassment.  Yet the University has consistently failed to meaningfully respond.  Its tolerance of anti-Semitism has allowed it to grow.

139.    At least one University official, Assistant Vice Chancellor for Executive Communications Dan Mogulof, was physically present at the February 26 riot.  Mr. Mogulof's job responsibilities include "[p]rovid[ing] external and internal communications support to the chancellor, executive vice chancellor & provost."  https://publicaffairs.berkeley.edu/people.  Yet, despite Assistance Vice Chancelor Mogulof's availability to advise them on their statement, the initial response to the riot by Defendants Christ and Hermalin failed to even mention anti-Semitism.  Public Affairs, *Upholding our values*, Berkeley News, February 27, 2024, https://news.berkeley.edu/2024/02/27/upholding-our-values.

140.    Defendants Christ and Hermalin's failure to address the obvious anti-Semitism that occurred on February 26 was widely recognized.  *See, e.g.,* Exhibit A, March 3, 2024 Katz Letter; Arsen Ostrovsky (@Ostrov_A), X (Feb. 28, 2024),

1   https://twitter.com/Ostrov_A/status/1762945549966159998?s=20.

2   141.   On March 4—a full week after the riot—Defendants Christ and Hermalin finally

3   acknowledged that, "[a]fter we sent last week's message, UCPD and [the Office for the Prevention

4   of Harassment & Discrimination] received reports that two of the Jewish students who organized

5   the event, as well as some of the attendees, were subjected to overtly antisemitic expression."  The

6   Defendants then acknowledged that, "[a]ntisemitic expression is a frightening attack on an entire

7   people. Every student, every member of our community, has a right to feel safe and welcome, and

8   a true sense of belonging regardless of their identity or perspectives."  Public Affairs, *Responding*

9   *to the events of Feb. 26*, BERKELEY NEWS (Mar. 4, 2024),

10  https://news.berkeley.edu/2024/03/04/responding-to-the-events-of-feb-26.

11  142.   Despite this (belated) acknowledgement, no actual steps have been taken to enforce

12  the University's policies.  Bears for Palestine has not had its recognized student organization

13  status revoked as a result of the riot and its successful plan to shut down the event.  Indeed, its

14  members have been able to continue harassing students.  The University has taken no effective

15  action at all in response to this event.

16  143.   The targeted harassment of Dean Chemerinsky and targeting of his home has

17  similarly gone unaddressed.  While the University condemned the actions of the students involved

18  and recognized that they were anti-Semitic, LSJP has not had its registered student organization

19  status revoked.

20  144.   Nor was any meaningful action taken following the harassment at Sather Gate or

21  Sproul Plaza, despite Berkeley's Time, Place, and Manner policy prohibiting students from

22  "[b]locking entrances or imped[ing] foot/vehicle traffic."  As noted above, the University has

23  acknowledged that the Sather Gate blockade violated its Time, Place, and Manner regulations,

24  which prohibits attempts to "[b]lock entrances or impede foot/vehicle traffic."  Berkeley Campus

25  Regulations § 321(a), https://studentaffairs.berkeley.edu/student-affairs-policies/berkeley-campus-

26  regulations-implementing-university-policies/.  According to Assistant Vice Chancellor Mogulof,

27  "[w]hile [Berkeley] support[s] the exercise of free speech rights, the campus also seeks to enforce

28  its time, place and manner restrictions" and it has "been making efforts to end those aspects of the

nonviolent protest at Sather Gate *that violate those restrictions.*"  Alex N. Gecan, *Jewish students at UC Berkeley demand greater protections from university*, BERKELEYSIDE, Mar. 11, 2024.

145.    The University also failed to take action to enable Jewish students to traverse Sather Gate without harassment.  The promised monitors are absent, and the organizations responsible for the blockade have not had their registered status revoked.

