1
2   HAILYN J. CHEN (State Bar No. 237436)
    hailyn.chen@mto.com
3   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, 50th Floor
4   Los Angeles, California 90071
    Telephone:      (213) 683-9100
5   Facsimile:      (213) 687-3702

6   BRYAN H. HECKENLIVELY (State Bar No. 279140)
    bryan.heckenlively@mto.com
7   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, 27th Floor
8   San Francisco, California 94105
    Telephone:      (415) 512-4000

9   *Attorneys for Defendants*

10  * Additional counsel listed on following page.

11                  **UNITED STATES DISTRICT COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA**

13                     **SAN FRANCISCO DIVISION**

14

15  THE LOUIS D. BRANDEIS CENTER, INC.;      Case No. 3:23-cv-06133-JD
    JEWISH AMERICANS FOR FAIRNESS IN
16  EDUCATION (JAFE),                        **MOTION TO DISMISS FIRST AMENDED COMPLAINT**

17              Plaintiffs,

18       vs.                                  Hearing Date:    August 8, 2024
                                              Time:            10:00 am
19  REGENTS OF THE UNIVERSITY OF              Place:           Courtroom 11
    CALIFORNIA; UNIVERSITY OF                 Judge:           Hon. James Donato
20  CALIFORNIA AT BERKELEY; BERKELEY
    LAW SCHOOL; MICHAEL DRAKE, in his
21  official capacity as President of the University
    of California; CAROL T. CHRIST, in her
22  official capacity as Chancellor of the
    University of California, Berkeley; BEN
23  HERMALIN, in his official capacity as
    Provost of the University of California,
24
                Defendants.
25

26

27

28

CHARLES F. ROBINSON (State Bar No. 113197)
RHONDA GOLDSTEIN (State Bar No. 250387)
KATHARINE ESSICK (State Bar No. 219426)
CAROL LYNN THOMPSON (State Bar No. 148079)
Carol.thompson@ucop.edu
UNIVERSITY OF CALIFORNIA
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-9800
Telephone:      (510) 987-9800
Facsimile:      (510) 987-9757


HELEN E. WHITE (pro hac vice forthcoming)
helen.white@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave NW, Ste. 500E
Washington, District of Columbia 20001-5369
Telephone:      (202) 220-1136
Facsimile:      (202) 220-2300

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELIEF SOUGHT ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

I.      INTRODUCTION.....................................................................................................1

II.     THE ALLEGATIONS IN THE COMPLAINT ........................................................2

      A.      The University's Commitment to Nondiscrimination and Free Expression. .............2

      B.      Plaintiffs Allegations of Antisemitism on UC Berkeley's Campus and The
            University's Response. .............................................................................................3

III.    LEGAL STANDARD ...............................................................................................5

IV.     ARGUMENT .............................................................................................................5

      A.      Plaintiffs' Claims Should Be Dismissed Under Article III and Rule
            12(b)(1)....................................................................................................................5

            1.      Plaintiffs' Title VI Claim Should Be Dismissed As Unripe. .......................5

            2.      Plaintiffs Lack Standing to Challenge the Student Group Bylaws. ..............7

      B.      All of the Claims Should be Dismissed Under Rule 12(b)(6)...................................8

            1.      Plaintiffs Fail to State an Equal Protection Claim........................................8

            2.      Plaintiffs Fail to State a Free Exercise Claim...............................................8

            3.      Plaintiffs Fail to State a Claim Under Section 1981. ....................................9

            4.      Plaintiffs Fail to State a Title VI Claim.......................................................9

                  (a)      Plaintiffs Fail to State a Claim for Direct Discrimination...............10

                (b)      Plaintiffs Fail to State a "Hostile Environment" Claim
                     Because They Have Not Alleged Deliberate Indifference. ..............10

            5.      Plaintiffs Fail to State an ADA Claim.........................................................14

V.      CONCLUSION ........................................................................................................15

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................5

5

*Ballou v. McElvain*,
29 F.4th 413 (9th Cir. 2022) .....................................................................................8

6

7

*Barnes v. Gorman*,
536 U.S. 181 (2002) ...............................................................................................6, 9

8

9

*Bassilios v. City of Torrance*,
166 F. Supp. 3d 1061 (C.D. Cal. 2015) ..................................................................15

10

*Bd. of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982) ..................................................................................................7

11

12

*In re Coleman*,
560 F.3d 1000 (9th Cir. 2009) ..................................................................................5

13

*Davis v. Monroe County Bd. of Education*,
526 U.S. 629 (1999) ...............................................................................10, 11, 13, 14

14

15

*Doe v. Oberlin College*,
60 F.4th 345 (6th Cir. 2023) .....................................................................................6

16

17

*Does 1-5 v. Chandler*,
83 F.3d 1150 (9th Cir. 1996) ..................................................................................15

18

*Felber v. Yudof*,
851 F. Supp. 2d 1182 (N.D. Cal. 2011) ...............................................................9, 11

19

20

*Feminist Majority Foundation v. Hurley*,
911 F.3d 674 (4th Cir. 2018) ..................................................................................14

21

*Friends of the Earth v. Sanderson Farms, Inc.*,
992 F.3d 939 (9th Cir. 2021) ....................................................................................7

22

23

*General Building Contractors Ass'n, Inc. v. Pennsylvania*,
458 U.S. 375 (1982) ..................................................................................................9

24

*Healy v. James*,
408 U.S. 169 (1972) ..................................................................................................7

