# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-10577-RGS

STANDWITHUS CENTER FOR LEGAL JUSTICE,
KATERINA BOUKIN, and MARILYN MEYERS

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

July 30, 2024

STEARNS, D.J.

This putative class action against Massachusetts Institute of Technology (MIT) challenges the adequacy of MIT's response to acts of antisemitism occurring on its campus. Plaintiffs StandWithUs Center for Legal Justice (SCLJ), Katerina Boukin, and Marilyn Meyers claim that, after the bloody October 7, 2023 Hamas terrorist attack on Israel, repeated incidents of antisemitic conduct took place on the MIT campus, causing Jewish and Israeli students to fear for their personal safety. The First Amended Complaint (FAC) alleges four counts: deliberate indifference to a hostile educational environment impacting Jewish and Israeli students in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count I); failure to prevent a conspiracy to interfere with civil rights in

violation of 42 U.S.C. § 1986 (Count II); negligence (Count III); and breach of contract (Count IV).[1]  Plaintiffs seek compensatory and punitive damages and prospective injunctive relief.

MIT now moves to dismiss the FAC, lodging challenges under Rules 12(b)(1) and 12(b)(6).  On July 24, 2024, the court convened a hearing on MIT's motion.  After careful consideration and commendable argument from both sides, the court will allow MIT's motion.

## BACKGROUND

The relevant facts, drawn from the FAC and taken in the light most favorable to plaintiffs, are as follows.  On October 7, 2023, the Palestinian Sunni Islamist terrorist group Hamas committed a violent terrorist attack on Israel.[2]  The day after the attack, multiple MIT student groups – including the Coalition Against Apartheid (CAA) and Palestine@MIT – released a joint statement "hold[ing] the Israeli regime responsible for all unfolding violence."  FAC ¶ 147.  The statement was posted on CAA's and

---

[1] Counts I-III are alleged by all plaintiffs.  Count IV is alleged by Boukin and Meyers individually and, for injunctive relief only, on behalf of a putative class of "[a]ll Jewish and/or Israeli students enrolled at MIT after October 7, 2023, who did not participate in the pro-Palestine protests described [in the FAC]."  First Am. Compl. (FAC) (Dkt. # 40) ¶ 366.

[2] "Hamas" is an acronym for Harakat al-Muqawama al-Islamiya, which translates roughly into Islamic Resistance Movement.  In 1997, the U.S. Department of State designated Hamas as a Terrorist Organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

2

Palestine@MIT's blogs, was sent to every undergraduate student's email, and was shared on Palestine@MIT's Instagram account. *See id.* ¶ 145. On October 19, 2023, CAA hosted a rally, which Meyers attended. A protestor shouted at Meyers and a friend, "Your ancestors . . . didn't die to kill more people." *Id.* ¶ 156. Others at the rally chanted phrases such as "Palestine will be free, from the river to the sea."[3] *Id.* ¶ 157. Student groups continued demonstrating throughout the semester, walking out of classes, organizing "die-ins," and protesting in Lobby 7, a "major thoroughfare" on the MIT campus. *See id.* ¶¶ 159-162, 169-188.

On November 9, President Sally Kornbluth issued a statement warning the Lobby 7 protestors that their conduct violated MIT's Code of Conduct; threatening the students with disciplinary action, including potential suspension; and ordering them to vacate Lobby 7 immediately.[4]

---

[3] "From the river to the sea" refers to the area between the Jordan River and the Mediterranean Sea, in which Israel, the West Bank, East Jerusalem, and the Gaza Strip are located. While some claim the phrase is a call for peace in the region, many, including the majority of members of the U.S. House of Representatives, condemn the phrase as "outrightly antisemitic." *See* H.R. Res. 883, 118th Cong. (2023).

[4] MIT provided documents intended to show that MIT began responding forcefully to the intimidation of Jewish and Israeli students on October 10, 2023. *See* Mem. of Law in Supp. of Def. MIT's Mot. to Dismiss the Am. Compl. (Mot.), Ex. 1 (Dkt. # 42-2). As these are not properly before the court on a 12(b)(6) motion (and they have no bearing on MIT's

After deciding that suspending students could lead to "collateral consequences . . . such as visa issues," MIT changed course and chose to suspend student violators from only non-academic campus activities. *Id.* ¶ 184. Around the same time, MIT also provisionally suspended CAA, *see id.* ¶ 125 n.3, and created the Standing Together Against Hate initiative, which was intended to "spearhead efforts to combat antisemitism at MIT,"[5] *id.* ¶ 201.

