# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-10092-RGS

ALEXANDER KESTENBAUM and
STUDENTS AGAINST ANTISEMITISM, INC.

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

August 6, 2024

STEARNS, D.J.

This case has its roots in an outburst of antisemitic behaviors on the
Harvard University campus following the October 7, 2023 terrorist attack by
Hamas on Israel. The plaintiffs are Alexander Kestenbaum, a Jewish recent
graduate of the Harvard Divinity School, and Students Against
Antisemitism, Inc. (SAA), a non-profit "comprised of voluntary members,
including students at higher education institutions" founded to defend the
rights of individuals "to be free from antisemitism in higher education."
Second Am. Compl. (SAC) (Dkt. # 63) ¶¶ 19-20. Alleging that Harvard
affirmatively ignored discrimination against Jewish and Israeli students,
plaintiffs sued the University seeking damages and prospective injunctive
relief. The Second Amended Complaint (SAC) is framed in three counts:

deliberate indifference to harassment of and direct discrimination against Jewish and Israeli students in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count I); breach of contract (Count II); and breach of the implied contractual covenant of good faith and fair dealing (Count III).

Harvard now moves to dismiss the SAC, arguing that the claims are nonjusticiable and that plaintiffs have failed to state a viable claim for relief. It also moves to strike plaintiffs' prayer for injunctive relief. On July 24, 2024, the court convened a hearing on Harvard's motions at which both sides presented laudably. For the reasons that follow, the court will allow the motion to dismiss in part and deny it in part and deny the motion to strike.

## BACKGROUND

The relevant facts, drawn from the SAC and taken in the light most favorable to plaintiffs, are as follows. On October 7, 2023, the Palestinian Sunni Islamist terrorist group Hamas committed a savage terrorist attack on Israel.[1] The day after the attack, more than thirty Harvard student groups issued a joint statement purporting to "hold the Israeli regime entirely responsible for all unfolding violence." *Id.* ¶ 101. On October 18, 2023, two

---

[1] "Hamas" is an acronym for Harakat al-Muqawama al-Islamiya, which translates roughly in English to Islamic Resistance Movement. In 1997, the U.S. Department of State designated Hamas as a Terrorist Organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

Harvard student groups organized a metaphorical "die-in" involving hundreds of students at which members of the protesting groups "harassed and physically assaulted Jewish students." *Id.* ¶¶ 114-115.

Throughout the fall 2023 semester, Harvard student groups, including Harvard Afro; Boycott, Divestment and Sanctions; Graduate Students for Palestine; Jews for Liberation; and the Palestinian Solidarity Committee (PSC),[2] regularly demonstrated on campus. Protestors marched through campus, staged classroom walkouts, and rallied in campus common areas, at times staying overnight. *See id.* ¶¶ 116-119, 125-142. During these events, demonstrators chanted provocative slogans such as "from the river to the sea,"[3] "free Palestine," and "globalize the intifada." *E.g.*, *id.* ¶¶ 100, 113-114, 116, 119, 122, 139, 141, 144. The bullying of Jewish students also spilled into classrooms. For example, a Harvard Law School Torts professor announced a final exam focused on the Israel/Gaza conflict (and only changed course when the Registrar's Office intervened). *See id.* ¶ 155. And a Harvard Law School student who assaulted a Jewish student at the October 18 "die-in" was

---

[2] Harvard Afro and Boycott, Divestment, and Sanctions are not registered student groups. *See* SAC ¶ 61.

[3] "From the river to the sea" refers to the area between the Jordan River and the Mediterranean Sea, in which Israel, the West Bank, East Jerusalem, and the Gaza Strip are located. Plaintiffs allege that the phrase is a "genocidal call for the destruction of Israel and its Jewish inhabitants." *Id.* ¶ 72.

permitted to remain in his position as a teaching fellow for a first-year Civil Procedure course.  *See id.* ¶¶ 115, 126, 153.

