# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-11354-RGS

THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
and JEWISH AMERICANS FOR
FAIRNESS IN EDUCATION

v.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

November 5, 2024

STEARNS, D.J.

Plaintiffs The Louis D. Brandeis Center, Inc. (Brandeis Center), and Jewish Americans for Fairness in Education (JAFE) bring this putative class action against the President and Fellows of Harvard College (Harvard) for allegedly allowing Jewish and Israeli students to be "subjected to cruel antisemitic bullying, harassment, and discrimination" in "recent years." Compl. [Dkt # 1] ¶ 2. The Complaint asserts three counts under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000D: direct discrimination (Count I), hostile educational environment (Count II), and retaliation (Count III). Harvard moves to dismiss these claims for lack of standing under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under Federal

Rule of Civil Procedure 12(b)(6). Having reviewed the briefing and considered the parties' arguments during the October 23, 2024 hearing, the court will allow the motion in part and deny it in part.

## BACKGROUND

The relevant facts, drawn from the Complaint and taken in the light most favorable to plaintiffs, are as follows. In the spring of 2023, three members of the Brandeis Center and JAFE attending the Harvard Kennedy School (the HKS Members) enrolled in a course entitled "Organizing: People, Power, Change," taught by Professor Marshall Ganz. Compl. ¶ 37. One of the core requirements of the course was that students form small teams and propose a project based on the promotion of their values. The HKS Members formed a team and proposed conducting a project based on their Israeli and Jewish identity. The next day, Professor Ganz called them "into his office for a meeting," during which he "pressured" them "to abandon the project" and "compared their use of the words 'Jewish State' to a student advocating for America to become a country of 'white supremacy.'" *Id.* ¶¶ 41, 42, 44. When the HKS Members refused to bend to his objections, Professor Ganz retaliated by, *inter alia*, permitting the teaching fellows and other students to engage in pro-Palestinian, anti-Israeli rhetoric during class without offering the HKS Members any opportunity to respond.

2

A few weeks after this incident, the Brandeis Center sent a letter to Harvard on behalf of the HKS Members describing "the discriminatory treatment that [the] HKS Members were subjected to and the hostile environment at" Harvard Kennedy School. *Id.* ¶ 65. Harvard responded by hiring an external investigator to evaluate the HKS Members' claims. The investigator ultimately concluded that it was more likely than not that (1) Professor Ganz's treatment of the HKS Members "ran counter" to Harvard's free speech and anti-bias policies, and (2) Professor Ganz had created a hostile learning environment and subjected the HKS Members to bias. *Id.*, Ex. A. Although Harvard "accept[ed] as final the Fact Finder's findings of fact and conclusions regarding the violations of School policies," *Id.*, Ex. D, it, acting under the guise of confidentiality, failed to take any remedial action against Professor Ganz after receiving the investigator's report.[1]

On October 7, 2023, the Palestinian Sunni Islamist terrorist group Hamas[2] committed a brutal terrorist attack on Israel. Antisemitism and anti-Israel agitation surged at Harvard in the wake of this attack. The next

---

[1] Harvard "subsequently publicly touted Professor Ganz as a civil rights hero" a few months later. *Id.* ¶ 80.

[2] "Hamas" is an acronym for Harakat al-Muqawama al-Islamiya, which translates roughly in English to Islamic Resistance Movement. In 1997, the U.S. Department of State designated Hamas as a Terrorist Organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

3

day, for example, more than thirty Harvard student groups signed a letter "purporting to 'hold the Israeli regime entirely responsible for all unfolding violence,' and stating that the 'apartheid regime' in Israel is 'the only one to blame.'" *Id.* at 86. Harvard did not condemn the students who signed the letter or take any remedial action against them. Instead, weeks later, Harvard commissioned a task force to protect them from a mounting public backlash.

On October 18, 2023, two pro-Palestinian student groups organized a metaphorical "die-in" demonstration on campus. A member of the Brandeis Center and JAFE attending the Harvard Business School (the HBS Member) was accosted by anti-Israel protestors as he attempted to film the demonstration. A protestor shoved a keffiyeh[3] in his face and told him to "get out," even though the demonstration was occurring in a space open to all students. *Id.* ¶ 117. When he refused to leave, more protestors joined the scrimmage, surrounding him and forcing him to the outside perimeter of the demonstration. At least two individuals grabbed the HBS Member during this effort and physically pushed him away from the protest. These two students have since been criminally charged by the Suffolk County District

---

[3] A keffiyeh is a traditional Middle Eastern scarf worn as a headdress.