146.    The University's response to the October 7 attacks was no better.  An October 2023 survey of 132 Jewish UC Berkeley students found that 85% felt that "the [Berkeley] administration has [not] adequately addressed the safety concerns of Jewish students impacted by the recent violence in Israel."  Schlacter Statement at 10.  In addition, the survey found that "75% of Berkeley's Jewish students do not feel safe expressing their Jewish identity on campus (e.g., Wearing a star of David necklace or talking about being Jewish with peers/faculty)."  *Id.*  And "85.6% of Berkeley's Jewish students confirmed that 'before becoming [students], [they were] warned by Jewish friends or family about … [Berkeley's] 'antisemitic' reputation."  *Id.*

147.    Defendants have also acknowledged that the Exclusionary Bylaw is anti-Semitic. Dean Chemerinsky has explained that student organizations "have the right to choose speakers for their events based on viewpoint."  Pat Joseph, *Discriminatory Bylaws and Free Speech; A Q&A with Berkeley Law Dean Erwin Chemerinsky*, CAL. MAG. (Dec. 1, 2022), https://alumni.berkeley.edu/california-magazine/2022-winter/discriminatory-bylaws-and-free-speech/.  But he added that "[i]t would be punishable if they discriminated based on religion (or race or sex or sexual orientation) in inviting speakers."  *Id.*

148.    Dean Chemerinsky further explained that actually "exclud[ing] a speaker on account of being Jewish or holding particular views about Israel" is "conduct, of course, [that] would be subject to sanctions."  Erwin Chemerinsky, *There Are No 'Jewish-Free' Zones on the UC-Berkeley Campus*, DAILY BEAST (updated Oct. 2, 2022), https://www.thedailybeast.com/there-are-no-jewish-free-zones-on-the-uc-berkeley-campus.  *See also* Erwin Chemerinsky, *On "Jewish Free Zones" at Berkeley, the Debate Between Chemerinsky and Marcus Continues*, JEWISH J. (Oct. 12, 2022), https://jewishjournal.com/commentary/opinion/352237/on-jewish-free-zones-at-berkeley-the-debate-between-chemerinsky-and-marcus-continues/ (explaining that "den[ying] the

right or the ability [of students] to express themselves, to exercise their freedom of speech …
would represent a cross-over from expression to conduct and that would be subject to serious
discipline.").

149.     More recently, Dean Chemerinsky recognized that it was "problematic" for the
Law School to award academic credit to students who participated in law journals who adopt the
bylaw.  *See* Exhibit C, E-Mail from Erwin Chemerinsky to Student Journal Leaders.

150.     Defendants have repeatedly defended their failure to act by suggesting the anti-
Semitic conduct that is poisoning the campus is protected by the First Amendment.  But as the
Supreme Court has made clear for over fifty years, "[i]nvidious private discrimination … has
never been accorded affirmative constitutional protections."  *Norwood v. Harrison,* 413 U.S. 455,
470 (1973).  Likewise, as Dean Chemerinsky has recognized, "stopping discrimination is more
important than protecting the freedom to discriminate."  Erwin Chemerinsky, *Op-Ed: Does the 1st
Amendment protect a right to discriminate?*, LOS ANGELES TIMES, Dec. 4, 2022,
https://www.latimes.com/opinion/story/2022-12-04/supreme-court-elenis-gay-discrimination-first-
amendment.  Otherwise, Dean Chemerinsky warned, "[t]hose who want to discriminate against
others based on race, sex or religion could simply raise a 1st Amendment defense."  *Id.*

151.     Nor can Defendants brush away the anti-Semitism on campus by suggesting it is
related only to the policies of the state of Israel.  As Dean Chemerinsky has made clear, while
"criticism of the Israeli government is not antisemitism… if you listen to what is being said on
college campuses now, some of the loudest voices are not advocating for a change in Israeli
policies, but are calling for an end to Israel."  Erwin Chemerinsky, *Nothing has prepared me for
the antisemitism I see on college campuses now,* L.A. TIMES (Oct. 29, 2023),
https://www.latimes.com/opinion/story/2023-10-29/antisemitism-college-campus-israel-hamas-
palestine.  He adds, "[C]alling for the total elimination of Israel is antisemitic."  *Id.*  And by
directly targeting Dean Chemerinsky—an avowed supporter of Palestinian rights—the students
responsible for this anti-Semitism have made clear that their harassment is not simply because of
the policies of the state of Israel.