25

26

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group Of Boston*,
515 U.S. 557 (1995) ..................................................................................................7

27

28

*Karasek v. Regents of the University of California,*
    956 F.3d 1093 (9th Cir. 2020)................................................................................6, 12

*Kennedy v. Bremerton School District,*
    142 S. Ct. 2407 (2022) ................................................................................................9

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988 (9th Cir. 2018)......................................................................................11

*Kirola v. City & County of San Francisco,*
    860 F.3d 1164 (9th Cir. 2017)....................................................................................15

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
    624 F.3d 1083 (9th Cir. 2010).....................................................................................7

*Lazy Y Ranch Ltd. v. Behrens,*
    546 F.3d 580 (9th Cir. 2008)......................................................................................11

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .....................................................................................................7

*M.S. v. Brown,*
    902 F.3d 1076 (9th Cir. 2018).....................................................................................8

*Mandel v. Bd. of Trustees of California State University,*
    No. 17-cv-03511-WHO, 2018 WL 1242067 (N.D. Cal. Mar. 9, 2018)....................9, 10, 12, 14

*Mandel v. Bd. of Trustees of California State University,*
    No. 17-cv-03511-WHO, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018)........................................6

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974) .....................................................................................................7

*Monteiro v. Tempe Union High School District,*
    158 F.3d 1022 (9th Cir. 1998).....................................................................................8

*Moore v. Regents of the University of California,*
    No. 15-CV-05779-RS, 2016 WL 2961984 (N.D. Cal. May 23, 2016) ...............................12, 13

*Oden v. Northern Marianas College,*
    440 F.3d 1085 (9th Cir. 2006).....................................................................................12

*Peloe v. University of Cincinnati,*
    No. 1:14-cv-404, 2015 WL 728309 (S.D. Ohio Feb. 19, 2015) .................................6

*Reeves v. Nago,*
    535 F. Supp. 3d 943 (D. Haw. 2021) ..........................................................................8

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) .....................................................................................................8

*Shooter v. Arizona*,
    4 F.4th 955 (9th Cir. 2021) ............................................................................................8

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    600 U.S. 181 (2023) ....................................................................................................10

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ......................................................................................11

*Tandon v. Newsom*,
    593 U.S. 61 (2021) .......................................................................................................9

*Tanjaya v. Regents of University of California*,
    No. CV 19-2956-GW(FFMx), 2019 WL 13252681 (C.D. Cal. Dec. 12, 2019) ......................13

*Terenkian v. Republic of Iraq*,
    694 F.3d 1122 (9th Cir. 2012) ......................................................................................5

*Texas v. United States*,
    523 U.S. 296 (1998) .....................................................................................................5

*The Committee Concerning Community Improvement v. City of Modesto*,
    583 F.3d 690 (9th Cir. 2011) ......................................................................................10

*United States v. County of Maricopa*,
    889 F.3d 648 (9th Cir. 2018) ........................................................................................5

*US West Communications v. MFS Intelenet, Inc.*,
    193 F.3d 1112 (9th Cir. 1999) ......................................................................................6

*Wash. Environmental Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ......................................................................................7

*Washington v. Davis*,
    426 U.S. 229 (1976) .....................................................................................................8

*Weinreich v. Los Angeles County Metropolitan Transportation Authority*,
    114 F.3d 976 (9th Cir. 1997) ......................................................................................15

**FEDERAL STATUTES**

42 U.S.C. § 1981 .............................................................................................................9

**FEDERAL RULES**

Rule 12(b)(1) ...............................................................................................................1, 5

Rule 12(b)(6) ...........................................................................................................1, 5, 8

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. I ........................................................................................................3, 7, 8, 11

**PLEASE TAKE NOTICE** that on August 8, 2024, before the Honorable James Donato in Courtroom 11, Defendants (collectively, "the University") will and hereby do move for an order dismissing Plaintiffs' First Amended Complaint ("FAC") with prejudice.  This Motion is based on the Notice of Motion and Memorandum of Points and Authorities, all papers on file, and any authority or argument presented in the reply and at any hearing.

<u>**STATEMENT OF RELIEF SOUGHT**</u>

Defendants seek dismissal of all claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     <u>INTRODUCTION</u>**

Plaintiffs' FAC seeks to transform this case regarding student organization bylaws into an open forum for litigating incidents at UC Berkeley as they hit the news.  The University is deeply committed to protecting all students from harassment and discrimination and has spoken with a clear voice in condemning acts of antisemitism, but neither the Constitution nor federal civil rights statutes make universities automatically liable for even abhorrent conduct by their students.  Instead, UC Berkeley can be held liable only if it engages in wrongful actions or is "deliberately indifferent" to harassment by others—neither of which Plaintiffs plausibly allege here.  Plaintiffs do not allege that *the University*'s response was motivated by antisemitism.  Nor do they plausibly allege deliberate indifference to the acts of others.  Indeed, the FAC demonstrates that the University was *not* deliberately indifferent, expressly alleging that the University denounced offensive conduct, offered support to Jewish members of the University community, and took action where appropriate—such as by opening a criminal investigation into the February 26 incident and denying academic credit to journals that adopted the bylaws Plaintiffs challenge.

What is more, to the extent that Plaintiffs' claims turn on ripped-from-the-headlines additions to their FAC, those claims are unripe.  Because the University is liable only for its own response to student misconduct—and not for the misconduct itself—the University cannot be sued until its process is complete.  Plaintiffs attempt to flip that on its head by citing actions that occurred just a few weeks—and in one case *two days*—before filing the FAC, while blaming the University for failing to investigate and then complete disciplinary proceedings in that short time.