As the protests continued over the academic year, many Jewish and Israeli MIT students, including plaintiffs and SCLJ's members, felt abandoned by the school's administration. For example, when a member of Congress asked President Kornbluth whether "calling for the genocide of Jews violate[s] MIT's code of conduct," President Kornbluth gave a hairsplitting legalistic response: "If targeted at individuals, not making public statements." *Id.* ¶ 198. And when students complained to MIT's Institute Discrimination & Harassment Response Office (IDHR) about the perceived antisemitic incidents, IDHR responded that the complained-of conduct "did not seem to violate the policies that IDHR has jurisdiction

---

12(b)(1) motion), the court is unable to consider them. *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

[5] MIT disbanded the initiative in February of 2024. FAC ¶ 202.

over" and, moreover, that Jews are not members of a protected class. *Id.* ¶ 205.

The protest activity at MIT reached a boiling point on April 21, 2024, when students erected an encampment on Kresge lawn (across from Hillel, an organization promoting Jewish campus life), protesting Zionism and MIT's ties to Israeli academics and government contractors. *See id.* ¶ 221. A Jewish student promptly emailed MIT Chancellor Melissa Nobles expressing dismay over the encampment, prompting Chancellor Nobles to reply that MIT was "working to move in a constructive direction with those who are protesting." *Id.* ¶ 224.

A week after the encampment appeared, President Kornbluth released a video statement. She informed students that the encampment violated MIT policy but, in the interest of protecting free speech, MIT had elected not to forcibly remove the student protestors. *See MIT Community Message from President Kornbluth* (April 27, 2024), https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth.⁶ President Kornbluth directed the MIT Police Department to patrol the area around the encampment 24

---

⁶ Plaintiffs cite – and link – to the transcript of President Kornbluth's speech in the FAC, so the court may consider it. *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

5

hours a day. *See id.* On May 6, President Kornbluth warned student demonstrators that if they did not take down the tents and leave by 2:30pm, they would face disciplinary proceedings. FAC ¶ 238. All but five students eventually complied with President Kornbluth's ultimatum. *See* Sally Kornbluth, *Update on the Encampment* (May 6, 2024), https://orgchart.mit.edu/letters/update-encampment. Despite the departure of most of the protestors, that evening, "an individual jumped over the fencing surrounding the [mostly abandoned encampment], causing a surge, and soon the area was breached," and the encampment started anew. FAC ¶ 239. Tensions continued to rise over the next several days. On May 8, after protestors defaced Israeli flags, "[t]he day ended with more suspensions." Sally Kornbluth, *Actions This Morning* (May 10, 2024), https://orgchart.mit.edu/letters/actions-encampment. The next day, protestors blocked Vassar Street – a main campus thoroughfare – and, after refusing to disperse, nine of them were arrested. *Id.* On May 10, after further police pressure, the encampment was discontinued. *See id.*

MIT maintains various policies that govern student conduct, including the Code of Conduct, Chalking Policy, and Events Policy, (together, the Policies). The Policies proscribe, *inter alia*, physical violence, behavior that has "serious ramifications" for the wellbeing of any student,

6

and discrimination. If a student violates the Policies, they are subject to a salmagundi of discipline, including a warning, probation, suspension, expulsion, or degree revocation. The Chalking Policy limits where students may chalk and hang posters and prohibits the removing or defacing of other groups' posters. The Events Policy bans expression used to harass, discriminate against, or target any groups or individuals.

## DISCUSSION

### Subject Matter Jurisdiction

MIT challenges the court's jurisdiction on three grounds: (1) SCLJ lacks associational standing to pursue any of the claims; (2) all plaintiffs lack standing to obtain prospective injunctive relief; and (3) Count I is unripe. To establish standing, plaintiffs must, "for each claim that they press and for each form of relief that they seek," "establish each part of a familiar triad: injury, causation, and redressability." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012). Standing to seek prospective relief hinges on a showing that the plaintiff is "likely to suffer future injury." *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983).

An association has standing to sue on its members' behalf when "(a) its members would otherwise have standing to sue in their own right;

7

(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Because an association's members are not parties to the case, to recover damages on behalf of its members, the association must show that the damages are "common to the entire membership." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Similar conditions apply to injunctive relief; if "member circumstances differ and proof of them is important," the association lacks standing to obtain an injunction for its members. *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006), quoting *Pharm. Care Mgm't Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005) (Boudin, J., concurring).

In assessing ripeness, the court considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A claim is not fit for decision if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *City of Fall River v. F.E.R.C.*, 507 F.3d 1, 6 (1st Cir. 2007), quoting *Texas v. United States*, 523 U.S. 296, 300 (1998).