Antisemitic episodes persisted and, if anything, intensified into the spring 2024 semester.  On January 2, 2024, Harvard students posted a flurry of antisemitic messages on a University-wide group app called Sidechat.[4] When Kestenbaum reported the messages to Harvard administrators, the official response was to terminate his access to Sidechat and restrict Sidechat membership to current undergraduate students.  In late January, posters memorializing Israeli citizens taken hostage by Hamas were vandalized with messages such as "ISRAEL DID 9/11."  *Id.* ¶ 195.  Soon after, a Harvard employee emailed Kestenbaum inviting him to debate Israel's "role in 9/11."[5] *Id.* ¶ 199.

A flash point ignited in April of 2024, when protesting students erected an encampment in Harvard Yard, an iconic close in the center of the Harvard

---

[4] These messages included students "proudly accept[ing] the label of terrorist," calling a Jewish student a "pedo lover," claiming that "all of you Zionists" are "[k]illers and rapists of children," and referring to a Jewish student's nose as "crooked."  *Id.* ¶ 148.

[5] On his social media account "9/11 Guy," the employee identified himself as "an 'anti-Semite' because [he has] no problem with Jews per se, just the ones who think there's a different set of rules for them," and questioned whether the October 7 terrorist attacks had truly occurred.  *Id.* ¶ 201.  Harvard eventually fired the employee in April of 2024.  *See id.* ¶ 204.

campus. Harvard had cautioned students that "tents and tables[] are not permitted in the Yard without prior permission," and that "[s]tudents violating these policies are subject to disciplinary action." *Id.* ¶ 250. Despite the warnings, Harvard did nothing to stop "[p]eople with backpacks, tents, suitcases, and carts" from descending on the Yard on April 24 to create a tent encampment. *Id.* The encampment was left undisturbed until May 14, when Interim President Alan Garber negotiated with leaders of the encampment over the terms of vacating the Yard. In exchange for an end to the encampment, Garber instructed all Harvard schools to reinstate any student protestors who had been placed on involuntary leave, promised to expedite any administrative hearings against these students, and agreed to conduct the hearings with "leniency." Garber also offered Harvard Out of Palestine, an unregistered student group, meetings with Harvard's governing board to advocate for divestment of any Harvard endowment ties with Israel.

The ongoing tumult caused many Jewish and Israeli students to fear for their personal safety and hindered their ability to complete their academic studies. During one of the protest rallies, demonstrators blockaded Jewish students in a study room, *see id.* ¶ 117, and during another, protestors "surrounded and intimidated" Jewish students, *id.* ¶ 141. Protesting students embedded in the encampment followed Kestenbaum

"[e]very time [he] tried to walk through Harvard Yard." *Id.* ¶ 258. Some students felt compelled to doff clothing that might identify them as Jewish and ceased attending Jewish-sponsored events on campus. Still others feared walking about campus, missed classes, and felt isolated from their classmates. *E.g.*, *id.* ¶¶ 303, 305-307, 309.

Plaintiffs further aver that they feel abandoned by Harvard's administration. Although Kestenbaum and SAA members have complained repeatedly to various Harvard offices and administrators, they claim that the situation has not improved. *E.g.*, *id.* ¶¶ 153, 155, 227, 294. And when asked before the U.S. House of Representatives whether "calling for the genocide of Jews violate[s] Harvard's rules of bullying and harassment," then-President Claudine Gay disconcertingly replied that "it depends on the context." *Id.* ¶ 163.

According to plaintiffs, Harvard's response has been not just simply inadequate but skewed in its bias. For example, after student groups protested for two weeks in Caspersen lounge, a common student area in the Harvard Law School, Jewish students asked Harvard deans and administrators if they could also hold a demonstration in the lounge. Only after that request was made did Harvard Law Dean of Students Stephen Ball email the student body that the lounge area is reserved for "personal or small

group study and conversation." *Id.* ¶ 127. That edict notwithstanding, Harvard (at least de facto) permitted pro-Palestine protests in the lounge to continue until the end of the semester. Harvard required Chabbad, a campus Hasidic Jewish community center, to remove its Hanukkah menorah from campus each night to prevent it being vandalized, but it provided 24/7 security to PSC's "Wall of Resistance." And although then-President Gay appointed an Antisemitism Advisory Group in November of 2023, Garber dissolved the Group before it could make any formal recommendations.[6] *See id.* ¶¶ 187, 191.