4

Attorney with misdemeanors for assault and battery and civil rights violations.

When the HBS Member attempted to complain about this conduct to Harvard, Harvard declined to take any remedial action, citing the pending criminal investigation against the protestors. After facing pressure from Congress, however, Harvard changed course and, on January 3, 2024, purported to assign outside counsel to conduct an external investigation on the matter. Outside counsel took no action with regard to the investigation for several months. Finally, on April 10, 2024, the night before Congress published a letter to Harvard demanding action, outside counsel reached out to the HBS Member to schedule an interview. Outside counsel does not appear to have similarly reached out to the alleged perpetrators, and no interview had been scheduled with them as of the date of the hearing.

On October 30, 2023, on her morning walk to the bus stop, a member of the Brandeis Center and JAFE attending the Harvard Medical School and the Harvard Kenneth C. Griffin Graduate School of Arts and Sciences (the HMS Member) encountered protestors "celebrating the terrorist attack and referring to it as an act of 'justified resistance' by 'brave freedom fighters.'" *Id.* ¶ 134. "On a weekly basis thereafter, [she] encountered rabid protests on campus shouting chants like 'There is only one solution: Intifada

5

Revolution!'—referring to a violent uprising against Israeli Jews—and 'Min il-mayye lal-mayye, Falastin 'arabiyye!'—an Arabic chant translating to 'From the water to the water, Palestine will be Arab.'" *Id.* ¶ 135. These chants are regarded by many as antisemitic. The HMS Member found the campus environment to be so distressing that she stopped commuting to her lab and instead began to work almost exclusively from her apartment.

On numerous occasions through the fall of 2023, the HMS Member emailed Harvard administrators to ask for help. She never heard back from any Harvard official. The HMS Member also tried, at one point, to file a formal complaint with Harvard's Office for Equity, Diversity, Inclusion, and Belonging. Harvard refused to let her proceed anonymously, however, and she, fearing retaliation, dropped her complaint.

In December of 2023, Congress found reports alarming enough that it "announced an investigation into 'the learning environments at Harvard' and its 'policies and disciplinary procedures.'"[4] *Id.* ¶ 165. Harvard initially attempted to stymie this investigation, forcing the congressional committee to issue subpoenas to three senior officials at Harvard.

---

[4] A few days before Congress launched the investigation, then-President Claudine Gay was called to testify on the issue. When asked whether "calling for the mass murder of Jews on campus" would violate Harvard's code of conduct, she perturbingly replied that it would "depend[] on the context." *Id.* ¶ 8.

6

Despite the ongoing congressional investigation, expression of antisemitism and hatred for Israel continued at Harvard through the spring semester. Several Brandeis Center and JAFE members, for example, were subjected to offensive statements[5] on Sidechat, an anonymous social network accessible only to those with Harvard emails. On February 18, 2024, several student groups and one faculty group posted an antisemitic cartoon depicting "a hand etched with a Star of David and a dollar sign holding a noose around the necks of what appear to be a black man and an Arab man" on their social media accounts.[6] *Id.* ¶ 102. And on March 28, 2024, the Harvard Law School's student government passed an anti-Israel resolution calling for Harvard to divest from "institutions that aid the ongoing illegal occupation of Palestine and the genocide of the Palestinians." *Id.* ¶ 106. Harvard does not appear to have taken any actions in response to these incidents.

---

[5] One student, for example, posted that "he or she 'proudly accept[s] the label of terrorist' and that it is 'very hard to gaf [i.e., 'give a f---'] about the concertgoers.'" *Id.* ¶ 95 (alterations in original). Another callously posted "LET EM COOK" in response to Israeli responders finding the bodies of babies burned to death. *Id.* ¶ 101.

[6] A Harvard dormitory organized a panel discussion on "Islamophobia, Antisemitism, and Religious Literacy" that would include a representative from one of the groups which posted this cartoon. The panel was cancelled, however, when two of the three panelists withdrew for unknown reasons.