152.     Nor is the anti-Semitic *conduct* at issue in this case *speech*.  Plaintiffs do not seek

to limit the ability of any student to express their views.  Rather, Plaintiffs challenge Defendants' failure to address anti-Semitic *conduct*, including the harassment of Jews, their exclusion from student organizations, and even the fact that they are physically assaulted because of their Jewish and/or Israeli identity.

153.     Each of the allegations in this Complaint—which Defendants have largely acknowledged are anti-Semitic—is problematic.  What is worse is that Defendants have seen the result of their failure to act first hand: student organizations and others have realized that they are free to act as they please without repercussion.  As a Jewish graduate student and member of JAFE explained:

> All of those incidents, the university administration did not identify that as explicit anti-Jewish hate, so then we see a riot happen that's violent, attacking Jews, because people on this campus learn it's OK to harass and be violent towards Jews. . . . So the university permitted all these violations for a while, and that led two weeks ago to the violent mob, where a speaker was forced to essentially abandon the premises, escorted by police.

Alex N. Gecan, *Jewish students at UC Berkeley demand greater protections from university*, BERKELEYSIDE, Mar. 11, 2024.

154.     As Rabbi Gil Leads, the co-director of the Rohr Chabad Jewish Student Center, explained:

> It's a slippery slope, and we feel that the university should be enforcing its policies and showing … that there's someone home … It's kind of hard to continue to be trusting in the university and their enforcement of policies and their stewardship of our students' academic experience when they just let things be trampled on time and time again.

*Id.*

155.     To quote Dean Chemerinsky, "There has been enough silence and enough tolerance of antisemitism on college campuses."  Erwin Chemerinsky, *Nothing has prepared me for the antisemitism I see on college campuses now,* L.A. TIMES (Oct. 29, 2023), https://www.latimes.com/opinion/story/2023-10-29/antisemitism-college-campus-israel-hamas-palestine.  Plaintiffs seek relief from this Court to ensure that Berkeley complies with the law and its own policies to ensure that anti-Semitic discrimination—like all discrimination—is punished.

1 At the very least, the University must stop providing recognition and resources to those student

2 organizations that are openly excluding Jews and fueling further anti-Semitism.

### COUNT I

**Violation of 42 U.S.C. § 1983 (Equal Protection Clause)**

**(on Behalf of All Plaintiffs Against Defendants Drake, Christ, and Hermalin)**

6  156.    Plaintiffs incorporate by reference the allegations set forth in the preceding

7 paragraphs.

8  157.    Under the Fourteenth Amendment to the United States Constitution, a State shall

9 not "deny to any person within its jurisdiction the equal protection of the laws."

10  158.    Defendants have, in their official capacities, deprived Plaintiffs of equal protection

11 of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats

12 Plaintiffs differently than similarly situated individuals because Plaintiffs are Jewish.  Specifically,

13 Defendants have selectively chosen not to enforce its official policies, including its Berkeley's all-

14 comers policy; the UC Antidiscrimination Policy; the UC Policy on Nondiscrimination; the Code

15 of Conduct and Berkeley's Time, Place, and Manner restrictions where the victims of the

16 violations of those policies were Jewish, and where Defendants were aware that enforcement of

17 such policies would have alleviated the hostile environment experienced on campus by Jewish

18 students.  Defendants have failed to revoke registered organizational status from any of the student

19 organizations responsible for the harassment or who have adopted the Exclusionary Bylaw.

20 Defendants have also failed to take adequate and effective action against individual students or

21 group leaders who have violated the University's policies.

22  159.    Defendants would and have admitted they would enforce these policies to prevent

23 discrimination against other protected classes.

24  160.    Defendants intentionally chose not to enforce their policies in an evenhanded way.

25 They have long been aware of the anti-Semitism on campus, which has been open and transparent.

26 They have also been repeatedly informed of the anti-Semitism through complaints by students,

27 news reports, and others.

28  161.    As a result of Defendants' decision not to enforce its policies, Plaintiffs have

1   suffered significant injuries.