Permitting claims against universities on such fresh allegations of student misconduct would transform the federal courts into campus administrators and require courts to speculate about how universities will mete out student discipline.  That is not how "deliberate indifference" operates.

As for the law school student group bylaws that Plaintiffs started with, the complaint has not meaningfully changed.  Plaintiffs still allege that certain student groups adopted bylaws refusing to invite speakers or publish articles by authors that support Zionism and requiring leaders of their groups to attend a training session.  Consistent with constitutional principles, the University did not discipline students for their speech.  The University, however, swiftly denounced the policies, expressed support for Jewish students, and announced that it would not grant academic credit for participation in any student organization that adopted the bylaws.

All of Plaintiffs' claims should be dismissed, but that does not mean that the University can or will ignore the underlying issues.  These are critical issues that the University is working hard to address.

## II.      THE ALLEGATIONS IN THE COMPLAINT

### A.      The University's Commitment to Nondiscrimination and Free Expression.

The University of California stands firmly against antisemitism and has long been committed to "civil rights and equal treatment of all persons regardless of race, ethnicity, national origin, gender, sexual preference, faith, military status, physical disability and/or heritage."  FAC ¶ 56.  The University's written policy prohibits a broad swath of discrimination, including on the basis of race, religion, color, citizenship, national or ethnic origin, and ancestry.  *Id.* ¶¶ 58–60. Berkeley Law, which is relevant to some of the allegations, thus requires student groups to adopt an "all-comers" policy providing that groups "may not impose membership restrictions" based on protected classes, including race, national origin, religion, citizenship, or ancestry.  *Id.* ¶ 64.

As a public university, the University is also bound to protect the free speech rights of its students.  *See id.* ¶¶ 64–65.  Thus, while the University has adopted time, place, and manner restrictions that limit when, where, and how students may protest (*see id.* ¶¶ 65–67), it does not and cannot limit the content or the viewpoints expressed during on-campus protests (*see id*).

B.     <u>Plaintiffs Allegations of Antisemitism on UC Berkeley's Campus and The University's Response.</u>

The core FAC allegations are that the University's response to a series of actions by students and others violates the Constitution and federal civil rights statutes, focusing first on law school student organization bylaws and then post-amendment on a series of campus protests that occurred after the filing of the original complaint.

*Student Organization Bylaws*.  Plaintiffs allege that certain law student groups adopted bylaws that (1) asserted that they will not invite outside speakers that support Zionism, *id.* ¶ 118; (2) required student leaders to participate in "Palestine 101" training, *id.*; and (3) refused to publish in their journal authors that supported Zionism, *id.* ¶ 122.  Plaintiffs also allege that Berkeley Law Dean Erwin Chemerinsky told the student body that the school would not award academic credit for work in groups that adopted the bylaws.  *Id.* Ex. C.  Dean Chemerinsky's email also indicated that student organizations would not face discipline for adopting the bylaws because the First Amendment entitled them to exclude speakers based on viewpoint.  *Id.*

*Spring Semester Protests*.  Plaintiffs also allege that a series of protests in the spring of 2024 involved antisemitic harassment of Jewish students.  *First*, on February 26, 2024, "Jewish students at UC Berkeley were forced to evacuate a campus theater after a riot led by Bears for Palestine . . . forcibly shut it down."  FAC ¶ 67.  Upon learning that Bears for Palestine intended to protest the event, the University allegedly worked with Jewish student leaders to move the event to another location to better guarantee the safety of attendees.  *Id.* ¶¶ 70–71.  Plaintiffs also allege that the University deployed multiple campus police officers, including the chief of campus police, to secure the event.  *Id.* ¶¶ 72–73.  The University allegedly shut down the event after campus police "were quickly overwhelmed" when individuals "gained unauthorized entry into the building."  *Id.*  Plaintiffs allege that several Jewish attendees were called antisemitic slurs, spit on, or were physically assaulted.  *Id.* ¶ 80.  Plaintiffs also allege that the University's police department is "investigating the incidents [on February 26, 2024] as hate crimes."  *Id.* ¶ 81.

*Second*, Plaintiffs allege that in March 2024 a student organization called for law students to boycott graduation dinners hosted by Dean Chemerinsky via electronic and paper posters

featuring an antisemitic caricature of the Dean which were denounced by the Dean as antisemitic. *See id.* ¶¶ 85–87.  A group of students then attended one of the dinners at the Dean's home and staged a disruptive protest.  After the event, University of California President Michael Drake called the students' actions "antisemitic [and] threatening" and explained that they "do not reflect the values of this university."  *Id.* ¶ 91.  The Chair of the Board of Regents, Rich Leib, called the students' actions "deplorable."  *Id.*  The remaining dinners took place with additional security.  *Id.*

*Third*, Plaintiffs allege that protesters hung banners and yellow police tape blocking the middle portion of Sather Gate, while leaving the two side portals of the gate free for foot traffic. *Id.* ¶ 93.  Plaintiffs allege that these protestors harassed Jewish students.  *Id.* ¶ 95.  Plaintiffs allege the Sather Gate protest violated the University's time, place and manner policies and that the University has said it is "making efforts to end those aspects of the nonviolent protest at Sather Gate that violate those . . . restrictions."  *Id.* ¶ 99.  Plaintiffs allege that the University said that "using law enforcement to clear [the gate] would create turmoil," and so did not do so.  *Id.* According to the FAC, the University expressed commitment to "posting monitors at the gate to ensure that the harassment is halted" and "reporting any violations to the police," *id.* ¶ 100, but "students" who are in touch with Plaintiffs have "reported" not seeing monitors.  *Id.*