The court perceives no jurisdictional bar to this case proceeding. Although MIT is correct that SCLJ lacks standing to seek damages on Counts I and III,[7] Boukin and Meyers have standing to seek damages for these counts. Because the FAC plausibly alleges ongoing injuries, Boukin and Meyers also have standing to seek prospective injunctive relief. *See Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023). Nor is the court persuaded that SCLJ's members need to be joined as parties to the case. Even if SCLJ's claims require "proof specific to individual members of the association," this is no bar to associational standing for purposes of injunctive relief. *See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 35 (1st Cir. 1990).

Plaintiffs' Title VI claim is also ripe. MIT argues that it should not have to "defend the adequacy of its response [to on-campus antisemitism] while that response [is] underway." Mot. at 21. Boukin's and Meyers's damages claims depend, however, on past events that have fully unfolded,

---

[7] SCLJ seeks to recover compensatory and punitive damages on behalf of its members. Because Title VI is "much in the nature of a contract," the scope of available damages relief is contractual in nature. *Barnes v. Gorman*, 536 U.S. 181, 186-187 (2002), quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis omitted). Contractual damages, however, are not "common to the entire membership." *See Warth*, 422 U.S. at 515. So, too, is the case with tort-based damages, which are designed to redress individualized non-economic losses.

9

so there can be no dispute that they are ripe. *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). And MIT's arguments that plaintiffs' claim for prospective injunctive relief is unripe turn largely on the merits of the dispute, *i.e.*, whether MIT has been deliberately indifferent and whether this alleged deliberate indifference is "sufficiently likely to happen" when campus life resumes this fall. *See Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002). Because the ripeness issue is intertwined with the merits, the court need not rule on it at this juncture. *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 n.3 (1st Cir. 2001)

**Failure to State a Claim**

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," the complaint will be dismissed. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

### *(a)  Count I: Title VI*

Title VI forbids recipients of federal funds from discriminating "on the ground of race, color, or national origin."  42 U.S.C. § 2000d.  The parties agree that discrimination against Jewish students comes within the statute's prohibition.  A Title VI hostile environment claim[8] has five elements:  (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . . harassment"; (2) the harassment "caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the school "knew of the harassment"; (4) the harassment occurred "in [the school's] programs and activities"; and (5) the school "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances."  *Porto v. Town of Tewksbury*, 488

---

[8] Although the FAC also gestures at a direct discrimination theory, plaintiffs have not pursued this theory in their briefing on the motion to dismiss.  At any rate, plaintiffs' direct discrimination theory is indubitably one of vicarious liability.  Although there is no Supreme Court or First Circuit precedent squarely addressing the issue, the Supreme Court has held that a school district cannot be held vicariously liable under Title IX for the actions of its teachers.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998).  The remedial schemes for Titles VI and IX generally mirror one another.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009); *see also Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) ("Title VI and Title IX are so similar that a decision interpreting one generally applies to the other.").  It follows that vicarious liability is unavailable under Title VI.  *See Corbett ex rel. Corbett v. Browning*, 2024 WL 862160, at *3 (D. Mass. Feb. 13, 2024).

11

F.3d 67, 72-73 (1st Cir. 2007), quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Deliberate indifference is a "stringent standard of fault." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "[A] claim that an institution could or should have done more does not establish deliberate indifference." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023). Rather, plaintiffs must allege facts showing that MIT's response to the incidents was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 175 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009). The test is not to be viewed through the lens of hindsight; instead, the court must consider whether MIT responded in a clearly unreasonable manner based on what it knew at the time. *See Porto*, 488 F.3d at 74; *see also Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (even where officials are aware of a risk of harm, they "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted"). Boiled down to its essence, deliberate indifference means affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires. Tempered by this understanding, the court cannot find that MIT acted with deliberate indifference.

12

The FAC compellingly depicts a campus embroiled in an internecine conflict that caused Jewish and Israeli students great anguish. Plaintiffs frame MIT's response to the conflict largely as one of inaction. But the facts alleged tell a different story. Far from sitting on its hands, MIT took steps to contain the escalating on-campus protests that, in some instances, posed a genuine threat to the welfare and safety of Jewish and Israeli students, who were at times personally victimized by the hostile demonstrators. MIT began by suspending student protestors from non-academic activities, permitting them only to attend academic classes, while suspending one of the most undisciplined of the pro-Palestine student groups. These measures proved ineffective when, in April of 2024, protestors erected the Kresge lawn encampment. MIT immediately warned students of impending disciplinary action, but its threat went unheeded when student demonstrators "surge[d]" and "breached" the largely evacuated encampment. When MIT's attempt to peacefully clear the encampment proved futile, it suspended and arrested trespassing students.