Harvard has a fulsome array of policies that govern student behavior. These include a Non-Discrimination and Anti-Bullying Policy, Protest Rules, a Statement on Rights and Responsibilities, Student Organization Policies, and various student handbooks (together, the Policies). The Policies prohibit "singling out or targeting an individual for less favorable treatment because of their protected characteristic" and "unwelcome and offensive conduct that

---

[6] Garber subsequently created a Presidential Task Force on Combating Antisemitism and appointed Professor Derek Penslar, a professor of Jewish history, as one of the co-chairs of the Task Force. Penslar's appointment "triggered an immediate public outcry" because he has argued that antisemitism that does not involve Jewish people being "attacked physically" should be "generally acceptable" and has claimed that "veins of hatred run through Jewish civilization." *Id.* ¶ 192. Penslar remains a co-chair of the Task Force.

is based on an individual or group's protected status." *Id.* ¶¶ 47, 51. They also bar "any unauthorized occupation of a University building, or any part of it, that interferes with the ability of members of the University to perform their normal activities" and "interference with freedom of movement or with freedom from personal force or violence." *Id.* ¶¶ 51, 57. Violation of the Policies is said to be "subject to appropriate discipline." *E.g.*, *id.* ¶ 51.

## DISCUSSION

### Subject Matter Jurisdiction

Harvard lodges a twofold factual jurisdictional challenge: (1) plaintiffs lack standing, and (2) their claims are not ripe. Because Harvard "controvert[s] the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff[s]," plaintiffs' jurisdictional averments are "entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). But if the genuinely disputed jurisdictional facts are "inextricably intertwined with the merits of the case," the court may defer ruling on the jurisdictional issue. *Id.* at 363 n.3.

### *(a) Standing*

To establish Article III standing, plaintiffs must satisfy three familiar requirements: "(i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *F.D.A. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). If the injury has not yet occurred, it must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). To seek prospective relief, plaintiffs must allege an "ongoing injury or a sufficient threat that the injury will recur." *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023).

An association has standing to sue on its members' behalf when (1) at least one of its members would have standing to sue individually, (2) the interests it seeks to protect are "germane to the organization's purpose," and (3) the claims and types of relief requested do not require individual participation of the members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). If the association seeks damages but "alleges no monetary injury to itself," associational standing is precluded unless the damages claims are "common to the entire membership." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Injunctive relief, by contrast, has "generally been held particularly suited to group representation." *Camel Hair & Cashmere*

*Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986). In assessing the third *Hunt* prong in cases seeking injunctive relief, the "nature of the claim" aspect thus plays a distant second fiddle to the type of relief sought. *See Warth*, 422 U.S. at 515 (the third prong "depends in substantial measure on the nature of the relief sought").

The court concludes that Kestenbaum has standing to seek damages to redress the harms he alleges that he suffered while a student at Harvard Divinity, and SAA has standing to seek prospective injunctive relief.[7] Harvard contends that SAA cannot seek injunctive relief because Title VI

---

[7] Kestenbaum lacks standing to pursue prospective injunctive relief; he graduated from Harvard, so "there is simply 'no ongoing conduct to enjoin' presently affecting" him. *Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022), quoting *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021). This may be better framed as a mootness problem. *See, e.g.*, *Camreta v. Greene*, 563 U.S. 692, 710-711 (2011). But either way, Kestenbaum's claim for equitable relief is not justiciable.

For its part, SAA lacks standing to seek damages. Compensatory damages are available under Title VI, but punitive and emotional distress damages are not. *See Barnes v. Gorman*, 536 U.S. 181, 187 (2002) (punitive damages); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 221-222 (2022) (emotional distress damages). SAA does not allege that it incurred any economic harm, so its only potential route to recover economic damages is through personal harms incurred by its members. Proof of such damages requires SAA's members to participate as parties because "the damages claims are not common to the entire membership." *Warth*, 422 U.S. at 515. Nonetheless, because at least one plaintiff has standing to pursue each type of relief, these thorny standing thickets are ultimately no bar to jurisdiction. *See Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 972 (1st Cir. 1993).

claims are "necessarily individualized." Mem. of Law in Supp. of Def.'s Mot. to Dismiss & Mot. to Strike Pls.' Second Am. Compl. (Mot.) (Dkt. # 74) at 12. Even if true, this does not preclude associational standing because the requested relief will "inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515.