Harvard maintains several policies that govern student conduct, including a Non-Discrimination and Anti-Bullying Policy, two Statements on Rights and Responsibilities, and several school-specific handbooks. These policies "protect students from . . . discrimination, retaliation, harassment, and violence" and are intended "to ensure equal access to rights, privileges, and opportunities without regard to race, color, religion, creed, national origin, ancestry, or any other legally protected basis." *Id.* ¶¶ 173, 174. Any individual found to have violated these policies is subject to disciplinary measures, including suspension, mandatory coaching and training, and/or termination/expulsion.

## DISCUSSION

### I. Standing

To establish Article III standing, plaintiffs must satisfy three familiar requirements: "(i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). If the injury has not yet occurred, it must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). To seek prospective relief,

8

plaintiffs must allege an "ongoing injury or a sufficient threat that the injury will recur." *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023).

An association has standing to sue on its members' behalf when (1) at least one of its members would have standing to sue individually, (2) the interests it seeks to protect are "germane to the organization's purpose," and (3) the claims and types of relief requested do not require individual participation of the members. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). If the association seeks damages but "alleges no monetary injury to itself," associational standing is precluded unless the damages claims are "common to the entire membership." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Injunctive relief, by contrast, has "generally been held particularly suited to group representation." *Camel Hair & Cashmere Inst. of Am., Inc. v. Assoc. Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986). In assessing the third *Hunt* prong in cases seeking injunctive relief, the nature of the claim plays a distant second fiddle to the type of relief sought. *See Warth*, 422 U.S. at 515 (the third prong "depends in substantial measure on the nature of the relief sought").

As in *Kestenbaum v. President & Fellows of Harvard College*, 2024 WL 3658793 (D. Mass. Aug. 6, 2024), and *StandWithUs Center for Legal Justice v. Massachusetts Institute of Technology*, 2024 WL 3596916 (D.

9

Mass. July 30, 2024), the court perceives no jurisdictional bar to associational standing.[7] Although Harvard disputes whether members' injuries are ongoing (arguing that they assert only two discrete instances of alleged discrimination), the Complaint paints a picture of a campus environment that, allegedly to this day, is filled with antisemitic and anti-Israeli rhetoric that Harvard refuses to sanction or even address. This is sufficient to give them standing in an individual capacity to seek prospective injunctive relief. And even assuming Harvard is correct that the Brandeis Center's and JAFE's claims will require individualized consideration of these members' experiences, this is no bar to associational standing because the requested injunctive relief will inure to the benefit of all injured class members. *See Warth*, 422 U.S. at 515.

## II. Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the allegations in the complaint are "too meager, vague, or conclusory to remove

---

[7] Because Brandeis Center has associational standing, the court need not determine whether it separately has organizational standing.

10

the possibility of relief from the realm of mere conjecture," the complaint will be dismissed. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

Title VI prohibits (with some exceptions not relevant here) recipients of federal funds from intentionally discriminating "on the ground of race, color, or national origin." *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). The parties agree that Title VI protects Jewish students from harassment, and discrimination based on actual or perceived Israeli identity is, of course, discrimination based on national origin.

### a. Direct Discrimination

Plaintiffs concede that they offer no comparator for the purposes of direct discrimination. They nonetheless contend that the Complaint plausibly establishes direct discrimination because Harvard took "affirmative steps to obfuscate, mislead, and deter [members of the Brandeis Center and JAFE] from seeking relief." Pls.'s Mem. in Opp'n to Def.'s Mot. to Dismiss [Dkt # 53] at 18. But even if true, nothing in the Complaint plausibly establishes that Harvard took these actions *because of* some anti-Jewish or anti-Israeli discriminatory animus. *See Dartmouth Rev. v. Dartmouth Coll.*, 889 F.2d 13, 20 (1st Cir. 1989) ("[T]he mere existence of disparate treatment—even widely disparate treatment—does not furnish adequate basis for an inference that the discrimination was racially

11

motivated."), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004). The evidence upon which plaintiffs rely – that Harvard invented a policy to delay disciplinary action pending resolution of criminal proceedings, or that Harvard obfuscated its response to the discrimination finding to avoid disciplining Professor Ganz – only creates a reasonable inference of bias if the university did not treat non-Jewish and non-Israeli comparators similarly. In the absence of any similarly situated comparator, the claim must be dismissed.

### b. Deliberate Indifference

An institution is deliberately indifferent to harassment if its response to the mistreatment is "clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).[8] The deliberate indifference standard "has considerable bite."[9] *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011).