2          162.    Jewish members of the Berkeley community, including members of JAFE, are

3   continually harassed, both physically and verbally, by members of student organizations who are

4   targeting Jews.  Jewish students have been spit upon and harassed as they try to cross Sather Gate,

5   Sproul Hall, or attend speaking engagements.  They are physically assaulted while traversing

6   campus or engaging in legitimate protest.  They receive hate mail calling for their murder.

7          163.    Israeli members of the Berkeley community, including members of JAFE, are also

8   harassed, both physically and verbally, by these groups.  Indeed, the student organizations

9   responsible for the hostile environment on campus do not differentiate or distinguish between

10  Jews, Israelis, or Zionists.

11         164.    Legal scholars who are members of JAFE have also been harmed.  They have been

12  deprived of the right to compete for the opportunity to present to organizations at Berkeley that

13  have adopted the Exclusionary Bylaw.  They are denied this right not because of anything they

14  would say, but because of their Jewish identity.  Many of these scholars have expertise in areas

15  that would be directly relevant to the groups that have adopted the Exclusionary Bylaw and would

16  benefit—financially and otherwise—by being able to present before these groups.

17         165.    In addition to the harassment described above, student members of Plaintiff JAFE

18  are deprived of the right to participate fully in student organizations at a time when

19  "extracurricular programs are … essential parts of the educational process."  *Christian Legal Soc.*

20  *Chapter of the Univ. of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 686 (2010).  This

21  denial is most acute for those members of JAFE who are Berkeley law students who are unable to

22  participate fully in groups that have adopted the Exclusionary Bylaw.  This denial precludes them

23  from participating in groups that have nothing to do with their Jewish beliefs or identity.  For

24  example, the Law School members of JAFE are denied the ability to participate in Community

25  Defense Project, an organization whose mission is to provide pro bono legal services to the

26  community.  The harm extends to undergraduates, as well, who have been forced to choose

27  between embracing their Jewish identity or being rejected from student organizations.  These

28  undergraduates report that the campus environment is not welcoming to Jewish students, many of

1   whom feel silenced and alienated. Some avoid wearing anything that identifies them as

2   Jewish.  Some avoid campus activities altogether, while others stick to Jewish groups and

3   activities.

4        166.   Defendants have no overriding or legitimate state interest, let alone a compelling

5   one, to justify their decision to selectively enforce UC Berkeley policy to the detriment of

6   Plaintiffs.  Even if such an interest existed, Defendants have failed to narrowly tailor their actions

7   to serve such an interest.

8                            **COUNT II**

9              **Violation of 28 U.S.C. § 1983 (Free Exercise Clause)**

10      **(On Behalf of All Plaintiffs Against Defendants Drake, Christ, and Hermalin)**

11       167.   Plaintiffs incorporate by reference the allegations set forth in the preceding

12   paragraphs.

13       168.   Free exercise of religion "means first and foremost, the right to believe and profess

14   whatever religious doctrine one desires." *Employment Div., Dept. of Hum. Res. of Or. v. Smith*,

15   494 U.S. 872, 877 (1990).

16       169.   As a result of Defendants' failure to enforce their policies in an evenhanded

17   manner, many Jewish students, including members of JAFE, have had to conceal their Jewish

18   identity in order to avoid harassment on campus.  Among other things, Jewish students who gather

19   to pray have had those prayers disrupted.

20       170.   Legal scholars who are members of Plaintiff JAFE and are practicing Jews for

21   whom Zionism is a core tenet of their religious identity have been deprived of the right to compete

22   for the opportunity to present to organizations at Berkeley that have adopted the Exclusionary

23   Bylaw.

24       171.   Similarly, student members of Plaintiff JAFE who are practicing Jews for whom

25   Zionism is a core tenet of their religious identity are deprived of the right to fully participate in

26   student organizations.

27       172.   In addition to being an integral component of Jewish ancestral, ethnic and national

28   identity, Zionism is a core tenet of the religious identity of many Jews, including Jews at Berkeley

1   Law, and Jews in the legal profession whose ideas, experience, and practice might resonate with

2   members of the Groups that would ban them.

3        173.    For centuries Jews have not only prayed facing Jerusalem, they have prayed for the

4   return of the Jewish people to Israel (the "ingathering of the exiles") and for the "rebuilding" of

5   Zion (Jerusalem). For many practicing Jews, this represents an integral tenet of their Jewish faith.

6   The Legal Scholars and speakers who are practicing Jews may not profess, but must disavow or

7   conceal, this core element of their Jewish religious identity to present to or participate in these

8   Groups, and are thus being asked to forego the free exercise of their religion as a condition of

9   speaking to or with Group members.  Similarly, the Jewish students who are practicing Jews may

10  not profess, but must disavow or conceal, this core element of their Jewish religious identity to

11  fully benefit from the student group opportunities.

12       174.    Defendants recognize this state of affairs.  Were they to enforce their policies to

13  punish those who harass or exclude Jews, Jewish members of the community would be free to

14  openly identify as practicing Jews for whom Zionism is a core religious tenet.  Defendants' failure

15  to do so is an abdication of their duty to protect the Free Exercise rights of these individuals in

16  contravention of the U.S. Constitution, federal civil rights laws, and UC rules prohibiting

17  discrimination on the basis of religious identity.

18                              **COUNT III**

19                      **Violation of 42 U.S.C. § 1981**

20            **(Interference with Right to Contract Based on Race)**

21      **(On Behalf of All Plaintiffs Against Defendants Drake, Christ, and Hermalin)**

22       175.    Plaintiffs incorporate by reference the allegations set forth in the preceding

23  paragraphs.

24       176.    42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the

25  United States shall have the same right in every State and Territory to make and enforce

26  contracts…as is enjoyed by white citizens."  "The term 'make and enforce contracts' includes the

27  making…of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

28  contractual relationship." *Id.* § 1981(b).

177.     To be actionable under § 1981, a contractual relationship need not already exist, "because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

178.     The U.S. Supreme Court has recognized that Jews may state a claim of racial discrimination under the civil rights statutes, including § 1981 and its sister statute, 42 U.S.C. § 1982. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 618 (1987) ("Jews are not foreclosed from stating a cause of action against other members of what today is considered to be part of the Caucasian race."); *see also id.* (citing the analysis of *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987), which examined Section 1981).

179.     JAFE and the Brandeis Center include Legal Scholars amongst their members. Those Legal Scholars are ready, able, and willing to enter into a contract to present to student organizations at Berkeley.  Because of their Jewish ancestral heritage and related support for Israel, and because of the Exclusionary Bylaw, they cannot do so.

180.     By permitting the Groups to remain registered student groups with all the benefits accruing to such groups, including space to meet on campus, funding, and use of the Berkeley logo, Defendants are allowing funds and assets derived from taxpayer money to be disbursed in a discriminatory manner.

## **COUNT IV**

### **Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.**

### **(On Behalf of All Plaintiffs Against All Defendants)**

181.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

182.     Defendant UC Berkeley receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

183.     Discrimination against Jews is prohibited under Title VI of the Civil Rights Act of 1964, as reflected in the written policies of the Department of Education's Office for Civil Rights. *See e.g.*, U.S. Dep't of Educ., OCR Dear Colleague Letter: Addressing Discrimination Against Jewish Students (May 25, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/antisemitism-

dcl.pdf; U.S. Dep't of Educ., OCR-000127, Questions and Answers on Executive Order 13,899 (Jan. 19, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf; U.S. Dep't of Educ., OCR-00107, Dear Colleague Letter: Combatting Discrimination Against Jewish Students (2017), https://www2.ed.gov/about/offices/list/ocr/docs/jewish-factsheet-201701.pdf; Letter from Thomas Perez, Asst. Att. Gen., Civ. Rts. Div., U.S. Dep't of Justice to Russlyn Ali, Asst. Sec'y for Civ. Rts., OCR, U.S. Dep't of Educ. Re: Title VI and Coverage of Religiously Identifiable Groups (Sept. 8, 2010), https://www.justice.gov/sites/default/files/crt/legacy/2011/05/04/090810_AAG_Perez_Letter_to_Ed_OCR_Title%20VI_and_Religiously_Identifiable_Groups.pdf; U.S. Dep't of Educ., OCR Dear Colleague Letter: Religious Discrimination (Sept. 23, 2004), https://www2.ed.gov/about/offices/list/ocr/religious-rights2004.html.

184.    On November 7, 2023, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they

> have a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language. . . Harassing conduct can be verbal or physical and need not be directed at a particular individual.

U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics 2 (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

185.    OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.*  And it repeats its longstanding admonition that "[s]chools

1  must take immediate and effective action to respond to harassment that creates a hostile

2  environment." *Id.*

3        186.    By its own admission, UC Berkeley's willful failure to enforce its policies to

4  protect Jewish students discriminates against Jews.  Similarly, UC Berkeley has failed to protect

5  Israeli students who have been the target of harassment on campus.  They, too, are protected under

6  Title VI.

7        187.    Defendants' failure to enforce UC policies has created an environment that is

8  hostile towards Jews and Israelis.  The hostility towards Jewish and Israeli members of the UC

9  Berkeley community is severe enough that it interferes with their ability to participate in the

10  programs and activities of the school.  Students are not free to move about campus without being

11  stopped and harassed.  Jewish members of the community receive hate mail.  Jewish and Israeli

12  students face physical assault from student protestors.  Because of the Exclusionary Bylaw, Jewish

13  law students are denied career advancement, including clinical opportunities, which provide

14  students the opportunity to engage in supervised practice of law and to earn course credits toward

15  their law degrees.   Many students have had to miss class as a result of the hostile environment on

16  campus.  Students have refrained from using the dining halls, libraries, and other public areas.

17  The hostile environment has left them unable to participate in most extra-curricular activities on

18  campus, and many Jewish students confine their non-academic pursuits to the campus Hillel

19  center, missing out on participating in a large range of activities on campus. and causing them to

20  refrain from engaging in most campus extra-curricular activities.

21        188.    While on notice of the discrimination against and hostile environment for Jewish

22  and Israeli members of the community (as shown by, inter alia, their public statements, and as

23  evidenced by multiple instances in which the instances of anti-Semitic harassment have been

24  brought to the University's attention'), Defendants have failed to take adequate and effective

25  corrective action.

26  / / /

27  / / /

28  / / /

1

2

3

<u>**COUNT V**</u>

**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.**

**(On Behalf of All Plaintiffs Against All Defendants)**

4        189.    Plaintiffs incorporate by reference the allegations set forth in the preceding

5 paragraphs.

6        190.    JAFE Member # 1 is a disabled person as defined in 42 U.S.C § 12102, as he has "a

7 physical impairment that substantially limits one or more major life activities."  Specifically,

8 JAFE Member # 1 is legally blind.

9        191.    Because of the blockade at Sather Gate and the occupation at Sproul Hall, JAFE

10 Member # 1, as well as other disabled members of the Berkeley community, has been "excluded

11 from participation in or be denied the benefits of the services, programs, or activities of a public

12 entity."  Specifically, the physical obstruction of these areas and targeting of JAFE Member # 1

13 for harassment has meant that he is denied free access through the public spaces on campus as a

14 result of his disability.

15        192.    Because JAFE Member # 1's civil rights are being violated, his injury is germane

16 to the purpose of both Brandeis and JAFE.  The mission of both organizations includes advancing

17 and protecting the civil rights of Jewish persons.

18        193.    Defendants' unlawful conduct has also harmed the Brandeis Center, which has had

19 to divert resources in order to provide counseling to disabled Jewish students like JAFE Member #

20 1 whose civil rights are being violated by Defendants.

21                                    <u>**PRAYER FOR RELIEF**</u>

22        WHEREFORE, Plaintiffs respectfully request that this Court order the following relief:

23        1.    An injunction preliminarily and permanently enjoining Defendants from (i)

24              permitting registered student organizations to harass or exclude Jews, including

25              under the guise of barring Zionists; (ii) funding any student organization that

26              harasses or excludes Zionists or, more generally, Jews; and (iii) granting official

27              recognition to any student organization that harasses or excludes Zionists or, more

28              generally, Jews.

2.    An injunction preliminarily and permanently requiring Defendants to enforce their Policy on Nondiscrimination, their Antidiscrimination Policy, their Code of Conduct, their all-comers policy, and their Time, Place and Manner policy on an evenhanded basis, consistent with the level of enforcement of those policies provided where the victims are in protected categories other than the Jewish religion, and ensuring that Jewish members of the Berkeley community are protected, with respect to their physical safety and otherwise, from discrimination on the basis of their Jewish identity, including those for whom Zionism is an integral part of that identity.

3.    An injunction preliminarily and permanently mandating that Defendants take action to end the hostile environment on campus by (i) communicating to the entire Berkeley community via broadcast e-mail or a similar medium that Berkeley will condemn, investigate, and punish any conduct that harasses members of the Jewish community, or others, on the basis of their ethnic or ancestral background, including harassment of Zionists; (ii) providing education about the forms of anti-Semitism that have recently been expressed at the University of California, including by conducting mandatory training for administrators and professors about anti-Semitic forms of anti-Zionism; and (iii) instituting strict review and approval policies to ensure that the administration does not conduct, or finance, programs that deny equal protection to Jewish members of the Berkeley community including those for whom Zionism is an integral part of their identity.

4.    An injunction preliminarily and permanently enjoining Defendants to enforce their time, place, and manner restrictions to ensure that pathways through campus are unobstructed.

5.    An injunction preliminarily and permanently mandating that Defendants take all necessary action to ensure that the blockade at Sather Gate and occupation at Sproul Hall do not continue to create a hostile environment for Jewish and Israeli students and do not impede access to disabled persons.

6.      An injunction preliminarily and permanently mandating that Defendants take all necessary action to remedy the culture of anti-Semitic bias and the hostile anti-Semitic environment and to stop the harassment of Jewish students at UC Berkeley.

7.      A declaratory judgment that the failure by Defendants to enforce its policies to protect Jewish members of the Berkeley community has violated Plaintiffs' rights under (i) the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, (ii) the Free Exercise Clause of the U.S. Constitution, (iii) Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d et seq., and (iv) Plaintiffs' right to contract as ensured by 42 U.S.C. § 1981.

8.      A declaratory judgment that the failure by Defendants to enforce its time, place, and manner restrictions has violated the rights of disabled persons under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

9.      Plaintiffs' reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

10.     Any other relief which this Court may deem just and proper.

1    DATED:  May 3, 2024

2

3                                              By:      /s/ John V. Coghlan

4
                                               TORRIDON LAW PLLC
5                                              John V. Coghlan (admitted *Pro Hac Vice*)
                                                 jcoghlan@torridonlaw.com
6                                              Tara Helfman (admitted *Pro Hac Vice*)
                                                 thelfman@torridonlaw.com
7                                              1155 F Street NW
                                               Washington, DC 20004
8                                              Telephone: (202) 249-6900

9                                              ELLIS GEORGE LLP
                                               Eric M. George (State Bar No. 166403)
10                                                egeorge@ellisgeorge.com
                                               David J. Carroll (State Bar No. 291665)
11                                                dcarroll@ellisgeorge.com
                                               2121 Avenue of the Stars, 30th Floor
12                                             Los Angeles, California 90067
                                               Telephone: (310) 274-7100
13
                                               THE LOUIS D. BRANDEIS CENTER FOR
14                                             HUMAN RIGHTS UNDER LAW
                                               Kenneth L. Marcus (admitted *Pro Hac Vice*)
15                                                klmarcus@brandeiscenter.com
                                               L. Rachel Lerman (State Bar No. 193080)
16                                                rlerman@brandeiscenter.com
                                               1717 Pennsylvania Ave., NW, Suite 1025
17                                             Washington, DC 20006
                                               Telephone: (202) 559-9296
18
                                               Attorneys for Plaintiffs
19                                             The Louis D. Brandeis Center, Inc. and Jewish
                                               Americans for Fairness in Education (JAFE)
20

21

22

23

24

25

26

27

28