*Fourth*, Plaintiffs allege that from April 22 to April 29, a 175-tent-encampment protest appeared outside Sproul Hall, which houses the Registrar and Financial Aid.  *Id.* ¶ 101.  Plaintiffs allege that Jewish and Israeli students who have gone to "observ[e]" have had their movement obstructed and been physically and/or verbally assaulted by demonstrators.  Plaintiffs allege that the University has stated it is "observing the demonstration," but that the students who have been harassed have not seen any police officers or university observers.  *Id.* ¶ 107.  Plaintiffs also allege that in the eleven days after the encampment began and before the FAC was filed, no student or group has been disciplined by the University.  *Id.*

*Finally*, Plaintiffs allege a series of incidents from fall 2023 in which Jewish students and faculty were subjected to antisemitism but do not make any allegations about the University's response other than to allege that in one case, the University sent an email the day after a robbery identifying it as a potential hate crime.  *Id.* ¶ 115.

1   **III.    LEGAL STANDARD**

2        Rule 12(b)(6) requires sufficient facts to "state a claim to relief that is plausible on its

3   face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The same is true for a facial

4   Rule 12(b)(1) motion.  *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).

5   **IV.    ARGUMENT**

6        **A.    Plaintiffs' Claims Should Be Dismissed Under Article III and Rule 12(b)(1).**

7              **1.    Plaintiffs' Title VI Claim Should Be Dismissed As Unripe.**

8        Plaintiffs' Title VI claim is not ripe.  "A claim is not ripe for adjudication if it rests upon

9   'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"

10  *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).  "[W]here further factual

11  development would aid the court's consideration," a case is unripe "until the pertinent facts have

12  been well-developed."  *In re Coleman*, 560 F.3d 1000, 1009 (9th Cir. 2009).  Until then, it is "too

13  'impermissibly speculative' to present a justiciable controversy."  *Id.* at 1005 (citation omitted).

14       That is the case here.  Plaintiffs do not allege that the University carried out, endorsed, or

15  promoted any of the actions they challenge.  And the University "cannot be held vicariously

16  liable" under Title VI for the bad actions of third parties.  *United States v. Cnty. of Maricopa*, 889

17  F.3d 648, 652 (9th Cir. 2018).  Instead, the essence of Plaintiffs' Title VI claim is that the

18  University has been deliberately indifferent to actions by others during a series of protests from

19  February to May of this year.  *See* FAC ¶¶ 69–117, 187–88.  But whether the University's

20  response is deliberately indifferent cannot be decided until the University actually has had an

21  opportunity to respond.  At a minimum, "further factual development would aid the court's

22  consideration" of the adequacy of the University's response.  *Coleman*, 560 F.3d at 1009.

23       The allegations in the FAC make clear that the University's response to harassment is

24  ongoing.  For example, Plaintiffs allege that students and faculty have filed reports with campus

25  police and sent letters to the University administration, FAC ¶ 25, that Congress has opened an

26  investigation, *id.* ¶¶ 16, 109, and that the University's police department "is investigating," *id.*

27  ¶ 81.  The protests at the heart of Plaintiffs' claim, *id.* ¶¶ 69–107, allegedly took place between

28  February and *May 1, 2024*—just two days before they filed the FAC.  *See id.* ¶¶ 93, 104.  The

1    encampment appeared *eleven days* before the FAC.  *Id.* ¶ 101.  The interrupted dinner at Dean

2    Chemerinsky's home occurred, in Plaintiffs' words, "[l]ess than a month" before the filing of the

3    FAC.  *Id.* ¶ 11.  Even as to the earliest event, the late-February event at Zellerbach Hall, Plaintiffs

4    allege the police department—in the present tense—"*is investigating.*"  *Id.* ¶ 81 (emphasis added).

5         The law (and the University's policies) allow it substantially more time to initiate and

6    complete a response before the response can be challenged as deliberately indifferent.  In the Title

7    IX context—which is interpreted "consistently with Title VI," *Barnes v. Gorman*, 536 U.S. 181,

8    185 (2002)—an investigation that takes more than *eight months* to impose any discipline is not

9    unlawful, even if the complainant is unaware that any such investigation is underway.  *See*

10   *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1106 (9th Cir. 2020).  Dismissal on

11   ripeness grounds is therefore warranted where, as here, the complaint is filed before the university

12   has had time to conclude a reasonable investigation.  *See Doe v. Oberlin Coll.*, 60 F.4th 345, 356

13   (6th Cir. 2023) ("the district court was correct to dismiss the selective enforcement claim on

14   ripeness grounds" because as of the filing of the complaint, "there was no certainty about what

15   action Oberlin would take," including the "possibility that Oberlin could have opened an

16   investigation"); *Peloe v. Univ. of Cincinnati*, No. 1:14-cv-404, 2015 WL 728309, at *14 (S.D.

17   Ohio Feb. 19, 2015) (claim that university "acted with deliberate indifference by failing to correct

18   misconduct is premature because the University has not made an enforceable final decision"

19   regarding the misconduct).  If Plaintiffs attempt to rescue the isolated set of fall 2023 incidents or

20   law school student group allegations as individually ripe for purposes of their Title VI claim, the

21   spring protests clearly are not—and should be severed from this action as unripe.  *See Mandel v.*

22   *Bd. of Trs. of Cal. State Univ.*, No. 17-cv-03511-WHO, 2018 WL 5458739, at *22, *25 & n.38

23   (N.D. Cal. Oct. 29, 2018) (individual allegations may be severed as unripe in Title VI action).

24        Finally, Plaintiffs have not "show[n] that withholding review would result in direct and

25   immediate hardship."  *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir.

26   1999) (citation omitted).  The academic year is over, and there is no allegation that the

27   encampment or Sather Gate protest will continue.  (Nor could there be—they have ended.)

28

**2.      Plaintiffs Lack Standing to Challenge the Student Group Bylaws.**

There is another 12(b)(1) issue: Plaintiffs lack standing to challenge the bylaws.

*No Injury to Scholars*.  Plaintiffs do not allege that any JAFE member would have been invited by the relevant student groups but for the bylaws such that their non-invitation is "fairly traceable" to the bylaws.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013); FAC ¶¶ 23–37.  If the University were allowed to force student groups to drop the bylaws, there is no reason to infer that those groups would invite JAFE members to speak.  Nor do Plaintiffs allege that any JAFE member has written or imminently will write— much less submit—an article appropriate for publication in the *Gender, Law, and Justice* journal that adopted the bylaw limiting publication.  *See* FAC ¶¶ 23–37.

*No Injury to Students*.  JAFE similarly fails to allege that any of its student members has standing.  JAFE makes only the conclusory allegation that its law student members have been "constructively expelled" from student groups that have adopted the bylaws.  But they notably do not allege that any law student has been excluded from membership or leadership in any group.

*No Organizational Injury*.  The Brandeis Center has no "organizational" injury related to the bylaws because it has not alleged that it diverted resources to addressing them or would have suffered injury had it not done so.  *See Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021).  The Center "cannot manufacture the injury by incurring litigation costs" such as the Public Records Act action it filed to prepare this one.  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); *see* FAC ¶ 25.

*No Redressability*.  Regardless, Plaintiffs' alleged injuries are not redressable because they seek relief that this Court cannot award.  The challenged bylaws are speech protected by the First Amendment:  The bylaws exclude speakers in order to preserve a desired message, *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. Of Boston*, 515 U.S. 557 (1995), allow editorial judgment about what speech and who to publish, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974), implicate student groups' rights to associate with outside groups and one another, *see Healy v. James*, 408 U.S. 169, 187 (1972), and assert students' right to obtain access to particular ideas, *see, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867

1   (1982).  Disciplining students for this speech activity would violate the First Amendment.  *See*

2   *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) (public universities

3   violate the First Amendment when they "select[] for disfavored treatment" student organizations

4   based on their particular "viewpoint").  And because Plaintiffs ask this Court to order Defendants

5   to do what the Constitution prohibits, their injuries are not redressable.  *See M.S. v. Brown*, 902

6   F.3d 1076, 1086 (9th Cir. 2018) (injuries not redressable when relief sought would violate

7   Constitution); *Reeves v. Nago*, 535 F. Supp. 3d 943, 956 (D. Haw. 2021) (same).

8        **B.    All of the Claims Should be Dismissed Under Rule 12(b)(6).**

9             **1.    Plaintiffs Fail to State an Equal Protection Claim.**

10          Plaintiffs' Equal Protection claim fails because they have not alleged that the University's

11   action (or inaction) was motivated by a discriminatory intent.  *Monteiro v. Tempe Union High Sch.*

12   *Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998) (citing *Washington v. Davis*, 426 U.S. 229 (1976)).

13   Discriminatory animus must be shown by alleging either "direct" or "circumstantial" evidence of

14   its existence.  *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022).  Here, Plaintiffs do neither.

15          Plaintiffs allege no direct evidence of animus by the University, as opposed to by

16   protestors or other students.  Just the opposite: the FAC quotes extensively from public statements

17   by Dean Chemerinsky and other University officials *condemning* the conduct Plaintiffs allege as

18   antisemitic.  *See* FAC ¶¶ 13, 15, 141, 143.  Nor do Plaintiffs allege circumstantial evidence of

19   animus, such as "a relevant comparator" who was treated better by the University despite being

20   similar to Plaintiffs' members "in all material respects."  *Ballou*, 29 F.4th at 423–24 (citation

21   omitted).  Plaintiffs make no allegation that the University has enforced its policies differently to

22   favor other groups.  The most Plaintiffs allege is that the University "would enforce these policies

23   to prevent discrimination against other protected classes" and "intentionally chose not to enforce

24   [the school's] policies in an evenhanded way."  FAC ¶¶ 159, 160.  But that conclusory allegation

25   is not sufficient to state a claim.  *See Shooter v. Arizona*, 4 F.4th 955, 960 (9th Cir. 2021) (bare

26   allegation of differential treatment insufficient to plead discriminatory intent).

27             **2.    Plaintiffs Fail to State a Free Exercise Claim**

28          Plaintiffs' Free Exercise claim likewise fails.  To allege such a claim, a plaintiff must

1  identify "official expressions of hostility" or show that a policy is not neutral and not generally

2  applicable.  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 & n.1 (2022) (citation

3  omitted).  The FAC identifies neither official expressions of hostility nor a non-neutral policy

4  attributable to the University.  Nor does the FAC plead facts showing that the University has

5  disciplined another student group for offensive speech about other protected groups, but chose not

6  to punish similar speech about Jewish students.  Plaintiffs thus have not alleged that the University

7  has "treat[ed] *any* comparable secular activity more favorably than religious exercise."  *Tandon v.*

8  *Newsom*, 593 U.S. 61, 62 (2021) (emphasis original).  To the extent that Plaintiffs premise their

9  Free Exercise claim on the actions of students in creating an allegedly hostile environment, the

10  University cannot be held liable for the actions of those private actors.  *Felber v. Yudof*, 851 F.

11  Supp. 2d 1182, 1186 (N.D. Cal. 2011).

12  **3.**   **Plaintiffs Fail to State a Claim Under Section 1981.**

13  Plaintiffs' section 1981 claim should be dismissed.  Section 1981 prohibits racial

14  discrimination in "mak[ing] and enforc[ing] contracts."  42 U.S.C. § 1981(a).  It applies only to

15  *intentional* race discrimination.  *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375,

16  396 (1982).  Plaintiffs do not allege that anyone was denied a contract by the University because

17  of race.  Plaintiffs allege only that "*[r]egistered student groups* … routinely contract with outside

18  speakers."  FAC ¶ 136 (italics added).  But they make no allegation that *the University* contracts

19  with those speakers—much less that the University refused to contract with anyone *because of*

20  race (or religion, national origin, or shared ancestry, which section 1981 does not reach).

21  **4.**   **Plaintiffs Fail to State a Title VI Claim.**

22  Plaintiffs' Title VI claim fails because Plaintiffs have not alleged that the University

23  intentionally discriminated against anyone.  Indeed, Title VI authorizes an implied private cause of

24  action only for "intentional conduct."  *Barnes*, 536 U.S. at 186–87; *Mandel v. Bd. of Trs. of Cal.*

25  *State Univ.*, No. 17-cv-03511-WHO, 2018 WL 1242067, at *17 (N.D. Cal. Mar. 9, 2018).

26  Plaintiffs have not plausibly alleged either direct discrimination by the University or deliberate

27  indifference to the actions of others.

28

(a)      *Plaintiffs Fail to State a Claim for Direct Discrimination.*

Plaintiffs' direct discrimination theory fails because they have not alleged animus by University officials.  *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023); *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2011).

(b)      *Plaintiffs Fail to State a "Hostile Environment" Claim Because They Have Not Alleged Deliberate Indifference.*

Nor have Plaintiffs stated a Title VI claim based on the theory that the University acted with "deliberate indifference" to known harassment.  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633, 642–43 (1999).  A school is deliberately indifferent only if its response to a hostile environment is "clearly unreasonable in light of the known circumstances."  *Id.* at 648.  This does not "mean that recipients can avoid liability only by purging their schools of actionable peer harassment."  *Id.*  Nor does it mean "that administrators must engage in particular disciplinary action."  *Id.*  Indeed, it would be "entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims."  *Id.* at 649. Universities have many other options for responding to harassment on campus to satisfy Title VI, including denouncing the harassment, expressing university values, and providing support to affected students.  *See* Dear Colleague Letter, Dep't of Educ., Office for Civil Rights (May 7, 2024).  Here, Plaintiffs have not plausibly alleged that the University's response—which, again, is still ongoing—has been deliberately indifferent.  To the contrary, their allegations show the University has not been deliberately indifferent.

**Law Student Organizations.**  With respect to the law school student group bylaws, Plaintiffs have alleged at least as robust of a response as those held not to be "clearly unreasonable."  In *Mandel*, for example, San Francisco State had investigated complaints of antisemitism at protest events and wrote reports in response detailing where administrators had erred and what corrective steps could be taken in the future, but no student was disciplined.  2018 WL 1242067, at *3, *19.  Here, Plaintiffs allege that the University forcefully denounced the bylaws, communicated directly to affected students expressing their support and explaining their

1   response, and denied academic credit where appropriate.  *See supra* pp. 3–4; *see also* FAC Ex. C.

2   Going further and disciplining student groups would violate the First Amendment—and "it would

3   be entirely reasonable for a school to refrain from a form of disciplinary action that would expose

4   it to constitutional or statutory claims."  *Davis*, 526 U.S. at 649; *Felber*, 851 F. Supp. 2d at 1188.

5           **February 26, 2024, Event.**  The FAC fails to allege that the University's response to a mob

6   that "shut down a speaking engagement organized by Jewish students" was deliberately

7   indifferent.  FAC ¶ 3.  Plaintiffs allege that the University "fail[ed] to stop the mob" or otherwise

8   "take any meaningful action."  *Id.* ¶ 4.  But the FAC shows that the University took proactive and

9   concrete steps before and during the event.  It moved the event to a more secure location, deployed

10  multiple campus police officers (including the chief of police), physically intervened to protect

11  students from rioters, and cancelled the event and evacuated attendees.  *See id.* ¶¶ 71–75.  The

12  University also took action after the fact.  *Id.* ¶ 15.  As the FAC says, "UC Berkeley Police

13  Department is investigating [the rioters' conduct] as hate crimes."  *Id.* ¶ 81.  And University

14  officials denounced the rioters and their "overt[] antisemitic expression."  *See id.* ¶¶ 81, 141.

15          Plaintiffs' primary issue with the University's response appears to be that "Bears for

16  Palestine has not been suspended or disciplined."  *Id.* ¶ 83.  Yet the FAC does not allege facts to

17  show that Bears for Palestine was responsible for *any* conduct that violated University policy.

18  Plaintiffs' allegation that "Defendant Christ acknowledged that students from *Bears for Palestine*

19  had 'gained unauthorized entry into the building'" is demonstrably wrong.  *Id.* ¶ 73 (emphasis

20  added).  Plaintiffs selectively quote from Chancellor Christ's statement, impermissibly "selecting

21  only portions of documents that support their claims" while "omitting portions" of the quotation

22  "that weaken—or doom—their claims."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,

23  1002 (9th Cir. 2018).  In fact, Chancellor Christ states only that "*protesters* gained unauthorized

24  entry to the building," not Bears for Palestine (or any other students).[1]  The only other allegations

25  _____

26  [1] Chancellor Christ's full statement appears in her official statement, *Upholding Our Values*, Berkeley
    News, Feb. 27, 2024, https://news.berkeley.edu/2024/02/27/upholding-our-values/, which is

27  named and cited via a hyperlink at paragraph 139 of the FAC.  It may therefore be considered by
    this Court as incorporated by reference.  *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007);

28  *see also Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("we need not accept as

1  about Bears for Palestine involve protected speech—posting publicly on social media and

2  organizing a protest, *id.* ¶¶ 69–70—which would be insufficient without more for the University

3  to impose discipline, even if the message is contrary to the University's values.

4          Moreover, failure to discipline students within two and half months of an incident is not

5  deliberately indifferent.  Rather, the Ninth Circuit has held that disciplinary processes can take as

6  many as eight months without crossing over into being unlawfully slow.  *Karasek*, 956 F.3d at

7  1106; *see also Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006).  It is reasonable to

8  await the results of the active investigation by campus police before starting disciplinary

9  proceedings.  *See* FAC ¶ 81; *Moore v. Regents of the Univ. of Cal.*, No. 15-CV-05779-RS, 2016

10  WL 2961984, at *6 (N.D. Cal. May 23, 2016).

11          Nor would discipline necessarily be required to avoid deliberate indifference.  *See Mandel*,

12  2018 WL 1242067 at *1, *4.  In *Mandel*, plaintiffs alleged that the campus was deliberately

13  indifferent in its response to a speech that was interrupted by protestors because it "confirmed that

14  violations of the Student Conduct Code had occurred" but "no actions were taken . . . other than

15  verbal warnings."  *Id.* at *4.  That was not deliberate indifference because the school had taken

16  "broader steps to address the shutdown of [the] event and anti-Semitism . . . in general."  *Id.* at

17  *19.  The University's response here has been more robust than in *Mandel*, as it has clearly

18  condemned the activity as antisemitic and initiated a criminal investigation, which is underway.

19          ***Sather Gate Protests.***  The FAC fails to allege that the University's response to the partial

20  blockade of Sather Gate was deliberately indifferent.  Here, Plaintiffs' primary objection appears

21  to be that the University did not clear the protests.  This aspect of Plaintiffs' FAC faults the

22  University for not clearing—perhaps forcibly—a protest that contained *both* undeniably protected

23  political speech and allegedly offensive harassment of Jewish students.  Clearing a protest at

24  which *some* students (even if not *all* participants) are expressing political speech is a "form of

25  disciplinary action that would expose [the University] to constitutional . . . claims" from *those*

26

27  ─────────────────

    true allegations contradicting documents that are referenced in the complaint").  Alternatively,

28  Defendants request judicial notice of the Chancellor's statement in a concurrently filed request.

1   *students* and is therefore not required by Title VI.  *Davis*, 526 U.S. at 649 (Title IX case, but as

2   noted, courts interpret Title VI and Title IX consistently.)

3          Plaintiffs also suggest that the University could have and should have shut down the

4   protest entirely because aspects of it violate time, place, and manner restrictions.  FAC ¶ 99.  But

5   again, Title VI does not command particular disciplinary actions.  *Davis*, 526 U.S. at 648.  There

6   is no allegation that the *entirety* of the protest violated that policy.  And Plaintiffs allege that the

7   University was "making efforts to end *those aspects of* the nonviolent protest at Sather Gate that

8   violate [its] time, place, and manner restrictions."  FAC ¶ 99 (emphasis added).  In any event, the

9   University stated that it did not use law enforcement to clear the protest because it did not want to

10  "create turmoil," *id.*, which is the sort of on-the-ground judgment that courts are not supposed to

11  second guess.  *Davis*, 526 U.S. at 648; *see also Moore*, 2016 WL 2961984, at *6.

12         ***Sproul Hall Encampment.***  Nor have Plaintiffs plausibly alleged deliberate indifference to

13  the encampments in front of Sproul Hall.  FAC ¶ 101.  That is due in no small part to the fact that

14  the encampment appeared *just eleven days* before Plaintiffs filed their FAC.  Courts have held

15  delays in responses that lasted weeks were not "clearly unreasonable."  *See, e.g.*, *Tanjaya v.*

16  *Regents of Univ. of Cal.*, No. CV 19-2956-GW(FFMx), 2019 WL 13252681, at *5 (C.D. Cal. Dec.

17  12, 2019), *aff'd*, 830 F. App'x 526 (9th Cir. 2020) (holding a weeks-long delay followed by an

18  eight-month investigation was not clearly unreasonable).  But Plaintiffs allege the University

19  assured the community that it is "observing the demonstration."  FAC ¶ 107.  If Plaintiffs' issue is

20  that the University did not discipline anyone for the encampment or (accepting the allegations as

21  true for now) take various other actions in the eleven days between when the encampment started

22  and the FAC, *see id.*, that only underscores that the claim is premature.  The need for deliberation

23  and patience is especially important due to the complexity of the issue and competing

24  considerations facing the University, including the risk of potential constitutional concerns

25  associated with taking action to address the encampment.  *See supra* pp. 10–11.

26         ***Dean Chemerinsky Event.***  The FAC also fails to allege that the University has been

27  deliberately indifferent to harassment related to the Dean Chemerinsky event.  FAC ¶ 11.  The

28  FAC alleges that LSJP members disrupted a dinner that the Dean hosted for graduating students,

refused to leave when asked to do so, and circulated an antisemitic caricature of the Dean.  *Id.*
¶¶ 11, 12.  Yet the FAC also makes clear that the University took firm and sweeping action in
response, denouncing the antisemitic images and supporting Dean Chemerinsky.  The FAC
acknowledges that "the University condemned the actions of the students involved and recognized
that they were anti-Semitic."  *Id.* ¶ 143.  President Drake issued a statement acknowledging that
the actions of the students "were antisemitic, threatening, and do not reflect the values of this
university."  *Id.* ¶ 91.  Board of Regents Chair Leib called the actions "deplorable."  *Id.*

Plaintiffs are not satisfied because "LSJP has not had its registered student organization
status revoked," *id.* ¶ 143, but that does not establish deliberate indifference.  The University's
clear condemnation is exactly the type of response imagined in Education Department guidance on
Title VI.  *See* Dear Colleague Letter at 3; *see also Feminist Majority Found. v. Hurley*, 911 F.3d
674, 693 (4th Cir. 2018) (suggesting "vigorously denounc[ing] the harassing and threatening
conduct" as an appropriate response).  And revoking LSJP's status in the present circumstances
would create risk of potential constitutional concerns.  *See Davis*, 526 U.S. at 648.  At least one
other university has been sued for just that.  *See Columbia Students for Justice in Palestine v.
Columbia Univ.*, No. 152220 (N.Y. Sup. Ct. Mar. 11, 2024).  At a minimum, the University should
be given time to respond before the Court can determine whether it has responded adequately.

***Other Incidents of Alleged Harassment.***  Plaintiffs also include "a number of additional
conclusory allegations that lack the date they occurred, how frequently they occurred, and who
was involved."  *Mandel*, 2018 WL 1242067 at *5.  Plaintiffs cannot rely on these sparse
allegations.  But even if they could, they do not support deliberate indifference.  Plaintiffs make no
allegations at all about the University's response, other than to fault the University for initially
calling one incident a "hate crime" without saying that it was antisemitic in nature.  FAC ¶ 115.

### 5.   Plaintiffs Fail to State an ADA Claim.

Plaintiffs' ADA claim also fails.  The FAC alleges that student protests have partially
obstructed Plaintiffs' access to two locations on the University's campus:  Sather Gate and Sproul
Hall.  FAC ¶ 191.  To state a claim under Title II, a plaintiff must show that they were either
excluded from participation in or denied the benefits of a public entity's services, programs, or

activities *solely* because of their disability.  *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997); *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996).  "An entity is 'not required to produce the identical result for handicapped and nonhandicapped persons,' but they nevertheless 'must afford handicapped persons equal opportunity to gain the same benefit.'" *Bassilios v. City of Torrance, CA*, 166 F. Supp. 3d 1061, 1077 (C.D. Cal. 2015) (citation omitted).

Plaintiffs do not meet this standard.  First, they do not allege that the protest at Sather Gate denies them access to the University's services, which means they fall short of the requirement to plead that there are locations that the plaintiff cannot reach at all "because of access barriers." *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017).  The FAC alleges that the protest prevents use of one portion of Sather Gate, while leaving two separate portions of the gate open to traffic.  FAC ¶ 96.  And the FAC does not allege that the protest prevents JAFE Member #1 from accessing classes; only that the student has had to go to class via other routes. *Id.*  Second, Plaintiffs do not allege that Sproul Hall is inaccessible to individuals *due to disability*; they allege that students feel unable to access Sproul Hall due to *harassment*.  *Id.* ¶ 102. Antisemitic harassment should not occur on campus, but if it does, it does not implicate the ADA.

## V.   **CONCLUSION**

For these reasons, the Court should dismiss Plaintiffs' claims.[2]

DATED:  June 10, 2024                         MUNGER, TOLLES & OLSON LLP


                                              By:      *Bryan H. Heckenlively*
                                                   BRYAN H. HECKENLIVELY
                                                   Attorneys for Defendants

---

[2] The Court should dismiss Counts I to III against The Regents of the University of California, which cannot be sued under sections 1981 or 1983 because it is an arm of the state.  *Armstrong v. Meyers*, 964 F.2d 948, 949–50 (9th Cir. 1992); *Pittman v. Or., Emp. Dep't*, 509 F.3d 1065, 1066 (9th Cir. 2007).  "UC Berkeley" and "Berkeley Law School" should be dismissed in full because they are not legal entities distinct from The Regents.  *See Mihan v. Regents of the Univ. of Cal.*, No. 2:16-cv-01390-KJM-CMK, 2016 WL 6875911, at *3 (E.D. Cal. Nov. 21, 2016).