In hindsight, one might envision things MIT could have done differently. Indeed, some campus administrators elsewhere, as plaintiffs allege, reacted to the protests differently (and with more positive results) than MIT. But that is not the applicable standard. That MIT's evolving and

13

progressively punitive response largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students shows that MIT did not react in a clearly unreasonable manner.

The court adds some concluding thoughts. The pain and hurt felt by plaintiffs and the Jewish and Israeli students that they seek to represent is genuine and fully understandable. But at bottom, the fault attributed to MIT is its failure to anticipate the bigoted behavior that some demonstrators – however sincere their disagreement with U.S. and Israeli policies – would exhibit as events unfolded. The transgressors were, after all, mostly MIT students whom the school (perhaps naively) thought had internalized the values of tolerance and respect for others – even those with whom one might disagree – that a modern liberal university education seeks to instill. To fault MIT for what proved to be a failure of clairvoyance and a perhaps too measured response to an outburst of ugliness on its campus would send the unhelpful message that anything less than a faultless response in similar circumstances would earn no positive recognition in the eyes of the law. Count I will thus be dismissed.

### (b) Count II: 42 U.S.C. § 1986

Plaintiffs seek to hold MIT liable under § 1986 for knowingly failing to prevent the formation of a conspiracy consisting of MIT student groups

14

to deprive plaintiffs of their civil rights.[9]  An essential element of this claim is proof of at least one of the conspiracies defined by 42 U.S.C. § 1985.  *See Gattineri v. Town of Lynnfield*, 58 F.4th 512, 516 (1st Cir. 2023).  Plaintiffs look to § 1985(3), which prohibits conspiracies undertaken to deprive, "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).

To plead an actionable § 1985(3) conspiracy, plaintiffs must allege: (1) the existence of a conspiracy; (2) that the "purpose of the conspiracy [was] 'to deprive the plaintiff[s] of the equal protection of the laws'"; (3) at least one overt act was committed in furtherance of the conspiracy; and (4) "either injury to person or property, or deprivation of a constitutionally protected right" followed as a consequence of the illegal undertaking.  *Alston v. Spiegel*, 988 F.3d 564, 577 (1st Cir. 2021), quoting *Péréz-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008).  To plausibly plead that a conspiracy existed, plaintiffs must allege either "facts indicating an agreement among the conspirators" or facts "sufficient to support a reasonable inference that such an agreement was made."  *Parker v.*

---

[9] The court is aware of no case (and plaintiffs cite none) holding a party liable under § 1986 for failing to prevent a conspiracy in which the party was not involved.  Nonetheless, the court will proceed on the shaky assumption that § 1986 liability could attach in these circumstances.

*Landry*, 935 F.3d 9, 18 (1st Cir. 2019). The requisite agreement must be to deprive plaintiffs of their civil rights. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (the right's "impairment must be a conscious objective of the enterprise").

Plaintiffs fail to plead any conspiratorial agreement. They claim that MIT student groups (1) jointly announced rallies, walkouts, and the encampment; (2) had overlapping membership; and (3) recruited participants for (and participated in) the encampment. These allegations establish that student groups acted in concert to plan protest events advocating their shared views, but nothing in the FAC raises a plausible inference that the groups agreed to plan the events "at least in part for the very purpose of" depriving plaintiffs of their civil rights. *See id.* at 276. Nor does plaintiffs' contention that the "clear practical effect" of the protests "was to impede the rights of Jewish and Israeli students on campus" rescue their claim. *See* Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Am. Compl. (Dkt. # 46) at 26. "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right."[10] *Bray*, 506 U.S. at 275. Count II will therefore be dismissed.

---

[10] It is also unclear whether student groups, rather than their constituent members, can form a § 1985(3) conspiracy. In the somewhat analogous civil RICO context, "[i]t is only a person, or one associated with

16

### *(c)   Counts III and IV:  Negligence and Breach of Contract*

Having dismissed all claims over which the court has original jurisdiction (and because plaintiffs have not pled diversity jurisdiction), the court will decline to exercise supplemental jurisdiction over plaintiffs' state-law claims.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); 28 U.S.C. § 1367(c)(3).

### ORDER

For the foregoing reasons, MIT's motion to dismiss the federal claims (Counts I and II) is <u>ALLOWED</u>.  The court declines to exercise jurisdiction over the state-law claims (Counts III and IV).  The Clerk will close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

an enterprise, not the enterprise itself, who can violate" RICO.  *Schofield v. First Commodity Corp. of Bos.*, 793 F.2d 28, 30 (1st Cir. 1986).  Other courts have concluded in the § 1985(3) context that "fail[ure] to allege with any specificity the persons who agreed to the alleged conspiracy" dooms a civil rights conspiracy claim.  *E.g.*, *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011).