### (b) Ripeness

A ripeness determination turns on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983), quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). The key ripeness consideration is "the extent to which 'the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all.'" *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990), quoting 13A Wright and Miller, *Federal Practice and Procedures* § 3532.2 (1984). Claims of future injury are ripe only if the "injury that has not yet happened is sufficiently likely to happen to warrant judicial review." *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002).

Harvard says this case is unripe because its efforts to combat antisemitism on campus are "still underway." Mot. at 8. Kestenbaum's

damages claims, however, depend entirely on past events, so they are ripe. *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995). The only genuinely disputed facts that weigh on SAA's ability to seek prospective injunctive relief are whether Harvard's actions to date have been adequate and whether they will likely be effective going forward. This is the core merits dispute in this case. The court accordingly declines to rule on the issue at this formative stage of the litigation. *See Valentin*, 254 F.3d at 363 n.3.

**Failure to State a Claim**

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," the complaint will be dismissed. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

### *(a) Count I: Title VI*

Title VI prohibits (with some exceptions not relevant here) recipients of federal funds from intentionally discriminating "on the ground of race, color, or national origin." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

The parties agree that Title VI protects Jewish students from harassment, and discrimination based on actual or perceived Israeli identity is of course discrimination based on national origin.

### Deliberate Indifference

An institution is deliberately indifferent to student-on-student harassment if its response to the mistreatment is "clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).[8]  The deliberate indifference standard "has considerable bite." *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011).  Proof of deliberate indifference "requires more than a showing that the institution's response to harassment was less than ideal." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 171 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).  As this court has observed in a very similar case, deliberate indifference means "affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires."

---

[8] *Davis* is a Title IX case, but the parties agree that *Davis*'s deliberate indifference test applies in the Title VI context.  Nearly every other circuit that has weighed in on the issue has reached the same conclusion.  *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012); *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011); *Fennell ex rel. Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015); *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty.*, 334 F.3d 928, 934 (10th Cir. 2003).

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 2024 WL 3596916, at *4 (D. Mass. July 30, 2024). In short, plaintiffs must plead that the school "either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007).

A deliberate indifference claim has five elements: (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . . harassment"; (2) the harassment "caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the school "knew of the harassment"; (4) the harassment occurred "in its programs and activities"; and (5) the school "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Id.* at 72-73. Harvard contends that the SAC fails to adequately plead the first and fifth elements.

In evaluating the first element, courts look to a constellation of non-dispositive factors: "severity of the conduct, its frequency, whether it [was] physically threatening or not, and whether it interfered with" the student experience. *Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013).[9] Taking

---

[9] In *Davis*, the Supreme Court relied on Title VII cases in identifying loose boundaries for determining whether harassment is severe, pervasive, and objectively offensive. 526 U.S. at 651, citing *Oncale v. Sundowner*

these factors into account, plaintiffs have plausibly pled that they were subject to severe, pervasive, and objectively offensive harassment. The SAC vividly limns repeated, fear-inducing conduct that amounted to more than "off-color banter," *see id.*, or, in Harvard's words, "offensive utterance[s]," Mot. at 27, quoting *Brown v. Hot, Sexy & Safer Prods., Inc.* 68 F.3d 525, 541 (1st Cir. 1995).[10] The protests were, at times, confrontational and physically violent, and plaintiffs legitimately fear their repetition. The harassment also impacted plaintiffs' life experience at Harvard; they dreaded walking through the campus, missed classes, and stopped participating in extracurricular events.

---

*Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998); *see also* U.S. Dep't of Educ., Off. of C.R., Dear Colleague Letter (May 7, 2024), at 4 n.15. Thus, while *Gerald* is a Title VII case, its hostile environment framework is instructive.

[10] The out-of-circuit district court cases on which Harvard relies to argue the opposite are easily distinguished. In *Mandel v. Board of Trustees of California State University*, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018), plaintiffs adequately alleged only three "isolated" events, and the remaining alleged events were "vague and lack[ing] substantiating specifics," such as dates, times, and identities of the students allegedly harassing Jewish students. *Id.* at *22. And in *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1184-1185 (N.D. Cal. 2011), "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present," and plaintiffs did not establish that they were denied access to educational services. *Id.* at 1188. Here, the SAC alleges with specificity a myriad of events occurring over seven months that Kestenbaum and/or SAA Members witnessed (or were targets of), many of which caused plaintiffs to be denied educational opportunities.

As to the fifth element, Harvard first argues that it could not, or at least is not legally required to, infringe on protected First Amendment activity. It may be true that, as a policy matter, Harvard has elected not to curtail the protests in the interest of protecting free speech (although as a private institution, it is not constitutionally required to do so). The court consequently is dubious that Harvard can hide behind the First Amendment to justify avoidance of its Title VI obligations.[11] At any rate, whether this argument has any teeth is a decision best reserved for a later day. The record is too thin to determine whether Harvard in fact acted to protect free speech rights as it contends Title VI required it to do and whether the protest activity itself comes within the protections of the First Amendment.

---

[11] The parties and *amicus* Foundation for Individual Rights and Expression (FIRE) helpfully briefed the legalities of the speech issue in depth, but their briefing only highlights why the issue should not be decided at this stage. FIRE characterizes *Davis* as the only Supreme Court case squarely on point. *See Amicus Curiae* Br. of FIRE in Supp. of Neither Party (FIRE Br.) (Dkt. # 87) at 7-8. But, as Justice Kennedy noted in his dissent in *Davis*, the majority opinion did not come to grips with the "obvious [First Amendment] limits on a university's ability to control its students." *Davis*, 526 U.S. at 667-668 (Kennedy, J., dissenting). Indeed, the majority opinion in *Davis* did not mention the First Amendment even once. Further, *Davis* involved a public school, to which the First Amendment unquestionably applies. FIRE may be correct that it "cannot be that the federal government could require private universities to enforce policies against speech that the government itself could not enforce at a public middle school," FIRE Br. at 8, but the court is reluctant to make such a determination now.

Harvard next contends that it responded to many of the incidents cited in the SAC and, although its response was perhaps less than "ideal," it "cannot plausibly be characterized" as clearly unreasonable. Mot. at 25, quoting *Fitzgerald*, 504 F.3d at 174. Harvard is correct that the SAC describes a handful of steps that Harvard took in response to antisemitic incidents. But as pled, Harvard's reaction was, at best, indecisive, vacillating, and at times internally contradictory. For example, the day after Dean Ball emailed all Harvard Law students that Caspersen lounge was limited to "personal or small group study and conversation," demonstrators hosted a "vigil for martyrs" in the lounge without any pushback from law school administrators. SAC ¶¶ 127-128. Rather than call a halt to the vigil, Dean Ball attended it. *Id.* ¶ 128. In another venue, while Harvard police officers were on scene at the encampment, when a Jewish student was openly "charged" and "push[ed]," the officers failed to react. *See id.* ¶ 251. And while Harvard, on April 22, 2024, suspended the PSC until the end of the semester, the short-term suspension proved to be in name alone, as the PSC spearheaded the creation of the encampment in Harvard Yard just two days later. *See id.* ¶¶ 247, 250.

These are but some of the many examples set out in the SAC documenting Harvard's failure to address what former President Gay and

17

Interim President Garber repeatedly publicly recognized as an eruption of antisemitism on the Harvard campus.  Indeed, in many instances, Harvard did not respond at all.  To conclude that the SAC has not plausibly alleged deliberate indifference would reward Harvard for virtuous public declarations that for the most part, according to the allegations of the SAC, proved hollow when it came to taking disciplinary measures against offending students and faculty.  In other words, the facts as pled show that Harvard failed its Jewish students.

The court, will, as it has before, add some concluding thoughts.  In assessing the actions taken in similar circumstances by Harvard's sister institution, the Massachusetts Institute of Technology, the court observed that the fault it attributed to MIT was "its failure to anticipate the bigoted behavior that some demonstrators – however sincere their disagreement with U.S. and Israeli policies – would exhibit as events unfolded." *StandWithUs Ctr.*, 2024 WL 3596916, at *5.  But despite MIT's failure of clairvoyance, it did respond with a perhaps overly measured but nonetheless consistent sense of purpose in returning civil order and discourse to its campus.  As the court pointed out, the law expects reasonable and proportionate acts by university officials – the standard is not faultless perfection or ultimate success.  Liability attaches when only when a school's

response is "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Fitzgerald*, 504 F.3d at 175. The facts as alleged in the SAC plausibly establish that Harvard's response failed Title VI's commands.

### Direct Discrimination

Plaintiffs' second theory is that, when compared to its response to other forms of discrimination, Harvard's enforcement of its policies against antisemitic speech and conduct evinces an "invidious double standard." Opp'n at 27. The "comparator" argument allows plaintiffs to prove discriminatory intent "based on 'evidence of past treatment toward others similarly situated.'"[12] *Doe v. Brown Univ.*, 43 F.4th 195, 207 (1st Cir. 2022), quoting *Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989). "[T]he mere existence of disparate treatment—even widely spread disparate treatment—does not furnish [an] adequate basis for an inference that the discrimination was racially motivated." *Dartmouth*, 889 F.2d at 21. Rather, the circumstances of the comparator cases must be "'reasonably comparable'

---

[12] Plaintiffs suggest that they "do far more" than allege reasonable comparators because "they allege that the way Harvard responds to antisemitic acts is *a fortiori* worse than the treatment Harvard has accorded other discrimination." *See* Opp'n at 27. To the extent plaintiffs mean to argue that their claim is an atypical and more sophisticated version of the comparator argument, the claim is rejected as underdeveloped.

and 'the nature of the infraction and knowledge of the evidence by college officials [need be] sufficiently similar.'" *Brown Univ.*, 45 F.4th at 207, quoting *Dartmouth*, 889 F.2d at 19 (alteration in original); *see also Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996) (comparators must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [school's] treatment of them for it"), quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

The SAC fails to adequately limn a comparator Title VI claim. Assuming that plaintiffs can advance a comparator claim based on Harvard's failure to punish the conduct of others,[13] plaintiffs do not identify reasonably comparable analogs. Plaintiffs contend that Harvard allows guest speakers and students to espouse antisemitic views but cancels other "controversial speakers" and disciplines mostly unnamed students who violate Harvard policies when the violations are not directed at Jewish and Israeli students. *E.g.*, SAC ¶ 281. For example, Harvard cancelled a speaker because she serves on the board of a trans-exclusionary radical feminist organization, but it permitted a speaker who falsely "claims that Israelis and Zionist Jews—

---

[13] This is not clear. In the bulk of comparator cases, a plaintiff claims that his own conduct was treated differently than that of others similarly situated. *See, e.g.*, *Dartmouth*, 889 F.2d at 21; *Brown Univ.*, 43 F.4th at 207.

whom he calls part of a 'death cult'—'harvest organs of' dead Palestinians."
*Id.* ¶¶ 76, 281.  And while Harvard expelled students for hosting a party in
their campus housing in violation of the University's COVID-19 policies, it
has not similarly punished students who have egregiously harassed Jewish
students.  *Id.* ¶ 295.  The examples are troubling, but plaintiffs identify no
comparably situated speakers or students who were treated more favorably
when engaged in conduct analogous to that of the protestors.[14]  At bottom,
plaintiffs' claim is one of viewpoint discrimination, which is not actionable
under Title VI.  *See Alexander*, 532 U.S. at 280.

### (b)  Counts II and III:  Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

To state a breach of contract claim, plaintiffs must plead that (1) at least
one Policy created a valid contract; (2) Harvard breached that contract; and
(3) plaintiffs sustained damages because of the breach.  *Brooks v. AIG
SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007).  Where a

---

[14] Plaintiffs' closest analog is Harvard rescinding a student's acceptance
because he had used racial slurs as a teen.  *See* SAC ¶ 295.  But because he
was a prospective student, this example is not reasonably comparable to
Harvard's treatment of current students.  *See, e.g.*, *Rowles v. Curators of
Univ. of Mo.*, 983 F.3d 345, 355-356 (8th Cir. 2020) (graduate student did
not identify comparator cases because his proffered comparators were not
graduate students); *Stanford v. Northmont City Sch. Dist.*, 2023 WL
1819117, at *9 (S.D. Ohio Feb. 8, 2023) (discipline of a middle school student
was "not an adequate comparator" to the punishment of a high school
student).

student claims that a private academic institution breached a contract, the inquiry is "whether the reasonable expectations" – meaning what "the school 'should reasonably expect' the student to understand from the language of the contract" – have been met. *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 704 (1st Cir. 2022), first quoting *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019), and then quoting *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 80 (1st Cir. 2018). Establishing a violation of the implied covenant further requires proof of "at least bad faith conduct." *Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535, 541 (1st Cir. 2009).

Plaintiffs' cognizable breach of contract theory[15] is that Harvard failed to follow the complaint-handling procedures that the Policies prescribe. The Non-Discrimination Policy applies to "alleged acts of discrimination that are committed by any member of the Harvard community." Mot., Ex. 1 (Dkt. # 75-1) § III. When a student files a formal complaint alleging a violation of the Policy, the Policy requires Harvard, "[w]ithin 5 ordinary business days of

---

[15] To the extent that plaintiffs' contract claim is based on statements in the Policies that are not tethered to any promise to act or provide services to Harvard students, the claim is not actionable. *Compare, e.g.*, *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019) ("[G]eneral statement[s]" of school's "core values" and "aspirational diversity statements" are "insufficiently definite to form a contract."), *with Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 100-101 (D. Mass. 2023) (statement that Harvard would "provide prompt and equitable methods of investigation and resolution to stop discrimination" held actionable).

receiving a complaint," to "engage in a preliminary consultation about the claim asserted." *Id.* § VI.C.1. Within 14 business days of receiving a formal complaint, Harvard must perform an "initial review," "determine if, on the face of the complaint, it alleges a violation of applicable policy and warrants an investigation," and "communicate[] in writing to the complainant . . . [t]he decision (either to dismiss or accept the complaint)." *Id.* § VI.C.2.

Plaintiffs identify at least two examples of Harvard failing to follow this procedure.[16] *See, e.g.*, SAC ¶¶ 77, 153. In one instance, SAA Member # 4 formally complained after a professor required that students read articles "propagating antisemitic claims and Hamas propaganda." *Id.* ¶ 77. The student met with Harvard's Chief Diversity, Inclusion, and Belonging Officer the same month, but Harvard never notified him of its decision whether to dismiss or accept his complaint. *See id.* In the other instance, SAA Member # 1 filed a formal complaint with the Dean of Students on October 12, 2023, about the conduct of his Civil Procedure teaching fellow. *See id.* ¶ 153. SAA Member # 1 met with Harvard's Assistant Director of Student Life, but SAA

---

[16] The SAC alleges many other instances of Kestenbaum and SAA members filing complaints and reports, but it is not clear whether these complaints were "formal" in the sense that they triggered the Non-Discrimination Policy's complaint-handling procedure.

Member # 1 never heard from anyone at Harvard regarding his complaint after the meeting. *See id.* These instances suffice to state a breach of contract claim.

For their implied covenant claim, plaintiffs allege that Harvard selectively enforces the Policies. As detailed above, the FAC alleges several instances in which students were penalized for violating various Harvard policies, but the students allegedly engaged in antisemitic conduct have not faced any discipline. Although these instances are insufficient to state a Title VI claim, they sketch a claim that Harvard breached the implied covenant by failing to evenhandedly administer its policies. *See Sonoiki*, 37 F.4th at 715-716.

**Motion to Strike**

The court may strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are "disfavored" and "rarely granted." *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985); *Hayes v. McGee*, 2011 WL 39341, at *2 (D. Mass. Jan. 6, 2011). Harvard moves to strike plaintiffs' requests for injunctive relief. While many of these requests are facially impractical or outside the jurisdictional authority of the court, because some injunctive relief is viable

as a remedy should SAA prevail in this case, the court sees no reason at this time to strike the prayer.[17]  The motion to strike will thus be denied.

**ORDER**

For the foregoing reasons, Harvard's motion to dismiss is <u>ALLOWED IN PART</u> and <u>DENIED IN PART</u>, and its motion to strike is <u>DENIED</u>.  The Clerk will issue a provisional scheduling order establishing deadlines for discovery on the surviving claims.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[17] As should be apparent, this is not an endorsement of the scope of plaintiffs' requested injunction.  But the court need not (and cannot) tailor an injunction at this early stage.