---

[8] Although *Davis* is a Title IX case, the parties agree that its deliberate indifference test applies in the Title VI context. Nearly every other Circuit has reached a similar conclusion. *See, e.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012); *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015); *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty.*, 334 F.3d 928, 934 (10th Cir. 2003).

[9] It demands that an institution have actual knowledge of harassment "to eliminate any 'risk that the recipient would be liable in damages not for

12

Proof of deliberate indifference further "requires more than a showing that the institution's response to harassment was less than ideal." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 171 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).  As this court observed in a very similar case, deliberate indifference means "affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires." *StandWithUs*, 2024 WL 3596916, at *4.  Plaintiffs must plead that the school "either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007).

    A deliberate indifference claim has five elements: (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . . harassment"; (2) the harassment "caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the school "knew of the harassment"; (4) the harassment occurred "in its programs and activities"; and (5) the school "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Id.* at 72-73.  Harvard challenges only the fifth element.  *See* Def.'s Mem. in Supp.

---

its own official decision but instead for its employees' independent actions.'" *Id.*, quoting *Davis*, 526 U.S. at 643.

13

of Mot. to Dismiss [Dkt #48] at 13 ("Plaintiffs' own allegations show Harvard's response was "not 'clearly unreasonable' as a matter of law."), quoting *Davis*, 526 U.S. at 649.

With respect to the HMS Member, Harvard contends that its response (to do nothing) was reasonable because it was unaware of the harassment she faced.[10] This argument, however, is wholly inconsistent with the Complaint, which directly alleges that the HMS Member "has emailed Harvard administrators on numerous occasions" and even tried to file a formal complaint. Compl. ¶ 162. It accordingly does not provide a basis for dismissal in this case.

As for the HKS Members and the HBS Member, Harvard contends that its response was reasonable because, in each instance, it affirmatively launched an outside investigation into the alleged harassment. But this argument misconstrues the nature of plaintiffs' claims. The alleged unreasonableness in Harvard's response arises from its failure (for more than a year) to take any remedial action based on the results of one

---

[10] To the extent Harvard attempts to rely on the First Amendment to excuse its failure to act, the court finds this argument unpersuasive for the same reasons discussed in *Kestenbaum*, 2024 WL 3658793, at *6.

14

investigation[11] and its failure (for months on end) to meaningfully advance the other. To conclude that the mere act of launching an investigation without any further follow-through necessarily defeats a deliberate indifference claim, would be to prioritize form over function.

### c. Retaliation

"Title VI's discrimination prohibition has been held to include an implicit prohibition on retaliation based on opposition to practices that Title VI forbids." *Cornelius-Millan v. Caribbean Univ., Inc.*, 2015 WL 1860831, at *4 (D.P.R. Apr. 23, 2015). A Title VI retaliation claim has three elements: (1) that the plaintiff engaged in protected activity; (2) that the defendant took a material adverse action against plaintiff; and (3) "that a causal connection existed between the protected activity and the adverse action." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003).

Harvard contends that the second element is lacking here, *i.e.*, that the Complaint fails to plausibly establish that Harvard took any material adverse action against the HKS Members. Plaintiffs do not appear to substantively dispute this point. They suggest, however, that despite the general absence

---

[11] Harvard vehemently disputes the notion that it has not taken remedial action against Professor Ganz, maintaining that it cannot, for reasons of confidentiality, divulge the nature of the action undertaken. At this stage, the court must accept plaintiffs' factual allegations as true.

15

of vicarious liability under Title VI, Professor Ganz's material adverse actions can nonetheless be attributed to the university under a deliberate indifference theory. *See Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 92 (D. Mass. 2023) ("Courts that have addressed the issue have determined that educational institutions may be subjected to liability for deliberate indifference to retaliation for complaints regarding sex discrimination."). The problem is this: The Complaint does not actually limn a claim to this effect. *See* Compl. ¶ 240 ("Defendant subjected Members #1–5 and certain members of the Brandeis Center and JAFE to material adverse actions as a result of their protected activity of reporting discrimination at Harvard. These occurred contemporaneously with, or after, reports of discrimination."). The court accordingly will allow the motion to dismiss the Title VI retaliation claim.

## ORDER

For the foregoing reasons, Harvard's motion to dismiss is <u>ALLOWED IN PART</u> and <u>DENIED IN PART</u>. Counts I and III are dismissed. Count II shall proceed to discovery.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE